## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

CASE NO: _____

BENTLEY KILLMON, JARED ALDRIDGE,
PAUL BAME, STEFANO BLOCH, STEVEN
DIAMOND, COLLEEN FLYNN, FARAH
FOSSE, GAN GOLAN, ERNESTO LONGA,
MICHAEL McCLEAN, DAVID MITCHELL,
JAMES MOORBY, MICHAEL PITULA,
LAUREL RIPPLE, CYNTHIA ROSIN, CALEB
SELMAN, AUSTIN STEWART, MIKEL STONE,
IVAN WELANDER, VICTORIA WELLE,
LARRY WINAWER,

04 - 20707

CIV - KING

MAGISTRATE JUDGE

          Plaintiffs,

v.

CITY OF MIAMI, a municipal entity; JOHN
TIMONEY, in his official and individual capacity
as Chief of the Miami Police Department;
MANUEL A. DIAZ, in his official and individual
capacity as Mayor of the City of Miami;
KATHLEEN FERNANDEZ-RUNDLE, in her
official and individual capacity as State Attorney
for Miami-Dade County; MIAMI-DADE
COUNTY, a division of the State of Florida;
ALEX PENELAS, in his official and individual
capacity as Mayor of Miami-Dade County;
CARLOS ALVAREZ, in his official and
individual capacity as DIRECTOR,
METROPOLITAN SHERIFF OF MIAMI-DADE
POLICE DEPARTMENT; KEN JENNE, in his
official and individual capacity as SHERIFF
BROWARD COUNTY; TOM RIDGE, in his
official capacity only as Secretary of the United
States  Department of Homeland Security; JOHN
ASHCROFT, in his official capacity only as
Attorney General of the United States; DOES 1-
100, in their official and individual capacities,

          Defendants.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; DAMAGES

### CLASS ACTION - F.R.CIV.P. 23(b)(2)

### JURY TRIAL DEMANDED



## INTRODUCTION

1.     This action is brought to challenge the mass false arrests of, and unreasonable force against, lawful demonstrators during the recent protests of the Free Trade Area of the Americas (FTAA) in November 2003 in Miami. Law enforcement coordinated an all out assault on the First Amendment, engaging in widespread political profiling, and swept the streets of anyone viewed as being an anti-FTAA activist, effectively suspending the Fourth Amendment in the city for ten days. Pursuant to a joint federal and local operation plan under the auspices of Homeland Security, the Miami Police Department "spearheaded" a multi-agency taskforce, which included the Miami-Dade Police Department, the Broward County Sheriff, and 23 other local law enforcement agencies, 7 state agencies and 7 federal law enforcement agencies, in carrying out a deliberate plan to disrupt political protest.  Unabashedly, defendant **JOHN TIMONEY** announced that defendants' actions were based on the policy that: "[t]he easiest way to prevent violence and disturbance at the FTAA Summit was to use a heavy police presence <u>to limit protest</u>."

## JURISDICTION AND VENUE

2.     This action seeks injunctive relief and damages pursuant to 42 U.S.C. § 1983 for past, ongoing and threatened injury to the First and Fourth Amendment rights of plaintiffs.   This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2201.

3.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. 1391(b) as all of defendants reside in this district and all of the acts and omissions giving rise to this action occurred or will occur in the Southern District of Florida.

## JURY TRIAL DEMAND

4.     Plaintiffs demand a jury trial in this action.

## THE PARTIES

**PLAINTIFFS:**

5.      Plaintiff **BENTLEY KILLMON** is a 71-year-old retired airline pilot and Korean War veteran.  He is a resident of the State of Florida.  On November 20, 2003, he participated in the permitted AFL-CIO rally and march in conjunction with the FTAA meetings.  He was accosted without warning by approximately 50 to 60 officers as he walked along the railroad tracks near NE 6th and North Miami Avenue with a group of 15 to 20 individuals, trying to find his bus for the return trip to Ft. Myers.  He was forcibly shoved to the ground, handcuffed and arrested, without probable cause and with unreasonable force, by officers, who wore no visible identifiable agency or name information, but who are believed to be employees of the defendant Broward Sheriff's Office.  All charges against him were dismissed at the initial bond hearing.  **KILLMON** wants to return to the Miami area to participate in other similar expressive activities but fears that he will be subjected to arrest and prosecution without probable cause again and solely on the basis of some political and ideological profiling by the police.

6.      Plaintiff **JARED ALDRIDGE** is a resident of the State of California.  He traveled to Miami to serve as a Street Medic during the protests of the FTAA meetings.  He was detained, arrested, and subject to an unlawful search on November 17, 2003, as he stopped while on his bicycle to look at the temporary fence erected around the "secure zone," where the FTAA meetings were to be held.  He was kept in custody until November 20th, after posting bail on the 19th.  He was arrested a second time on November 21st, without probable cause and with unreasonable force, when he was surrounded by bicycle officers, ordered to the ground, kicked and arrested as he dispersed from a peaceful vigil outside the jail.  His charges are still pending.

7.      Plaintiff **PAUL BAME** is a 43-year-old software engineer from Fort Collins, Colorado.

3

He came to Miami as a radio reporter for a non-commercial educational radio station in Fort Collins, where he volunteers in the news department. He also planned to participate in the November 20, 2003 permitted rally and march sponsored by the AFL-CIO. He was arrested without probable cause on November 15, 2003, after he took photographs of the police detaining one of his friends while they were all standing on a public sidewalk during daylight hours in a retail area of downtown. When he was arrested, a Miami Police Department officer took the image card from Bame's digital camera and erased the photographs before returning the camera, although Bame was later able to recover the images from the memory card. He was charged with obstructing a sidewalk under a Miami Ordinance that was repealed in March, 2004. The charges are still pending.

8.     Plaintiff **STEFANO BLOCH** is a graduate student at the University of California, Los Angeles. He was present on the grassy knoll in Bayfront Park when the police opened fire on the group with less-lethal munitions and chemical weapons. He left the area immediately and began walking back to the Convergence Center at 23rd and North Miami. He was arrested on November 20, 2003, without probable cause and with unreasonable force, as he neared the Convergence Center with several friends after the permitted AFL-CIO march. The charges were dismissed at his bail hearing.

9.     Plaintiff **STEVEN DIAMOND** is a 28-year-old from Dover, New Hampshire. He is a certified Emergency Medical Technician and Wilderness Emergency Medical Technician and is also trained as a Street Medic. He was detained by approximately a dozen bicycle officers from the Miami Police Department and an officer in a SWAT-like black jumpsuit, handcuffed, subjected to a nonconsensual search of his person and property, and arrested, without probable cause, while walking on the Flagler bridge to the Amphitheater area on the morning of November 20, 2003. He was originally charged with felony possession of "burglar" tools based on a small combination pocket knife/tool he had in his possession, as well as with a misdemeanor "unlawful assembly" charge. The

4

charges were changed to giving a false name after arrest because he initially asserted his constitutional right to refuse to identify himself to the police since there was not even reasonable suspicion to stop him or believe he had, or was about to, commit a crime.  The charges were reduced to a single misdemeanor count of resisting arrest without violence.  The charges have now been dismissed.

10.     Plaintiff **COLLEEN FLYNN** is a third-year law student at Southwestern Law School in Los Angeles, California.  She was at the grassy knoll outside Bayfront Park Amphitheater following the permitted AFL-CIO march when officers abruptly ordered the group to disperse, then tear gassed and used other force against the demonstrators.  She was arrested on November 20, 2003, without probable cause and with unreasonable force, as she walked near the Convergence Center with several friends after the permitted AFL-CIO march and rally.  Her charges were dismissed at her bail hearing.

11.     Plaintiff **FARAH FOSSE** is a research and communications consultant for non-profit organizations and a substitute teacher in the Washington, D.C. school system.   On November 15, 2003, she was detained on a public sidewalk, during daylight hours while in a retail shopping area of downtown, and subjected to interrogation, without reasonable suspicion to believe she had committed, or was about to commit a crime.  She was physically restrained by the police and questioned as to where she was from, how long she had been in town and how she had traveled to Miami.  She was arrested after a nonconsensual search of her property produced several FTAA-related flyers.  She was interrogated by eight law enforcement officers at the police station, including several federal agents.  She was charged with "obstructing" a sidewalk, in violation of Miami Code §54-2.  Her charge is currently pending.

12.     Plaintiff **GAN GOLAN** is a graduate student in International Relations at the Massachusetts Institute of Technology.  He was arrested on November 21, 2003, without probable cause and unreasonable force, as he complied with unlawful police orders to disperse a lawful

5

assembly outside the Dade County Jail.  He was part of the group of 50 to 60 demonstrator who were trapped, beaten and sprayed as they fully complied with police orders to disperse by walking on the public sidewalk.  After his arrest, **GOLAN**, who was among those sprayed at close range with chemicals, was taken into a "hazmat" area, where the group was "decontaminated" by personnel in fully-sealed chemical protection suits and gas masks.  Their clothes were cut off and they were stripped naked, then sprayed all over their bodies.  **GOLAN** was held for two nights and released on bail on November 23, 2003.  He was charged with unlawful assembly, later reduced to failure to obey a lawful order, and resisting arrest peacefully.  He received a directed judgment of acquittal at trial.

13.    Plaintiff **ERNESTO LONGA** is a second year-law student and served as a legal observer for the National Lawyers Guild during the FTAA protests.  He is a resident of Hollywood, Florida.  He was arrested on November 21, 2003, as he complied with unlawful police orders to disperse a lawful assembly outside the Dade County Jail.  He was charged with unlawful assembly and resisting arrest without violence.  The charges were dismissed after the Lieutenant who gave the defective dispersal order failed to appear for the trial.  **LONGA** wants to participate as a legal observer at First Amendment assemblies in Miami.  He is unwilling to do so because of fear that he will again be subjected to arrest and prosecution without probable cause based on political and ideological profiling by defendants.

14.    Plaintiff **MICHAEL McCLEAN** is a resident of Mahwah, New Jersey.  He was arrested on November 20, 2003, without probable cause and with unreasonable force, including being tackled and tasered without provocation, as he waited in line to enter the Bayfront Park Amphitheater for the permitted AFL-CIO rally.  **McCLEAN** observed an officer, who had no identifying information on his black jumpsuit point, to him and his friends.  A phalanx of officers then pushed their way through to the group, tackled, tasered, handcuffed and arrested them, all without warning

6

or provocation. His bail was originally set at $10,000 for a felony, which was then reduced to a misdemeanor count of resisting arrest. His charges are still pending.

15.      Plaintiff **DAVID MITCHELL** is a student at the University of Michigan at East Lansing. He organized a bus of activists to travel to Miami for the FTAA protests, the costs of which were subsidized by the local AFL-CIO unions. In the early morning of November 20th, he was walking in a group of approximately 100 persons toward the Bayfront Park Amphitheater, where the permitted AFL-CIO rally and march were to occur. The group was stopped by police and told they would have to proceed in smaller clusters or be "escorted" to buses to take them out of the area. Despite full compliance with this unlawful order, **MITCHELL** was among those herded, assaulted and arrested by a group of bicycle officers, all without probable cause and with unreasonable force. **MITCHELL** was charged with a felony, which was reduced to a misdemeanor count of resisting arrest. His charges are still pending.

16.      Plaintiff **JAMES MOORBY** is a student at St. Lawrence University in Canton, New York. He was arrested on November 21, 2003, without probable cause and with unreasonable force, as he complied with unlawful police orders to disperse a peaceful vigil outside the Dade County Jail. As **MOORBY** left on 14th Street, he observed a line of officers cross the traffic lanes from the opposite sidewalk to trap the group of 50 to 60 demonstrators walking ahead of **MOORBY**'s group. He saw the demonstrators shoved into and collapse the fence, and also heard them crying out in pain as the officers fired projectiles and sprayed the group with chemical. To avoid the police assault, **MOORBY** and his friends turned down a side street. A few blocks later, as they were walking in an orderly fashion on the sidewalk with approximately 30 other people, they were suddenly surrounded by approximately two dozen bicycle officers and ordered to get on the ground, face down. Once down on the ground, with rifles pointing at their heads, **MOORBY** and the others were forcibly handcuffed.

**MOORBY** was ordered released on $40 bail at his arraignment, but was then held for nearly 14 hours, without any opportunity to make a phone call for more than a day after his arrest. Although he posted bail, at his probable cause hearing, it was ordered returned after the judge determined that the arrestees should have been released on their own recognizance. He was originally charged with unlawful assembly, which was later changed to failure to obey an order. This charge is still pending.

17.     Plaintiff **MICHAEL PITULA** is a resident of Illinois. He is a volunteer with Chicago Action Medical and serves as a Street Medic at demonstrations. He is certified in First Aid and Adult CPR by the American Red Cross. He was stopped, detained and arrested without probable cause on November 11, 2003, as he walked during daylight hours with another First Aid Responder toward the Convergence Center. **PITULA** exercised his constitutional right not to respond to the officers as he had not committed any crime and there was not even reasonable suspicion to support the stop. He was subjected to a pat-down search, which produced no evidence of weapons or illegal activity. His property was searched without his consent and he was then informed he was being detained. Several additional police cars arrived at this time until there were approximately seven officers from the Metropolitan Police Department and Metro-Dade Police Department. None had visible name tags or badges. He was held in a police car for approximately 5 hours, except for a brief period of time when he was interrogated about his political and ideological beliefs and associations. **PITULA** was released on bond the next day. He was charged with a violation of Florida law prohibiting "loitering and prowling" and with "resisting arrest without violence." The charges are still pending.

18.     Plaintiff **LAUREL RIPPLE** is a resident of Miami, Florida, presently attending Hampshire College, where she majors in Buddhist Studies. She was hired by the Sierra Club to organize students for lawful protests at the FTAA meetings. She was trapped and arrested, without probable cause and with unreasonable force, through the unconstitutional use of police lines and

chemical weapons to block the orderly dispersal of plaintiff and others as they walked on a public sidewalk following the unwarranted and illegal order to disperse a lawful assembly across from the Dade County Jail. She was repeatedly pepper sprayed in the face and eyes at close range, arrested, and then stripped as part of a toxin decontamination process. She was charged with a single misdemeanor count of unlawful assembly. Her charges are still pending..

19.     Plaintiff **CYNTHIA ROSIN** is a resident of Rockaway, New York, where she is an elementary school teacher. She was in Miami with members of the New York City Independent Media Center (IMC) videography team to attend the FTAA protests and provide support for the IMC videographers. On the morning of November 20, 2003, as she marched from the Convergence Center to the scheduled AFL-CIO rally at the Amphitheater with approximately 100 lawful protestors, the group was stopped and surrounded by the police, then "escorted" them to the police station at NW 2d Avenue and NW 3rd Street, where the group was surrounded and detained by officers in riot gear for well over an hour. When they were finally permitted to leave to proceed to the Amphitheater area, their path was continually blocked by bicycle officers, who struck the demonstrators with their bicycles and herded them back and away from the Amphitheater. Ultimately, the groups was tackled by the police, thrown to the ground, and forcibly arrested as the IMC people videotaped the unlawful police action. The police then confiscated the IMC camera equipment and destroyed the videotape. **ROSIN** was held in custody for 40 hours, without a blanket in very cold temperatures, and with no appropriate food. Iinitially charged with aggravated assault on an officer and resisting arrest without violence, her charge was reduced to disorderly conduct at her first court appearance, while her co-defendant's charges were dropped entirely. Her charges are still pending.

20.     Plaintiff **CALEB SELMAN** is a resident of the State of Florida, a student at Florida State University in Tallahassee, and a member of Students United for Peace and Justice. Three

busloads of activists came from Tallahassee, arriving in the late morning on November 20th and going directly into the AFL-CIO sponsored rally at the Bayfront Park Amphitheater. When the rally ended, **SELMAN** participated in the permitted march, returning to the Amphitheater area in late afternoon. At approximately 4:00 p.m., he observed hundreds of police officers in full riot gear, with shields and various weapons. He was behind the police lines at Bayfront Park when they opened fire on a group of demonstrators with less-lethal munitions, chemical weapons, and tasers. When the police left the hill area, deliberately herding the demonstrators north on Biscayne Boulevard, **SELMAN** and his friends left, trying to find their bus for the ride back to Tallahassee. As **SELMAN** and 15 or 20 others walked peacefully more than a mile from Bayfront Park, along the old railroad tracks, they were suddenly accosted by approximately 40 to 50 officers, who shouted at them to get down and then forcibly handcuffed him. He pled guilty to a misdemeanor at his arraignment the following morning after being told that, if he had no money for bail, he could be held for up to three weeks in jail.

21.     Plaintiff **AUSTIN STEWART** is a resident of the State of Colorado. He is a member of the Gunnison Valley Peace Initiative. He traveled to Miami with members of this group to protest the FTAA policies and their adverse effect on small farmers in the Midwest. He participated in the permitted AFL-CIO rally and march on November 20, 2003. He left the area of Biscayne Boulevard after the march when the police opened fire on the demonstrators with tear gas and other munitions. Because of police barricades at various intersections, he ended up at N. Miami Avenue and N.E. 14th street, near the metro station, where he met up with Miami New Times reporter Celeste Delgado. The group continued to walk north on Miami Avenue, away from the heavy police presence in the downtown area, and toward the Convergence Center at North Miami Avenue and N.E. 23rd Street, when they were suddenly stopped by the police as they neared 19th Street and N. Miami Avenue at around 5 p.m., well more than a mile from the Bayfront Park Amphitheater. Without any probable

cause, **STEWART** and the others were ordered to get on the ground, handcuffed, and physically and verbally abused by officers with no visible identification. **STEWART** was originally arrested on the allegation that he was "with a group of persons fitting description of those who were throwing rocks at FTAA event," and that he had been asked three times to stop but refused. Neither allegation was true and the charges were dropped at **STEWART**'s arraignment. Many of the possessions he had with him at the time of his arrest, including a camera, were never returned to him.

40.     Plaintiff **MIKEL STONE** is a resident of the State of Colorado. He was subjected to the unconstitutional use of police lines to block passage to the Bayfront Park Amphitheater, where the AFL-CIO was scheduled to hold a permitted rally and march, and to push and knock lawful demonstrators to the ground. At approximately 9:00 a.m. on Thursday, November 20, 2003, he was standing on Biscayne Boulevard and SE 1st Street, where a crowd of demonstrators had assembled and a line of riot-gear clad police were standing across the width of Biscayne Boulevard. As **STONE** stood in this area, the line of police moved forward without warning, pushing the demonstrators with their shields. He observed a woman to his left being beaten by an officer with a baton. When **STONE** and two other individuals attempted to assist her, they were repeatedly struck by baton-wielding officers, including the one who had been beating the female demonstrator. **STONE** was grabbed by an officer and pulled behind the police line, where he was repeatedly beaten on his ribs and legs. He was handcuffed and his backpack was thrown it into a trash canister by the police. He was arrested, without probable cause and with unreasonable force, and charged with failing to disperse and being "part of an illegal assembly . . . that had exceeded the 30 minutes" allowed under Miami Code §54-6.1, a Miami public assembly ordinance enacted less than a week before, and in anticipation of, the FTAA meeting, which has now been repealed. The charged was ultimately reduced to failure to obey a police officer. When **STONE** was arrested, the police took his glasses and placed him in "the

11

freezer," a room maintained at a temperature of approximately 40 degrees. When released, he was told that there was no record of any property booked for him, including his glasses. His charges are still pending.

41.     Plaintiff **IVAN WELANDER** is a resident of Madison, Wisconsin, where he works at a food cooperative. At around 10 a.m. on November 20th, he was near Bayfront Park when he observed the police deploying tear gas against some demonstrators. Fearful for his personal safety, **WELANDER** decided to avoid this area and walked over to stand in line to enter the Amphitheater for the permitted AFL-CIO march and rally. As he waited in line, he observed the police pointing him out to other officers, so he immediately left the area and returned to the Convergence Center, where he remained for most of the day because of the police presence on the streets. At around 6 p.m., he left the Center with his friends, walking on the public sidewalk on N. Miami Avenue. As they approached N.E. 19th Street, they came upon another small group of people walking near train tracks. Suddenly, the entire group was accosted by dozens of officer, without any visible agency or name identification, who ordered them to the ground, pointed rifle-type weapons at them and arrested them, without probable cause and with unreasonable force. At the time of his arrest, **WELANDER** was told by an officer that arrests on the street were being directed by radio command from law enforcement helicopters. He also overheard officers asking who should be listed as the arresting officer and what the charges should be. In response, an officer said: "I don't know, as long as our asses are covered." **WELANDER** was charged with resisting arrest without violence on the baseless allegation that he was "observed within a large group of protestors who were throwing rocks" at the police and that he had run away when ordered earlier in the day to stop. His possessions were dumped into the street by defendants at the time of his arrest and were never returned to him. His charges are still pending.

45.     Plaintiff **VICTORIA WELLE** is a resident of the State of California. She was a legal

observer at the FTAA-related demonstrations. She was trapped and arrested on November 21, 2003, without probable cause and with unreasonable force, through the unconstitutional use of police lines and chemical weapons to "herd" the demonstrators and block the orderly dispersal of plaintiff and others as they walked on a public sidewalk following the unwarranted and illegal order to disperse a lawful assembly across from the Dade County Jail. While in detention, she was questioned by defendants about her political beliefs and her interest in the FTAA. She was held in custody for two days. **WELLE** was originally charged with a single misdemeanor count of unlawful assembly, which was changed to "failure to obey" an order to disperse. She was acquitted of this charge at trial.

46.     Plaintiff **LARRY WINAWER** is the statewide Florida Field Organizer for the Alliance for Retired Americans (A.R.A.). He traveled by bus to Miami on November 20, 2003, with over 1000 senior citizens to participate in the permitted AFL-CIO march and rally at the Bayfront Park Amphitheater. He was arrested, without probable cause and with unreasonable force, as he walked peacefully along a public way, assisting retiree and plaintiff **KILLMON** to locate his bus for the return trip to Ft. Myers. Without any warning, they were ordered to the ground and violently arrested by approximately 50 police in full riot gear. **WINAWER** was handcuffed for more than 12 hours, suffering nerve damage to both hands, deprived of food, water and access to counsel. He was originally charged with disorderly conduct, which has been reduced to failure to obey. He rejected the State's offer of a diversion program and completion of a "values" class, so his charges are still pending. He wants to return to Miami to protest the police abuses during the FTAA, as well as other political events, but he is concerned that he may be arrested and prosecuted again solely because he advocates disfavored political and ideological views. His charges are still pending.

**DEFENDANTS:**

47.     Defendant **CITY OF MIAMI (CITY)** is a municipal entity organized under the laws

of the State of Florida, with the capacity to sue and be sued.  The **CITY** enacted the municipal ordinances pursuant to which plaintiffs and others were deprived of their rights under the First Amendment to speak, assemble and petition.  It is the legal and political governmental entity responsible for the actions of the **Miami Police Department** (**MPD**), its officials, agents and employees.  The **MPD** is a subdivision of the **CITY**.  The **MPD** and the **CITY** coordinated the response of all federal, state and local law enforcement and prosecutorial agencies for the FTAA meetings.  Members of the **MPD**, acting according to the policies, practices and customs of the department, were responsible for the violations of rights plaintiffs and other suffered in November 2003 in opposing the policies of the FTAA.  Members of the **MPD** enforced the challenged state and municipal laws to disrupt and terminate the lawful exercise of First Amendment rights and to search and seize plaintiffs and others without probable cause and in retaliation for the exercise of First Amendment rights.  The **CITY** is sued in its own right and on the basis of the acts of its officials, agents and employees.

48.     Defendant **JOHN TIMONEY** (**TIMONEY**) is, and at all times relevant to this action was, the Chief of Police of **MPD**.  He is responsible for the policies, practices and customs of the **MPD**, including all policies, practices and customs challenged herein as unlawfully applied to the activities of lawful demonstrators in Miami opposing the policies of the FTAA in November 2003. **TIMONEY** has final policy-making authority for the **MDP**, including policies for arrests, use of force and training of officers.  At all times relevant to this action, defendant **TIMONEY** was an employee of the defendant **CITY** and acting within the scope and course of his employment.  **TIMONEY** was present at the site of the arrests, riding his bicycle and, at times, identifying specific demonstrators for officers to arrest.  On information and belief, plaintiffs allege that defendant **TIMONEY** planned the law enforcement actions complained of herein, targeting plaintiffs and others based on their political

ideology and/or their association with other demonstrators. **TIMONEY** authorized, ratified and condoned the conduct challenged herein. He is sued in his official and individual capacity for injunctive and declaratory relief, compensatory and punitive damages.

49.     Defendant **MANUAL A. DIAZ** is the Mayor of the defendant **CITY**. He is the **CITY** official with authority to establish policy for the municipal entity. He authorized, ratified and/or condoned the acts which violated plaintiffs' constitutional rights. He is sued in his official and individual capacity for injunctive and declaratory relief, compensatory and punitive damages.

50.     Defendant **KATHLEEN FERNANDEZ RUNDLE** is the State Attorney for the 11th Judicial Circuit of the State of Florida, which includes Miami-Dade County. She is the Circuit's chief prosecutor. She was a member of the Legal Committee for the FTAA planning group. On information and belief, plaintiffs allege that **RUNDLE** was present at, and/or directed members of the State Attorney's Office to be present at, and participate in, the law enforcement actions that resulted in the arrests and use of unreasonable force against plaintiffs and others during the demonstrations at the FTAA meetings. She is sued in her official capacity for injunctive and declaratory relief, and her individual capacity for compensatory and punitive damages.

51.     Defendant **MIAMI-DADE COUNTY (COUNTY)** is a division of the State of Florida, with the capacity to sue and be sued. The **COUNTY** enforced both state and **CITY** laws pursuant to which plaintiffs and others were deprived of their rights under the First Amendment to speak, assemble and petition. It is the legal and political entity responsible for the actions of the **Miami-Dade Police Department (M-DPD)**, its officials, agents and employees. The **COUNTY** is sued in its own right and on the basis of the acts of its officials, agents and employees. Members of the **M-DPD**, acting according to the policies, practices and customs of the department, were responsible for the violations of rights plaintiffs and other suffered in November 2003 in protesting the policies of the

FTAA.   Members of the **M-DPD** enforced the challenged state and municipal laws to disrupt and terminate the lawful exercise of First Amendment rights and to search and seize plaintiffs and others without probable cause and in retaliation for the exercise of First Amendment rights.

52.    Defendant **ALEX PENELAS (PENELAS)** is the Mayor of the defendant **COUNTY**. He is the **COUNTY** official with authority to to establish policy for the county entity.  He authorized, ratified and/or condoned the acts constituting the violations of plaintiffs' constitutional rights.   He is sued in his official and individual capacity for declaratory and injunctive relief and compensatory and punitive damages.

53.    Defendant **CARLOS ALVAREZ (ALVAREZ)** is the Director, Metropolitan Sheriff and the head of the **M-DPD.**  He is the individual with final policy-making authority for the **M-DPD,** including policies for arrests, use of force and training of officers.  Officers with the **M-DPD** arrested and used unreasonable force against plaintiffs, all without probable cause.  On information and belief, plaintiffs allege that **ALVAREZ** authorized, ratified and/or condoned the unlawful detention, arrest and use of force against plaintiffs. At all times relevant to this action, **ALVAREZ** was an employee of defendant **COUNTY**.  At all times relevant to this action, **ALVAREZ** was an employee of the defendant **COUNTY** and acting within the scope and course of his employment.  **ALVAREZ** is sued in his official and individual capacity for injunctive and declaratory relief, compensatory damages and punitive damages.

54.    Defendant **KEN JENNE** is the **SHERIFF OF BROWARD.    JENNE** is the individual with final policy-making authority for the **BROWARD SHERIFF'S OFFICE (BSO),** including policies for arrests, use of force and training of officers.  **BSO** arrested and used unreasonable force against plaintiffs, all without probable cause.  On information and belief, plaintiffs allege that **JENNE** authorized, ratified and/or condoned the unlawful detention, arrest and use of force

16

against plaintiffs. He is sued in his official and individual capacity for injunctive and declaratory relief, compensatory damages and punitive damages.

55.    Defendant **TOM RIDGE** is the Secretary of the United States Department of Homeland Security for the federal government. The Department of Homeland Security is the federal agency, whose employees participated in the development and implementation of the "security plan" for the FTAA meetings in Miami in November, 2003. Prior to the FTAA meetings in Miami, employees and agents of the federal agencies within the Department of Homeland Security provided local and state law enforcement, including those named in this action, with information concerning the plaintiffs and those with whom they associate. Agents of the Bureau of Immigration Control Enforcement (BICE) and the Office of Domestic Preparedness (OPD) participated in the interrogation of plaintiffs following their unlawful arrests. Information collected by these agents and the other defendants during the unlawful arrests and interrogations of plaintiffs and others has been entered into computer database maintained by the Department and/or given to other federal agencies that maintain such databases to monitor the lawful First Amendment activities of plaintiffs and others. Secretary **RIDGE** is sued in his official capacity only.

56.    Defendant **JOHN ASHCROFT** is the Attorney General of the United States. He is sued in his official capacity only as the head of the Department of Justice, which includes, *inter alia*, the Federal Bureau of Investigation (FBI), and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (AFT). Agents of the FBI and AFT participated in developing plans for, and, on information and belief, were present at, law enforcement operations for the FTAA ministerial meetings in Miami in November, 2003. Information collected by defendants from the unlawful interrogations and surveillance of plaintiffs was provided to the FBI and AFT, which have maintained and disseminated this information to monitor the lawful expressive activities of plaintiffs and others

17

based on their political and ideological beliefs and associations.

57.     Plaintiffs are informed and believe that the **DOE** defendants are all officials, agents and/or employees of the named defendants, and other local, state and federal law enforcement agencies, which participated in a joint plan and joint action with the named defendants to prevent, limit, and disrupt plaintiffs' lawful expressive activities and to deprive plaintiffs and others of their clearly established First and Fourth Amendment rights. The **DOE** defendants were, at all relevant times, acting in the course and scope of their employment and pursuant to the policies, practices and customs of the named defendants and the as yet unidentified law enforcement agencies. Plaintiffs are ignorant or uncertain of the true names of the **DOE** defendants as they, and other officers of named defendants and other law enforcement agencies were dressed deliberately to obscure or hide their identifying information, including the names of their agencies, their names and badge numbers. The names of the arresting officers entered on plaintiffs' arrest reports were not necessarily the actual arresting officer. Once plaintiffs learn the names of the individual, supervisorial and entity **DOE** defendants, they will amend this Complaint to identify them by their true names. Each of the **DOE** defendants is sued in its, his or her individual and official capacity.

58.     The acts complained of herein were part of a deliberate and pervasive pattern of intimidation by all defendants through the enforcement of patently unconstitutional laws and the application of other facially valid laws in an unconstitutional manner, all aimed at suppressing plaintiffs' First and Fourth Amendment rights. Each of the acts complained of herein was taken, and each violation of plaintiffs' rights occurred, pursuant to the policies, practices and/or customs of the named, and the as yet unidentified, law enforcement agencies and other defendants that joined in the plan to "police" the FTAA demonstrations by preventing expression in advance of its occurrence and by subjecting plaintiffs and others to detention, search, arrest and unreasonable force without probable

18

cause. Each act complained of was approved, condoned and/or ratified by persons of authority with the defendants **CITY, COUNTY, BSO, HOMELAND SECURITY,** and **FBI** and **AFT** and those as yet unidentified local governmental entities who participated in the joint plan and whose actions violated plaintiffs' constitutional rights.

59.    In doing each of the violations of law complained of herein, defendants, their officials, agents and employees, were acting under color of law. The acts complained of were willful, wanton and malicious and displayed a conscious disregard for, and deliberate indifference to, plaintiffs' constitutional rights.

60.    On information and belief, at all times mentioned herein, defendants, their officers, employees, and agents have acted pursuant to the official policies and customs of the defendant county and municipal governmental entities. These policies and customs have been approved of, ratified, and/or enforced by the persons and/or entities with the authority to set policy for each of the non-federal government defendants. This includes, without limitation, the authorization and/or ratification by defendants of repeated violations of stated policy on the use of so-called "less lethal" munitions, batons, tasers, chemical weapons and other use of force against plaintiffs, as well as the deliberate limitation and disruption of lawful expressive activity. Defendants failed to train their officers, employees and agents on the proper and permissible use of such force and the constitutional limitations on defendants' ability to restrain expression based on speculation of future violence.

## CLASS ALLEGATIONS

**Definition of the Class:**

61.    Plaintiffs seek to certify a class pursuant to F.R.Civ.P. 23(b)(2) for injunctive relief only. The class include all those individuals who were or would be subject to one or more of the defendants' unconstitutional policies, practices, or customs challenged by this action, including:

       a.      disruption of lawful protest activities through the use of mobile police lines to block access to public fora and to "trap and arrest" demonstrators;

       b.      unlawful detention, search, and arrest as a preemptive tactic;

       c.      excessive force to limit lawful expressive activities and to disperse non-violent demonstrators; and,

       d.       retaliatory prosecution for the exercise of First Amendment rights.

**The Numerosity of the Class:**

62.    Several thousand demonstrators participated in the demonstrations in Miami in November 2003, opposing the FTAA meetings. Of that number, 283 were taken into custody during the FTAA protests in November 2003, and 232 were, ultimately, charged with some criminal violations, almost all for failure to obey, unlawful assembly, obstructing a sidewalk, loitering and prowling, or resisting without violence. Several hundred lawful protestors were shot with less-lethal munitions and chemical weapons for completely arbitrary and capricious reasons as they peacefully assembled in the City during the FTAA protests. Thousands of additional persons are likely to engage in similar lawful protest activities in Miami in the future. The class is so numerous that joinder of all members is impractical.

**Common Questions of Law and Fact:**

63.    The common questions of law to be determined in this instance are whether defendants' policies, practices and customs are unconstitutional and violate plaintiffs' rights under the First, Fourth and Fifth Amendments to the U.S. Constitution. These questions of law are common to all members of each of the proposed class and predominate over any question affecting individual class members. The violations of the rights of the class members arise from a common set of facts and a common and deliberate plan of defendants to "limit" and disrupt political protest as a preemptive measure.

**Typicality:**

64.     The claims of the representative parties are typical of the claims of the class members. **DEFENDANTS'** policies or practices will affect all members of the proposed class in the same way, thereby making injunctive and declaratory relief appropriate to the class as a whole. The representative parties will fairly and adequately represent the interests of the class.

65.     The class representatives know of no conflict of interest among class members. The conflicts, if any, would only arise in respect to damages claims, if any, which are being pursued on an individual basis for those plaintiffs who are entitled to damages according to law.

**Adequacy of Class Counsel:**

66.     Plaintiffs are represented by the attorneys shown on the signature page of this complaint, all of whom are experienced civil rights attorneys, who will vigorously prosecute this action. Almost all of the counsel for plaintiffs are experienced in class action litigation and at least three of the counsel have successfully brought class action litigation for injunctive relief in recent cases alleging police violations of First and Fourth Amendment rights.

## GENERAL FACTUAL ALLEGATIONS

**The "Security Plan" to Limit Protest**

67.     Defendant **TIMONEY** characterized the "security plan" for the FTAA meetings as "the largest collaborative law enforcement operation in the history of Florida and perhaps in the country." This plan required the multiple agencies involved to "submit to a single plan and a single command," with defendants **CITY** and **TIMONEY** in a "primary leadership role." The defendant **CITY** and **MPD**, together with the FTAA Legal Training Committee (Legal Committee), developed Rules of Engagement each agency was required to follow.

68.     Prior to the FTAA meetings, defendants met with certain of the **DOE** defendants to

21

create a Legal Committee, which was composed of police commanders, representatives of the State Attorney's Office, FBI, ATF, U.S. Attorney's Office, Dade County Clerk's Office and the Police Legal Counsels from the defendants **MPD**, **M-DPD**, **BSO**, as well as the Miami Beach Police Department, the Miami-Dade County Corrections and Rehabilitation Department, and the Florida Department of Law Enforcement. The **MPD** After-Action Report disclosed that, during the FTAA event, members of the Legal Committee were present, including "on-scene at demonstrations," to provide legal advice to commanders "in an instant."

**The Pre-FTAA Surveillance**

69.     Almost nine months before the FTAA meetings in Miami, a Planning and Intelligence Committee began meeting on a regular basis. As part of this early stage, officers from various of the defendant entities worked undercover to gather "intelligence" for defendants. The so-called "intelligence" was so incorrect that it was, most likely, the deliberate work of *agent provocateurs* to rationalize the use of force employed to limit the protests. The Miami-Dade After Action Report noted that 80,000 demonstrators were expected in Miami for the FTAA protests and that "intelligence" sources reported "that protestors would endeavor to overrun and occupy government buildings in an attempt to disrupt normal operations and free demonstrators." Based on this patent misinformation, defendants were able to get the courts to agree to "stagger bond hearings and releases so that arrestees were not able to return to the conference site." In addition to these types of institutional abuses, defendants began a campaign to demonize the demonstrators in the press and with local businesses. A Power Point presentation, created with the assistance of the federal defendants, showed incidents of alleged protestor violence at other locations to create a climate of fear in Miami. With buzz words such as "anarchist" and images of widespread property destruction, defendants laid the groundwork for their plan to "limit" protest through arbitrary police actions, unconstitutional police lines, the use

of extraordinary violence against the demonstrators.

70.     A key element of the plan was the use of unreasonable force and preemptive arrests based on political and ideological profiling, without any probable cause to believe that criminal conduct was imminent or had occurred. Defendants conducted unlawful stops and interrogations of individuals throughout the City, randomly detaining people on public sidewalks and pulling over vehicles based solely on the belief those targeted by these surveillance actions were in Miami to protest the FTAA meetings. During these stops, defendants questioned anyone who fit the "FTAA protestor" profile as to who they were, where they were from, and their viewpoint on the FTAA. Several people were arrested as a result of these unlawful stops and charged with violating a City ordinance barring "obstructing" sidewalks that has since been repealed as a result of post-FTAA litigation brought against the City. *See Lake Worth for Global Justice, Inc. v. City of Miami*, CASE NO. 04-20262-CIV-GRAHAM.

71.     As the protestors began to arrive in Miami, a primary focus of defendants' surveillance was the area around the Convergence Center, a building at N.E. 23rd and N. Miami that was used by the anti-FTAA protestors as a central organizing location. Defendants stopped individuals in the area and demanded they produce identification based on nothing more than perceived ideological associations. Lacking any legitimate basis for arresting them, defendants charged several individuals with "loitering and prowling" under factual circumstances that have repeatedly been held to be insufficient as a matter of law by Florida courts.

**The Implementation of the Plan during the FTAA Meetings**

72.     Once the FTAA meetings began on November 20th, defendants escalated the plan to limit protest by targeting and intimidating ideological demonstrators. Defendants deployed mobile police lines to interfere with freedom of association; encircled protestors with lines of riot-gear clad

23

officers with weapons drawn; dispersed lawful assemblies; unlawfully detained, searched and arrested those opposed to the FTAA without probable cause; and used unprecedented brutal force and various chemical toxins against peaceful demonstrators.  In effect, defendants became judge and jury on the street, meting out severe punishment for the lawful exercise of First Amendment rights to send a message to the demonstrators that violence would not be tolerated in Miami.  But the only violence was by the police against demonstrators.

73.     November 20, 2003, was the first day of the FTAA meetings.  The AFL-CIO had a permit to hold a rally at Bayfront Park Amphitheater, with a march scheduled to follow.  The Amphitheater is located between Bayfront Park and the Hotel Intercontinental, where the FTAA meetings were being held.  On the morning of November 20, 2003, as protestors walked toward the Bayfront Park Amphitheater, they found their passage impeded by police at virtually every turn. Squads of police lined the streets and blocked intersections.  Through this tactic, defendants "herded" the demonstrators into one location and then surrounded them.  A large group of demonstrators, that had grown to approximately100 as people walked in an orderly and peaceful manner along the sidewalk from the Convergence Center, was "herded" so that, eventually, they were forced to the police station, where they were completely surrounded and detained by the police for more than an hour.  Ultimately, the demonstrators were told they could not walk on public sidewalks together and would only be allowed to continue to the Amphitheater in smaller groups.  Coupled with this unlawful condition was the threat that, if they did not agree with the capricious police order, the demonstrators would be "escorted" to buses and driven out of the downtown area.  None of the demonstrators had violated any law and no permit could lawfully be required for them to walk on a public sidewalk while obeying all traffic regulations.

74.     Even as the demonstrators complied with police orders and left for Bayfront Park in

smaller groups, taking different routes, they were immediately targeted by the police. One group was accosted by bicycle officers, who deliberately struck the protestors on the sidewalk with their bicycles, blatantly trying to provoke a response to justify demonstrators' arrests. The activists attempted to avoid the bicycle officers and kept walking, but the bicycle police persisted in their deliberate provocation, both physically and verbally, ultimately forcing the demonstrators off the sidewalk and into the street. The police then "herded" the demonstrators into a waiting line of officers in the vicinity of NW 1st Place. Once trapped, the demonstrators were repeatedly assaulted by the officers with their bicycles, knocking several protestors to the ground, then handcuffed and arrested them. Several individuals from the New York City Independent Media Center (NYC IMC) videotaped the incident and were then arrested. Their cameras were taken and film footage destroyed. This pattern was repeated throughout downtown in a calculated plan to prevent people from reaching the Amphitheater as even small groups of two or three people walking on the public sidewalks, were stopped, searched and arrested, all without probable cause.

75.     Defendants also targeted the permitted AFL-CIO rally and march. As people waited in line to be admitted to the Amphitheater, uniformed and undercover officers identified several of the young people standing in line as targets for arrest on the erroneous belief that they looked like someone who was alleged to have been part of an incident between police and demonstrators earlier in the morning in which the defendants alleged that some of the demonstrators threw objects at them when defendants unlawfully blocked their passage. Some of the people so identified in the line at the Amphitheater were not even in Miami at the time, or at the earlier incident. Nonetheless, without warning or provocation, defendants simply charged people standing in line, grabbed, beat, tasered, pepper-sprayed and arrested these youths.

76.     Following the AFL-CIO rally, the permitted march was held, leaving from the

25

Amphitheater, marching through downtown Miami, and returning to the Amphitheater. After the march ended, a number of demonstrators remained on a grassy knoll in Bayshore Park, near the Amphitheater. Some members of this group began chanting at a line of police standing nearby. After approximately ten minutes, a police representative informed the group that they could remain assembled there so long as the group remained peaceful, but within barely a minute of this announcement, officers opened fire on the demonstrators with so-called "less lethal" munitions and "tear gas," converting the entire area into a "no-protest" zone. As defendants began to chase the protestors, many of those in the area, including the retirees and students who had come by bus for the day to attend the AFL-CIO rally, left down side streets to avoid any conflict.

77.     Defendants continued to chase the demonstrators for several blocks, shooting at them with "tear-gas" filled projectiles and less-lethal munitions. In one especially egregious incident, defendants chased a woman who was bleeding from a head wound. She had been shot by defendants at close range with a less-lethal projectile while kneeling, alone, in prayer on the grassy knoll after police opened fire on the demonstrators. She was pursued to the Wellness Center on North Miami, a drop-in medical clinic. Defendants viciously assaulted everyone outside the Wellness Center with batons and pepper-spray, without provocation and without knowing whether any of these people had even been at the Amphitheater earlier. One of the medics, who was treating people with head wounds from defendants' assault on demonstrators at the Amphitheater, was pepper-sprayed in the face and eyes and beaten with a baton. Another was hit in the shoulder by what appeared to be a pepper spray bullet. Defendants also sprayed the outside walls and door, pulled open the door of the Wellness Center, and sprayed the interior with a type of tear-gas, directly hitting at least one person and contaminating the area where injured people were being treated. Other officers set out in vans, sweeping an area of at least two miles from the Amphitheater to the Convergence Center, with riot-

clad officers indiscriminately stopping anyone in the area who looked to be a demonstrator and, with weapons drawn, forcibly arresting them.

78.     The total lawlessness of defendants' actions is apparent by the arrests of several of the plaintiffs near the railroad tracks. Plaintiffs **KILLMON**, a 71-year-old retiree, and **WINAWER**, an employee of the retiree association to which **KILLMON** belongs, were trying to find their bus for the return trip to Ft. Myers after defendants blocked all chartered buses from picking up passengers at the Amphitheater. As a result of unconstitutional police lines blocking streets in downtown **KILLMON** and **WINAWER** were "herded" to an area along old railroad tracks. Along with more than a dozen others walking in the same area, they were arrested, without warning and with unreasonable force, well more than a mile from the Amphitheater location. The arrests were made by officers who could not and did not witness any unlawful activity by these individuals and, so, lacked any probable cause.

**The Jail Solidarity Vigil and the Arrests of November 21, 2003**

79.     On November 21, 2003, approximately 200 demonstrators assembled in a public parking lot adjacent to the State Attorney's Office, across from the Gerstein Court and the Pre-Detention Center, to protest the arrests and detentions of the previous day. The protestors referred to this gathering as "The Jail Solidarity Vigil." Almost from the outset, several hundred officers were present in riot gear, monitoring the vigil. The group engaged in peaceful chanting for several hours. Shortly before 5 p.m., they were told they would have to disperse. By the time that this initial dispersal order was given, an estimated 500 officers had assumed positions in the streets on three sides of the assembly, with the State Attorney's office building backing the demonstration. Because the officers had blocked off all the streets, the only possible exit was a small opening on the northeast corner of the parking lot.

80.     As the protestors left in compliance with the order, they were caught between lines of

riot-gear clad officers. When defendants gave an order to disperse, instructing the demonstrators that they would have two minutes to get on the sidewalk and leave east on 14th Street, the demonstrators fully complied, as several of the defendants have already testified in the criminal trials of some of the plaintiffs. Nonetheless, defendants trapped the dispersing demonstrators before the two minutes had expired and completely surrounded approximately 60 of the demonstrators on the sidewalk at 11th Street. Defendants shoved the group with their shields and clubbed them with batons, forcing them into each other and against a wire fence, that collapsed under the weight of the demonstrators. Surrounded by defendants in riot gear and forced down on the ground, many of the demonstrators raised their hands in peace signs as a last attempt to deescalate the police violence. Despite the fact that there was no violence or resistance on the part of the demonstrators, the officers began beating them with batons and pepper-spraying the group with toxic chemicals in the eyes and face at close range, in some cases pulling their hands away so that the officers could spray them with the chemicals directly and repeatedly in their eyes.

81.    While the first group of 60 demonstrators was being assaulted, several smaller groups of demonstrators, who witnessed the police entrapment and assault, turned down other streets to avoid any confrontation with the police. They continued walking, peacefully and lawfully, for several blocks on the public sidewalk without incident. Nonetheless, defendants pursued the dispersing demonstrators, trapped, and arrested them with unreasonable force. In all, approximately two dozen demonstrators were arrested in smaller clusters when they were several blocks to almost a mile away from the County jail, the point of the original dispersal order, and several blocks away from where the larger group of demonstrators was suddenly surrounded and arrested on 14th Street.

82.    Although defendants plan was executed under the guise of preventing violence and averting "terrorism," in fact, law enforcement deliberately and maliciously prevented lawful

expressive activity from taking place in the first instance. In the course of the FTAA meetings, the police swept up hundreds of demonstrators and subjected them to meritless criminal charges and prosecutions in retaliation for lawful expressive activity. Those opposing the FTAA were arrested for alleged misdemeanor violations of the City's unconstitutional public assembly laws and various Florida criminal statutes, including "loitering and prowling," unlawful assembly, and failure to disperse. For days, time after time, the police targeted demonstrators and supporters of the protestors, including street medical providers and legal observers, and subjected them to unwarranted custodial detentions, illegal searches and false arrest under factual circumstances that no reasonable officer would believe was permitted under the First and Fourth Amendments.

83. Defendants established an undefined and floating "no-protest zone" by making downtown Miami and the area surrounding it off limits to political dissent during the FTAA meetings unless the various law enforcement personnel decided to permit expression, and, even then, only for as long as law enforcement allowed peaceful demonstrators to remain in traditional public fora. Repeatedly, demonstrators were deliberately ensnared when they assembled with explicit police agreement to allow them to gather at a particular location, only to have the police arbitrarily and almost immediately revoke this "permission"and order the group to disperse on the pretext that the demonstrators were violating state and municipal public assembly laws.

**Use of Force and Other Factors**

84. The common factors in all of these actions was the use of force to intimidate and stifle dissent, coupled with the absence of any probable cause to disperse or arrest those assembled or simply walking on a public way. In some instances, the police utilized arrest forms, which were partially filled out in advance, requiring only the entry of names, height, weight and other individual identifiers to supplement the boilerplate and generic descriptions of the supposed unlawful activity.

Arrests were made without arresting officers even knowing what law had been violated. It was sufficient that the individual detained was believed to be protesting against the FTAA, the worst type of "guilt by and for association." The actions of the defendants in violating the rights of the demonstrators were so egregious that one state criminal court judge who happened to be in the area during the demonstrations stated in open court that he witnessed "no less than 20 felonies committed by police officers." The judge characterized the actions of law enforcement as "pretty disgraceful" and said that he would have also been arrested while walking on Biscayne Boulevard but for the fact that one of the police officers recognized him from court.

85.     The use of force by defendants was particularly malicious, with defendants uncontrollably beating and shooting people, who 1) had violated no law, or, at worst, had only committed a minor criminal offense, 2) posed no threat to the safety of officer or others, and 3) were not evading arrest. Moreover, the completely unrestrained use of force in this instance, even if some force might have been warranted in isolated instances to effectuate a lawful arrest, was far outside the bounds of any possible permissible force as it involved potentially "lethal" force, including, but not limited to baton strikes to the head of demonstrators, shooting less-lethal munitions and projectiles at close range and at the heads and upper torsos of demonstrators, and repeatedly spraying pepper spray and other chemical irritants directly into the eyes, noses and mouths of non-violent protestors who were trapped by police. Defendant **TIMONEY** has stated publicly that the police intended to use the challenged tactics described above as a prophylactic measure to prevent possible violence, even where no violence was threatened, and that law enforcement believed it was lawful and proper to prevent speech because some persons in the assembly might engage in unlawful conduct. The response to the FTAA protest was nothing short of a police riot. Knowing in advance that they would engage in such wholesale and deliberate violations of the FTAA protestors' First and Fourth

Amendments, the officers obscured their identities behind riot gear and generic uniforms with no visible badges or name tags.

86.     Those arrested on November 20 and 21, 2003, were taken to makeshift detention areas set up specifically to detain FTAA protestors, where most were kept for hours in wire kennel-like enclosures, without food, water, bathroom facilities, or access to counsel.  They were denied the opportunity to make a phone call for lengthy periods of time.  They were held in custody and required to post bail in cases where the usual practice would have been to release a misdemeanor defendant on his or her own recognizance.  Even when the charges were dropped for a complete lack of probable cause, or where bail was granted, plaintiffs still were not released because of the deliberate plan of defendants to keep anyone arrested in conjunction with the FTAA meetings in custody so that s/he could not return to the site of the FTAA meetings.  For many, their property was thrown away by police at the site, left for community residents to take.  Some residents even reported that the police had expressly told them it was okay to steal the possessions of the demonstrators.  Photographic equipment, in particular, was destroyed, with film and digital images of the police misconduct deliberately ruined by officers as the demonstrators watched.

87.     In all, 283 people were arrested and 231 were formally charged.  Of those formally charged, 203 were for misdemeanors and 28 for felonies.  Eighty percent of the felonies were reduced to misdemeanors.  To date, every case that has gone to trial has resulted in an acquittal.  Despite the fact that the retaliatory criminal charges against plaintiffs were baseless, prosecutions were and are being pursued and most of the plaintiffs have been required to post bond, retain counsel, take time off from work and school, incur expenses to return to Miami for trial, and similar costs related to defending against these meritless criminal charges, all because they sought to engage in lawful protest concerning an issue with national and global social, economic and political import.

31

88.     Those arrested were also subjected to extensive interrogation about their political beliefs and activities.  This, too, was part of the plan developed in coordination between the federal and local law enforcement agencies to use unlawful and unwarranted mass political arrests as a mean to collect information about political activists and their associations.  Agents from the FBI of and the BICE were present and participated in the interrogation of those demonstrators who were unlawfully arrested.  These federal agencies, together with other federal agencies, collect such "intelligence" and, on information and belief, disseminate and make such personal information available to other entities, including local law enforcement.  Some of the information collected as a result of these unlawful arrests and interrogations has already been disseminated by defendants to law enforcement databases, including those operated by the federal defendants, and used to detain and question in New York state the college student brother of an individual who participated in the FTAA demonstrations in Miami.

89.     The conduct challenged herein was neither aberrational nor the consequence of overzealous, but well-intentioned, law enforcement.  It was the implementation of a pre-designed plan to engage in unconstitutional preemptive arrests intended to be a back-door way to coerce information for federal and local government databases on lawful First Amendment activity, to disrupt lawful expressive activities in advance of their occurrence and round up political activists and lock them up in the absence of probable cause.

90.     Plaintiffs seek to enjoin the facially unconstitutional ordinances and statutes used to stifle their First and Fourth Amendment rights, as well as the unconstitutional application of otherwise lawful statutes and ordinances for the same invidious purpose.

**INJUNCTIVE RELIEF**

91.     Plaintiffs reallege and incorporate by reference, as though fully set forth here, the allegations set forth in the preceding paragraphs.

92.     Defendants have engaged in a course of unlawful conduct aimed at intimidating plaintiffs and deterring them from the exercise of their protected constitutional rights of speech, association, assembly and petition.  Defendants have carried out their unlawful behavior by, among other means, enforcing patently unconstitutional laws and applying constitutional laws in an unlawful manner, all for the aim of imposing a "limit" on protest, surveilling plaintiffs on the basis of their presumed political and ideological beliefs, prohibiting plaintiffs and others from assembling together, using unconstitutional police lines to block plaintiffs' access to traditional public fora, dispersing lawful assemblies, and using unjustified force – including police horses, batons, so-called less-lethal munitions, taser weapons, and various nerve agents and chemical irritants –  to disperse lawful assemblies and to arrest non-violent demonstrators, without probable cause.

93.     Plaintiffs intend to continue to protest the policies of the FTAA, the police abuse to which they were subjected based on their political opposition to the FTAA, as well as a variety of other political and social issues, as they have done in the past.  They fear they will suffer the same violations of their rights when they do so and that others will be discouraged from participating with them in public because of fear that they, too, will be prevented from exercising their rights and will be shot, clubbed, tasered, pepper-sprayed and/or arrested by the police.

94.     Plaintiffs have suffered harm and, absent extraordinary relief from this Court, plaintiffs will continue to suffer irreparable harm through being subjected to unwarranted restrictions on their First Amendment rights of speech, association, assembly and petition.  Damages will not be an adequate remedy at law because, although plaintiffs have suffered injury, including physical injury as a consequence of defendants' unlawful acts, damages cannot adequately compensate plaintiffs for the loss of their First Amendment rights.

## FIRST CLAIM FOR RELIEF
### Right to Assemble, Associate, Speak and Petition
### (42 U.S.C. § 1983 and First Amendment)

95.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if they were fully set forth here.

96.     Defendants violated plaintiffs' First Amendment rights to assemble, speak and petition by, among other tactics: denying the right to assemble in public fora where no permit would be needed; terminating lawful assemblies; targeting demonstrators for arrest; and deploying officers to surveill, infiltrate and disrupt plaintiffs' lawful expressive First Amendment activities.

97.     Defendants unlawful actions were done willfully, knowingly and with the specific intent to deprive plaintiffs of their constitutional rights based on political and ideological profiling, guilt by association and guilt for association.

98.     As a consequence of defendants' actions, some of the plaintiffs are less inclined to participate in lawful expressive activities, and/or do so with fear and apprehension that they will, again, be subject to similar unlawful acts by defendants done for the purpose of "limiting" plaintiffs' expressive activities.

99.     As a direct and proximate result of defendants' unlawful actions, plaintiffs have suffered and/or continue to suffer physical pain, mental pain and suffering, embarrassment, anguish, costs of counsel, loss of property and other losses.

## SECOND CLAIM FOR RELIEF
### Right to Be Free From Unlawful Search and Seizure
### (42 U.S.C. § 1983 and Fourth Amendment)

100.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if they were fully set forth here.

101.    Defendants violated plaintiffs' Fourth Amendment rights by, among other tactics:

seizing and detaining plaintiffs to prevent lawful assembly, arresting them without probable cause, assaulting them, subjecting them to nonconsensual searches of their persons and property, imprisoning and maliciously prosecuting plaintiffs, all without probable cause or reasonable suspicion to believe that plaintiffs had violated the law.

102.    Defendants unlawful actions were done willfully, knowingly and with the specific intent to deprive plaintiffs of their constitutional rights based on political and ideological profiling, guilt by association and guilt for association.

103.    As a consequence of defendants' actions, some of the plaintiffs are less inclined to participate in lawful expressive activities, and/or do so with fear and apprehension that they will, again, be subject to similar unlawful acts by defendants, including the use of unwarranted and/or unreasonable force done for the purpose of "limiting" plaintiffs' expressive activities.

104    As a direct and proximate result of defendants' unlawful actions, plaintiffs have suffered and/or continue to suffer physical pain, mental pain and suffering, embarrassment, anguish,  costs of counsel, loss of property and other losses.

### THIRD CLAIM FOR RELIEF
Due Process of Law
(42 U.S.C. § 1983 and Fifth Amendment)

105.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if they were fully set forth hereat.

106.    Plaintiffs were imprisoned and required to post bail for their release under circumstances and for violations of the law where a person would ordinarily be released by defendants on their own recognizance.  Defendants deliberately staggered bond hearings and then kept plaintiffs in jail after they had been ordered released, even where no probable cause was found to support the arrest, for the sole purpose of preventing them from returning to the FTAA conference site.

Defendants were denied the opportunity to counsel, subjected to abusive interrogation after, and for, asserting the right to counsel, and, in many instances, denied the opportunity to make a phone call. Plaintiffs were also denied food, water, and bathroom facilities as they were held in makeshift detention cages created specifically and only for those persons arrested during the FTAA protests.

107.    Defendants unlawful actions were done willfully, knowingly and with the specific intent to deprive plaintiffs of their constitutional rights based on political and ideological profiling, guilt by association and guilt for association.

108.    As a direct and proximate result of defendants' unlawful actions, some or all of the plaintiffs have suffered and/or continue to suffer physical pain, mental pain and suffering, embarrassment, anguish,  costs of counsel, loss of property and other losses.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for relief as follows:

1.    A preliminary and permanent injunction ordering Defendants, their officers, agents and employees, from interfering with Plaintiffs' speech, association, assembly and petition activities;

2.    A preliminary and permanent injunction enjoining Defendants, their officers, agents and employees, from using less-lethal munitions, batons, nerve agents and against lawful and peaceful demonstrators;

3.    For a declaration that Defendants' past, present and threatened future actions to limit lawful protest violate plaintiffs' rights to free speech, association, assembly and to petition the government for redress of grievances,

4.    For a declaration that Defendants' past, present and threatened future actions to limit lawful protest violate plaintiffs' rights to be free from unreasonable search and seizure, including excessive force, under the Fourth Amendment to the U. S. Constitution;

36

5.      For a declaration that Defendants' actions in engaging in retaliatory prosecutions and manipulation of the arraignment and release process violated plaintiffs' rights to due process of law under the Fifth Amendment to the U.S. Constitution;

6       For compensatory and punitive damages, including all costs of criminal defense, lost property, medical expenses and other damages as permitted by law and according to proof at trial;

7.      For costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988;

8.      For attorneys fees pursuant to 42 U.S.C. § 1988;

9.      For such other relief as this Court deems just and proper.

DATED: March 25, 2004                    Respectfully submitted

                                         By:  ROBERT W. ROSS, JR., FBN 921660

Carol A. Sobel (Pro Hac Vice)            LAW OFFICES OF ROBERT W. ROSS, JR.
LAW OFFICE OF CAROL A. SOBEL             601 South Federal Highway
429 Santa Monica Boulevard, Suite 550    Lake Worth, Florida 33460
Santa Monica, California 90401           T. 561 251-4896; F. 561-241-2790
T. 310 393-3055; F. 310 393-3605         NATIONAL LAWYERS GUILD
NATIONAL LAWYERS GUILD                   MASS DEFENSE COMMITTEE
MASS DEFENSE COMMITTEE


Mara Verheyden-Hilliard (Pro Hac Vice)   Jonathan Moore (Pro Hac Vice)
PARTNERSHIP FOR CIVIL JUSTICE, INC.      MOORE & GOODMAN, LLP
1901 Pennsylvania Avenue, NW             740 Broadway at Astor Place
Washington, D.C. 20006                   New York, New York 10007
T. 202 530-5630;  F. 202 530-5634        T. 212 353-9587; F. 212 674-4614
NATIONAL LAWYERS GUILD                   NATIONAL LAWYERS GUILD
MASS DEFENSE COMMITTEE                   MASS DEFENSE COMMITTEE

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET 04 - 20707

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS** Bentley Killmon, Jared Aldridge, Paul Bame, Stefano Bloch, Steven Diamond, Colleen Flynn, Farah Fosse, Gan Golan, Ernesto Longa, Michael McLean, David Mitchell, James Moorby, Michael Pitula, Laurel Ripple, Cynthia Rosin, Caleb Selman, Austin Stewart, Mikel Stone,

**DEFENDANTS** City of Miami, John Timoney, Manuel A. Diaz, Kathleen Fernandez-Rundle, Miami-Dade County, Alex Penolas, Carlos Alvarez, Ken Jenne, Secretary of Department of Homeland Security Thomas Ridge, United States Attorney General John Ashcroft

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
Ivan Weissman, Victoria Welle, Larry Wigamer,
Dale Wooten, 2004 CV JVSJ O'SULLIVAN
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Miami-Dade
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Robert W. Ross, Jr.     561-251-4896
601 South Federal Highway
Lake Worth, Florida  03360

ATTORNEYS (IF KNOWN)

CIV-KING
MAGISTRATE JUDGE
O'SULLIVAN

(d) CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  BROWARD,  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med Malpractice | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R.R. & Truck | **A PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | **PERSONAL PROPERTY** | B☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 340 Marine | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | B☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **A LABOR** | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | | A☐ 535 Death Penalty | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☒ 444 Welfare | B☐ 540 Mandamus & Other | ☐ 791 Empl Ret Inc Security Act | A☐ 871 IRS – Third Party 26 USC 7609 | A OR B |
| ☐ 290 All Other Real Property | ☒ 440 Other Civil Rights | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)
42 U.S.C. § 1983. Injunctive relief and damages for violations of First, Fourth and Fifth Amendment rights violated during protests of FTAA meetings in Miami in November, 2003.

LENGTH OF TRIAL
via ___ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION ☒ UNDER F.R.C.P. 23(b)(3)
DEMAND $ yes
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE GRAHAM
DOCKET NUMBER 04-20262-CIV-GRAHAM

DATE
3/25/04

SIGNATURE OF ATTORNEY OF RECORD
Robert W. R

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT $150.00 APPLYING IFP 898856 JUDGE _____ MAG. JUDGE _____

03/25/04

JS 44 Reverse
(Rev. 12/96)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44
## Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.    (a) **Plaintiffs – Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.   Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.   Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**V.    Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**VI.   Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**VII.  Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.