FILED by _____ D.C.
ELECTRONIC

**Jan 4 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No.  04-20707-CIV-ALTONAGA/Bandstra

KILLMON, et al.,

      Plaintiffs,

v.

CITY OF MIAMI, et al.,

      Defendants.

_____/

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS SECOND AMENDED COMPLAINT OF DEFENDANTS MIAMI-DADE COUNTY AND CARLOS ALVAREZ

**I.     STATEMENT OF FACTS**

Plaintiffs hereby incorporate by reference the Statement of Facts in Plaintiffs' Memorandum of Law in Opposition to Defendant City of Miami and Timoney's Motion to Dismiss the Second Amended Complaint ("SAC").

**II.     DEFENDANT ALVAREZ HAS NOW BEEN SERVED IN HIS INDIVIDUAL CAPACITY.**

Defendant ALVAREZ has been personally served in his individual.  A copy of the proof of service is being filed with the Court.

**III.     DEFENDANT ALVAREZ MAY BE DISMISSED IN HIS OFFICIAL CAPACITY.**

Plaintiffs inadvertently kept ALVAREZ in both his official and individual capacity.  As Miami-Dade County has also been named, ALVAREZ should be dismissed in his official capacity.

1

## IV.   DEFENDANT ALVAREZ IS NOT ENTITLED TO QUALIFIED IMMUNITY

### A. No Qualified Immunity for the Unlawful Plan for the FTAA Protests

_____Defendant ALVAREZ is not entitled to qualified immunity for the reasons set forth in the oppositions to the motions filed by Defendants TIMONEY and JENNE. During the FTAA, ALVAREZ publicly expressed approval of the tactics being used by his officers to suppress speech. He personally went to observe what was occurring, before doing so. SAC at ¶28. Supervisorial liability for a government official in this Circuit may attach either "when the supervisor personally participates in the alleged constitutional violation," or, second, "when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999), *quoting Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). In essence, liability may be based on the existence of an improper policy, or the absence of a necessary policy. *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991).

_____At least 12 of the plaintiffs claim a constitutional violation as a direct result of the County's policies, including unlawful detention, searches, arrests and force, pepper-spraying, strip-searching and detention in the "kennel." SAC at ¶¶6, 8, 9, 10, 12, 13, 14, 16, 17, 18, 21, 23, 24. This sweeping lawlessness could only be the result of deliberate policies, or deliberate indifference. At this point, Plaintiffs are entitled to go forward with their case on both bases against ALVAREZ.

_____ALVAREZ was on the planning committee that developed the unlawful policy and he expressly approved it. SAC at ¶¶79-80 . The policy adopted by ALVAREZ and the others for the FTAA protests evinced, in theory and application, "deliberate indifference to [Plaintiffs'] constitutional rights." *Rivas*, 940 F.2d at 1495. In *Rivas*, the Sheriff of Monroe County was held liable for "deliberate indifference" based on his failure to "establish sufficient and appropriate procedures and policies regarding identification of arrestees, warrantess searches and computer checks." *Id.* at 1496. For the same reasons, ALVAREZ should be denied qualified immunity in this instance.

### _____B.   No Qualified Immunity for First Amendment Violations

Plaintiffs have alleged that the policy to prevent them from assembling fundamentally burdened their expressive activity through the targeted violation of their Fourth Amendment rights all amounts to a violation of their clearly established First Amendment rights.  This Circuit's decision in *Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004) establishes that a policy implicating Fourth Amendment rights that is implemented on the basis of the content of the protestors' speech violates the First Amendment, as well.  *Id.* at 1317 ("decision to institute the mass search policy content-based").  Defendants "targeted [the protestors] because of the message they were sending. " *Id.*  "[W]hen a government official decides that certain expressive activity will lead others to break the law, he is making a content-based decision.  *Id.* at 1320.

Plaintiffs have alleged that Defendants acted on the erroneous belief that the diminution of Fourth Amendment rights, especially the stops, detentions and searches, were "a permissible restriction on the manner of protest," *Bourgeois*, 387 F.3d at 1323, as the "easiest way to prevent violence and disturbance."  See SAC at ¶¶1, 81-100.  This is an impermissible "prophylactic measure" and, unlike in *Bourgeois*, not even tied to an otherwise permissible "manner" restriction. *Id.* at 1322.

_____The Supreme Court has repeatedly instructed that, if the First Amendment means anything, it is that the government may not suppress or disrupt speech in advance of its expression in order to prevent speculative violence.  *Cox v. Louisiana*, 379 U.S. 536, 551 (1965).  "[T]he Constitution recognizes higher values than speed and efficiency." *Stanley v. Illinois*, 405 U.S. 645, 656 (1972). It is long and "clearly established" that the proper response to potential or actual violence is to arrest those who actually commit an unlawful act, rather than to suppress lawful First Amendment actions as a prophylactic measure.  *Kunz v. New York*, 340 U.S. 290, 294-95 (1951).  *Kunz* held that "[t[he [lower court] mistakenly derived support for its conclusion [that a permit for a rally was properly denied] from the evidence produced at the trial that appellant's religious meetings had, in the past, caused some disorder. There are appropriate public remedies to protect the peace and order of the community if appellant's speeches should result in disorder or violence." 340 U.S. at 294-295.

3

In *Carroll et al. v. President and Commissioners of Princess Anne et al.*, 393 U.S. 175 (1968), the Court vacated an injunction issued upon ex parte application to prevent a rally after a similar event the prior day on the basis of potential for violence. "Ordinarily, the State's constitutionally permissible interests are adequately served by criminal penalties imposed after freedom to speak has been so grossly abused that its immunity is breached." *Id.* at 180-81. There are no facts here justifying any deviation from this well-settled rule, nor could there be since Defendants adopted their plan to "limit protest" months before Plaintiffs came together to engage in lawful expressive activities. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (government may not prohibit or penalize speech unless it is aimed at imminent lawless action).

Defendants applied a deliberate policy of preempting expression in Miami based on nothing more than generalizations about some unidentified persons or groups who may have engaged in unlawful activity in Seattle or other cities five years earlier, or even in Miami at a time and place when Plaintiffs were not present. This is the worst type of guilt <u>by</u> and <u>for</u> association. *See NAACP v. Claiborne Hardware*, 458 U.S. 886 (1982); *Healy v. James*, 408 U.S. 169 (1972).

Nor could defendants implement a policy allowing them to declare an unlawful assembly on a whim and arrest persons lawfully on a public sidewalk or in a public park. *Cox,* 379 U.S. at 551. This is particularly true of "archetypal" public fora such as sidewalks, which occupy "a special position in terms of First Amendment protection," in which the government's authority to restrict expression "is very limited." *Boos v. Barry*, 485 U.S. 312, 319 (1988). The government's ability to restrict speech in these fora is even more constrained when the speech at issue, as here, is political speech, as such expression occupies a special place at the core of the First Amendment. *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 513-14 (1981). No objectively reasonable officer would believe that a policy or practice regarding speech in pubic fora that, effectively, set "no limits at all on the dispersal authority of the police" would be lawful, *Boos*, 485 U.S. at 330, because a policy "that allows a person to stand on a public sidewalk only on the whim of a police officer is unconstitutional." *Shuttlesworth v. Birmingham*, 382 U.S.87 (1965).

4

      **C.     No Qualified Immunity for Pepper-Spraying and Strip-Searching Plaintiffs**

      Two other constitutional violations unique to the County defendants compel the conclusion that ALVAREZ should not be granted qualified immunity in this instance because the need for policies and/or training is so obvious that the failure to do so amounts, at minimum, to "deliberate indifference" to the violation of constitutional rights.

      The first is the extraordinary use of pepper spray against the peaceful protestors dispersing from the jail vigil on November 21, 2003.  Both Plaintiffs GOLAN and RIPPLE allege that they were complying with all  orders to disperse on the sidewalk when they were assaulted by M-DPD officers and then, while offering no resistance to their unlawful arrests, repeatedly sprayed with chemical irritants in their eyes, nose and mouth at close range.  Indeed, the M-DPD officers involved deliberately sprayed them repeatedly at close range. SAC at ¶¶12, 18. Use of pepper spray in this manner clearly states a Fourth Amendment violation in this Circuit. *Vinyard,* 311 F.3d 1340, 1348 (11th Cir. 2002) ("Courts have consistently concluded that using pepper spray is excessive force in cases where . . . the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else").[1]  Although Plaintiffs GOLAN and RIPPLE were not yet handcuffed pursuant to their unlawful arrests, in every other respect, they offered no resistance, were not acting violently and there was no threat to the M-DPD officers or anyone else. SAC at ¶¶12, 18.

      The same is true for the allegations of Plaintiffs MITCHELL and McLEAN that they were subjected to an unlawful strip-search by the M-DPD in the jail.  SAC at ¶¶ 14, 15.  To justify a custodial strip search, officers must have reasonable suspicion of concealed weapons or contraband. *Wilson v. Jones*, 251 F.3d 1340, 1341 (11th Cir. 2001); *id.* at 1343 (citing consensus of Circuits); *Justice v. City of Peachtree City*, 961 F.2d 188 (11th Cir. 1992); See also *Bell v. Wolfish*, 441 U.S. 520 (1979).

---

[1] *See also Park v. Shiflet*, 250 F.3d 843, 852-53 (4th Cir. 2001) ("irresponsible use of pepper spray twice from close range on unarmed Mrs. Park was indeed excessive"); *Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185 (2001), *vacated on other grounds*, 534 U.S. 801 (2001), on remand, 276 F.3d 1125 (2002) *cert. denied*,    U.S.    (2002).

Although the Supreme Court has upheld as reasaonble routine strip searches of inmates, absent some particularized danger, usually only after visitation with outsiders and justified based upon common occurrence and the danger of smuggling contraband into detention facility, *see Bell*, 441 U.S. 520 (1979),  outside these circumstances, this Circuit has rejected the constitutionality of a strip search where "there did not exist the same threat to security that justified the routine search in *Bell*." *Wilson*, 251 F.3d at n. 4.

Yet, even when justified by reasonable suspicion, this Circuit has required that strip searches must be conducted in the "least intrusive manner" due to the extreme invasiveness of the technique. *Justice*, 961 F.2d at 189, 191.  The reasonableness of a strip search depends upon the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.  *Justice*, 961 F.2d 188, *citing Bell*, 441 U.S. at 559.

No reasonable suspicion existed for the deeply intrusive searches of Plaintiffs McLean and Mitchell.  Mitchell alleges he was never placed in the general jail population and was handcuffed for most of the 9 hours after his arrest, yet he was subjected to an extremely intrusive search.  SAC at ¶15.  As in *Wilson*, the strip and cavity search of Mitchell were entirely unreasonable since he did not have contact with other inmates and no other factors gave rise to suspicion that he was hiding weapons or contraband.  The search would still be unreasonable, even if some possible justification existed, as it was not conducted in the "least intrusive manner" as Mitchell's anus was penetrated.  The same is true for McLean.  SAC at ¶14.  Because he was arrested only for "resisting an officer without violence," with no indication he was concealing weapons or contraband, the strip search of his body before release from jail, and long after he was taken into custody, was not reasonable.

## V.    PLAINTIFFS HAVE DEMONSTRATED STANDING FOR INJUNCTIVE RELIEF

Plaintiffs incorporate the arguments set forth in opposition to the motions to dismiss filed by the City of Miami and the federal defendants.  Plaintiffs believe they are entitled to injunctive relief against each unlawful practice alleged against the County defendants.  At a minimum, they may obtain injunctive relief to prevent dissemination of the records of their wrongful arrests.

VI.   **PLAINTIFFS ALDRICH, BLOCH, FLYNN, DIAMOND, GOLAN, LONGA, MOORBY, PITULA, RIPPLE, STEWART, WELANDER AND WELLE STATE A CLAIM FOR MALICIOUS PROSECUTION AGAINST DEFENDANTS MIAMI-DADE COUNTY AND ALVAREZ**

Defendants Miami-Dade County and Alvarez argue that Plaintiffs Aldrich, Bloch, Flynn, Diamond, Golan, Londa, Moorby, Pitula, Ripple, Stewart, Welander and Welle fail to state a claim for malicious prosecution because they have not established the legal requirements. (Dkt. #161 at 11.) This statement is incorrect under the facts in the Second Amended Complaint. *Id.* Defendant, Miami-Dade County, also argues that a claim for malicious prosecution against a government entity is barred because they cannot be liable for the malicious acts of their employees. (Dkt. #161 at 10.) As discussed below, Defendant's argument is incorrect as a matter of law concerning federal malicious prosecution claims brought pursuant to 42 U.S.C. § 1983.

A.      **Section 1983 Malicious Prosecution Claim**

Plaintiffs hereby incorporate by reference Section V., A. in their Memorandum in Opposition to the City of Miami and Timoney's Motion to Dismiss the Second Amended Complaint.

B.      **Plaintiffs State a Claim for Malicious Prosecution**

Defendants argue that under *Kingsland*, 382 F.3d at 1234, Plaintiffs fail to state a claim for malicious prosecution because the requirement of posting bond, appearing at arraignment and returning to the state for court appearances do not constitute a "seizure" under the Fourth Amendment.[2] (Dkt. #161 at 11.) Defendants' argument misrepresents the relevant facts in the Second Amended Complaint which clearly show that Plaintiffs have stated a claim.

As discussed below, each Plaintiff has established the state law elements of a malicious prosecution claim. Also, unlike the Plaintiff in *Kingsland*, each of the Plaintiffs can establish a

_____

[2] Although not explicitly stated as such, Defendants adopt the arguments made by the Defendants City of Miami, Timoney and Jenne which make this argument.

7

significant deprivation of their liberty interests by the Defendants, post-arrest, which constitutes a "seizure" in violation of the Fourth Amendment. *See e.g., Whiting,* 85 F.3d at 584-85. The facts concerning the post-arrest physical restraint of each of the named Plaintiffs are anything but the "normal conditions of pretrial release" which the Eleventh Circuit, in *Kingland*, found did not rise to the level of "seizure" under the Fourth Amendment for purposes of a malicious prosecution claim.

Plaintiffs experienced significant deprivations of their liberty interests through egregious post-arrest/pre-trial release procedures such as: holding them for several hours to days in jail after they had posted bond; requiring Plaintiffs to post bail, rather than releasing Plaintiffs on their own recognizance – the standard procedure for misdemeanor offenses; leaving Plaintiffs in restraints for several hours post-arrest; holding plaintiffs for hours in make-shift "kennel" type detention cages without access to a phone, water, food or bathroom before transporting them to jail for further detention; destroying or failing to return plaintiffs' personal property; interrogating plaintiffs about their political beliefs and associations while in custody after they requested counsel; requiring Plaintiffs to retain private counsel and return from out of state to defend against charges for which they were either acquitted or received a nolle prosequi. SAC at ¶¶ 6, 8-10, 12, 13, 16, 18, 21, 23, 24. Defendants arguments to the contrary are without merit.

Defendant Miami-Dade County also argues that it cannot be liable because <u>Florida</u> law "bars claims for malicious prosecution against government entities because they cannot be liable for the malicious acts of their employees." (Dkt. # 161 at 10.) Defendant's assertion is incorrect and misapprehends the nature of a malicious prosecution under §1983,[3] a <u>federal</u> claim.

---

[3] Defendant relies on § 768.28(9), Fla. Stat., which does hold that, a matter of state law claims, government entities cannot be liable for the malicious acts of their employees. While a number of Florida courts have applied this statute, *see e.g., City of Coconut Creek v. Fowler,* 474 So. 2d 820 (Fla. 4th DCA 1985), at least one judge has questioned the constitutionality of this section. *Id.* at 822-24 (Carlisle, J. concurring specially).

Section 1983 claims are federal, not state, claims and whether the elements of the claim are met is "controlled by federal [not state] law. *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003). "To establish a malicious prosecution claim under §1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable *seizures* <u>in addition</u> to the elements of the common law tort of malicious prosecution. [Italics in original, other emphasis supplied.] *Id*. at 881 (11th Cir. 2003), and cases cited therein. *See also Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004). As explained in *Ubho v. Reno*, 141 F.3d 1000 (11th Cir. 1998) this type of Constitutional tort under the Fourth Amendment is by away of analogy to the common law tort of malicious prosecution. "Courts historically have looked to the common law for guidance as to the constituent elements of the claim." *Id*. at 1004. The Eleventh Circuit's approach is to look to the common law elements "only as needed to assist the enforcement of analogous constitutional violations - seizures under the Fourth Amendment." *Castellano v. Fragozo*, 352 F.3d 939, 949 (5th Cir. 2003). "Although both state and federal law help inform the elements of the common law tort of malicious prosecution, a Fourth Amendment malicious prosecution claim under § 1983 remains a federal constitutional claim, and its elements and whether they are met ultimately are controlled by federal law." *Alderman v. McDermott*, 2004 WL 1109541 at *8 (M.D. Fla) (internal citation omitted). There is no authority cited by Defendant, nor is there any, which suggests that any immunities established against a state law claim are read into the federal claims. Defendants' argument fails.

Further, each of the elements of a malicious prosecution claim are established for each of the Plaintiffs, as detailed below:

**1.**    <u>**Plaintiff Aldrich States a Claim for Malicious Prosecution**</u>

An original judicial proceeding was commenced and continued following his arrest, without

probable cause, by officers with Defendant M-DPD on November 21, 2003, when he was surrounded by bicycle officers, ordered to the ground, kicked and arrested as he was dispersing (several blocks away) from a peaceful vigil outside the Dade County Jail. SAC at ¶6. He was falsely charged with unlawful assembly. *Id.*

Defendants violated his Fourth Amendment rights, post-arrest, in several ways. He was kicked in the back by an unidentified officer with the M-DPD as he complied with the unlawful arrest orders. *Id.* His bicycle was taken and never returned. *Id.* He was held for approximately six hours in the makeshift detention facility, fashioned like a "kennel," where he was denied access to water and bathroom facilities and kept in tight handcuffs. *Id.* Ultimately, he was released on his own recognizance. *Id.* Aldrich was required to retain counsel and return from out of state to defend against the baseless charges. *Id.* & ¶131.

His charges were favorably terminated on or about April 26, 2004, through a nolle prosequi. *Id.* His arrest was with malice because there was no probable cause – defendants based their arrest on information which they knew to be untrue and merely arrested Plaintiff based on ideological profiling prohibited by the Constitution.[4] SAC at ¶¶6 & 128. Aldrich also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental pain and suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages. SAC at ¶131; 71, ¶12 & 73, ¶25. Plaintiff is also fearful that information about his wrongful arrest has and will be disseminated by the defendants and that he has been labeled

---

[4] This allegation as to the element of malice is true for each Plaintiff and is incorporated by reference in the discussion of each individual's claims herein.

10

as someone who is likely to break the law.[5] SAC at ¶6.  Aldrich is also reluctant to participate in large-scale lawful expressive activities, or does so with fear and apprehension that he will, again, be subject to similar unlawful acts by defendants done for the purpose of "limiting" lawful expressive activities.[6]  SAC at ¶130.

## 2. **Plaintiff Bloch States a Claim for Malicious Prosecution**

An original judicial proceeding was commenced following his arrest on November 20, 2003 by officers with the M-DPD, without probable cause and with unreasonable force while he was sitting on private property, with the permission of the property residents.  SAC at ¶8.  His arrest form is signed by defendant Espinosa, M-DPD, badge number either 4840 or 4810.  *Id.*  Although he complied with all orders by the police to get down on the ground, officers with the M-DPD used unwarranted and excessive force against him even though he was clearly not resisting his unlawful arrest.  *Id.*

Defendants violated his Fourth Amendment rights, post-arrest, in several ways.  Following his arrest, he was held for hours in the makeshift detention facility, fashioned like a "kennel," where he was kept in handcuffs for much of the time and denied access to food, water and bathroom facilities.  *Id.*  He was taken into custody at approximately 5:30 p.m. on November 20, 2003, was ordered released at his bail hearing at 10:00 a.m. on November 21, 2003, but was not released by defendant M-DPD for approximately half a day following the hearing.  *Id.*

His charges were favorably terminated by dismissal at his bond hearing. *Id.*  Bloch also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain,

---

[5] This factual  allegation is true for each Plaintiff and is incorporated by reference in the discussion of each individual's claims herein.

[6] This factual allegation is true for each Plaintiff and is incorporated by reference in the discussion of each individual's claims herein.

11

mental pain and suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages.  SAC at ¶131; 71, ¶12 & 73, ¶25.

### 3.   Plaintiff Flynn States a Claim for Malicious Prosecution

An original judicial proceeding was commenced following her arrest on November 20, 2003 by officers with the M-DPD, including defendant L. Perez, badge number 2436, without probable cause and with unreasonable force, while she was sitting on private property, with the permission of the property residents.  *Id.* at ¶10.  She was charged with unlawful assembly and obstruction of justice.  *Id.*

Defendants violated her Fourth Amendment rights, post-arrest, in several ways.  After being taken into custody, she was held in the makeshift detention facility, fashioned like a  "kennel," where she was denied access to food, water and bathroom facilities.  *Id.*  She was taken into custody at approximately 5:30 p.m. on November 20, 2003, was ordered released at her bail hearing at 10:00 a.m. on November 21, 2003, but was not released by defendant M-DPD for approximately half a day following the bond hearing.  *Id.*

Her charges were terminated favorably by a dismissal her bond hearing.  *Id.*  Flynn also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental pain and suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages.  SAC at ¶131; 71, ¶12 & 73, ¶25.

### 4.   Plaintiff Diamond States a Claim for Malicious Prosecution

An original judicial proceeding was commenced and continued following his arrest, on November 19, 2003, after he was detained handcuffed, subjected to a  non-consensual search of his

12

person and property, and arrested, without probable cause, by officers believed to be with Defendant M-DPD.  SAC at ¶9.   He was falsely charged with felony possession of "burglar" tools (a small combination pocket knife/tool) and a misdemeanor, "unlawful assembly."  *Id.*  The charges were changed to the misdemeanor of giving a false name after arrest, then changed, again, to resisting arrest without violence.  *Id.*

Defendants also violated his Fourth Amendment rights, post-arrest, in several ways. While in Defendants' custody, Diamond was subjected to non-consensual questioning  about his political beliefs.  *Id.*  His personal property taken at the time of arrest was never returned.  *Id.*  Diamond  was held in custody for five days and for approximately 13 hours after his bail was posted.  *Id.* Diamond was required to retain counsel and return from out of state to defend against the baseless charges. *Id.* & ¶131.

The charges were terminated in his favor through a dismissal.  SAC at ¶9.  Diamond also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, and other compensatory damages. SAC at ¶131; 71, ¶12 & 73, ¶25.

### 5.     Plaintiff Golan States a Claim for Malicious Prosecution

An original judicial proceeding was commenced and continued following his arrest on November 21, 2003 by officers with the M-DPD, without probable cause and was trapped, beaten, dragged and sprayed with chemicals by unidentified officers with the M-DPD, as he complied with unlawful police orders to disperse from a lawful assembly outside the Dade County Jail.  SAC at ¶12.  His arrest form was signed by defendant M-DPD officer J. Leon, badge #4329.  *Id.*   He was charged with unlawful assembly, later reduced to failure to obey a lawful order, and resisting arrest without violence.  *Id.*

13

Defendants violated his Fourth Amendment rights, post-arrest, in several ways.  After his arrest, Golan was taken to the makeshift "kennel" detention facility and into a "hazmat" area, where he was "decontaminated" by personnel in fully-sealed chemical protection suits and gas masks who cut his clothes off, stripped him naked and then sprayed him all over his body with alleged de-contaminants.  *Id.*  Golan was held in custody for two nights and released on bail on November 23, 2003.  *Id.*  Personal property was not returned to him upon his release from jail. *Id.*  Golan was required to retain counsel and return from out of state to defend against the baseless charges.  SAC at ¶¶12, 131.

His charges were favorably terminated when he received a directed judgment of acquittal at trial on January 28, 2004.   SAC at ¶12. Golan also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental pain and suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages.  SAC at ¶131; 71, ¶12 & 73, ¶25.

### 6.    Plaintiff Longa States a Claim for Malicious Prosecution

An original judicial proceeding was commenced and continued following his arrest by officers with defendant M-DPD on November 21, 2003, as he complied with unlawful police orders to disperse from a lawful assembly outside the Dade County Jail. *Id.* at ¶13.  His arrest form was signed  by defendant M-DPD Officer C. Moon, badge # 4335, but defendant Moon is believed to have acted with other officers with the defendant M-DPD and with the knowledge and approval of command officers with defendant M-DPD.  *Id.*  He was charged with unlawful assembly and resisting arrest without violence.  *Id.*

Defendants violated his Fourth Amendment rights, post-arrest, in several ways.  He was held

in the makeshift detention facility, fashioned like a "kennel," where she was denied access to food, water and bathroom facilities. *Id.* Longa was arrested at approximately 5 pm. on November 21, 2003 and released at approximately 2:30 a.m. on November 23, 2003. *Id.* Longa was required to retain counsel and return to court to defend against the baseless charges. *Id.* & ¶131. Longa received a favorable dismissal of the charges on February 9, 2004, after the Lieutenant who gave the defective dispersal order failed to appear for the trial. SAC at ¶13. However, the charges against Longa were re-filed after the filing of this action and after the directed verdict of acquittal for Plaintiff Golan who was arrested in the same incident. *Id.* Longa was again required to retain counsel and return to court to defend against the baseless charges. *Id.* & ¶131.

Longa wants to participate as a legal observer at large-scale First Amendment assemblies in Miami. SAC at ¶13. He is unwilling to do so because of fear that he will again be subjected to arrest and prosecution without probable cause based on political and ideological profiling by defendants. *Id.* & ¶124. Longa also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental pain and suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages. SAC at ¶131; 71, ¶12 & 73, ¶25.

### 7.   Plaintiff Moorby States a Claim for Malicious Prosecution

An original judicial proceeding was commenced and continued following his arrest on November 21, 2003, without probable cause and with unreasonable force, as he complied with unlawful police orders to disperse a peaceful vigil outside the Dade County Jail. *Id.* at ¶¶16. Moorby was arrested by M-DPD officer F. Reynolds, badge #4606. *Id.* He was falsely charged with unlawful assembly, which was later changed to failure to obey an order. *Id.*

Defendants violated his Fourth Amendment rights, post-arrest, in several ways.  After he was ordered to the ground by Defendants, with a rifle pointed at his head, he was forcibly handcuffed, for hours, almost without interruption, while detained in the "kennel" at the makeshift detention center and at jail.  *Id.*  As the police were transporting him to the detention facility, they cut his backpack off of him and left it in the street.  *Id.*  When Moorby had his possessions returned to him on his release, several items were missing. *Id.*  Before getting in the van for transport to jail, he was patted down by a female officer, who grabbed him inappropriately in his genital area.  *Id.*  He was denied water or approximately nine hours while in custody. *Id.*  Moorby was taken in shackles along with other FTAA arrestees for a bail hearing and ordered released on $40 bail at his arraignment. He was not permitted to make a phone call until over a day after his arrest.  *Id.*  He was not released until approximately 10:00 p.m. on November 22, 2003, even though the judge at his bail hearing ordered that the $40 in his possession was sufficient to post his bail at 10:00 a.m. that morning.  *Id.* Although he posted bail, at his probable cause hearing it was ordered returned after the judge determined that Moorby and the other FTAA protesters should have been released on their own recognizance pursuant to the usual practice for misdemeanor arrestees.  *Id.*  Moorby was required to retain counsel and return from out of state to defend against the baseless charges.  *Id.* & ¶131.

His charges were favorably terminated by a dismissal nolle prosequi on May 4, 2004. *Id.* Moorby also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental pain and suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages.  SAC at ¶131; 71, ¶12 & 73, ¶25.

### 8.   Plaintiff Pitula States a Claim for Malicious Prosecution

An original judicial proceeding was commenced and continued following his arrest after he

16

was stopped, detained, searched (without consent) and arrested without probable cause by defendant M-DPD Officers Erdo Bermudez, Fadrey and E. Todoro, on November 11, 2003, as he walked during the day towards the activists' Convergence Center.  SAC at ¶17.  His arrest form was signed by M-DPD Det. R. Dean.  *Id.*  He was falsely charged with "loitering and prowling" and with "resisting arrest without violence." *Id.*

Defendants also violated his Fourth Amendment rights, post-arrest, in several ways.  He was subjected to a pat-down search, which produced no evidence of weapons or illegal activity.  *Id.*  His property was searched without his consent and several items were not returned, including his driver's license, credit card and bank card. *Id.*  He was held in handcuffs in a police car for approximately 5 hours, except for a brief period of time when he was interrogated about his political and ideological beliefs and associations.  *Id.*  Pitula was held in custody for approximately 15 hours.  *Id.*  He was released on bond the next day.  *Id.*  He was required to retain counsel and return from out of state to defend against the baseless charges.  *Id.* & ¶131.

His charges were favorably terminated by a dismissal on March 23, 2004.  *Id.*  When his property was returned to him after his release, several items were not returned.  *Id.*  Pitula also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental pain and suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages.  SAC at ¶131; 71, ¶12 & 73, ¶25.

### 9.    Plaintiff Ripple States a Claim for Malicious Prosecution

An original judicial proceeding was commenced and continued after she was trapped and arrested, without probable cause, by officers with defendant M-DPD as she complied with an illegal order to disperse a lawful assembly across from the Dade County Jail. *Id.* at ¶18. According to a use-

17

of-force report disclosed in the Miami-Dade County Independent Review Panel report, Ripple was "pepper sprayed" at close range in her eyes by defendant M-DPD Sergeant Carlos Acin, even though she was not resisting arrest and even though alternative methods of control of Ripple to effectuate her arrest had not been exhausted, let alone attempted. *Id.*    Ripple was arrested by M-DPD Officer J. DeArmas, badge #4317. *Id.*    She was falsely charged with unlawful assembly. *Id.*

Defendants violated her Fourth Amendment rights, post-arrest, in several ways.   After "pepper-spraying" her, defendant Acin picked her up off of the ground by her arms and slammed her back down onto the ground, twisting her left ankle severely. *Id.* Ripple was unable to walk on her injured ankle and, so, defendant Acin dragged her along the ground, handcuffed, while yelling at her that she was "resisting." *Id.* Ripple was struck in the stomach and back by unknown officers with the M-DPD when she and others requested medical aid after being sprayed and then handcuffed tightly. *Id.* She was taken to the "kennel" makeshift detention center. *Id.* When she complained of tight handcuffs, an unknown officer with the M-DPD deliberately twisted her arms above her head, causing her extreme pain as he replaced her handcuffs. *Id.* Ultimately, Ripple was stripped naked by four male officers in hazmat suits. *Id.* Her requests for female officers for the process were ignored. *Id.* Ripple remained in police custody for approximately ten hours, before her release on her own recognizance. *Id.* She was handcuffed for six hours, denied a bathroom for four hours, denied food or water for at least six hours, and was never allowed to make a phone call despite multiple requests. *Id.* Ripple was required to retain counsel and return from out of state to defend against the baseless charges. SAC at ¶131.

Her charges were favorably terminated by a dismissal on June 25, 2004. SAC at ¶18. Ripple also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental pain and suffering, embarrassment, anguish, emotional distress, medical expenses, lost

property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages.  SAC at ¶131; 71, ¶12 & 73, ¶25.

### 10.     Plaintiff Stewart States a Claim for Malicious Prosecution

An original judicial proceeding was commenced after he was stopped, without probable cause, by the police believed to be with Defendant M-DPD (who were wearing no agency identification) and ordered to get on the ground, handcuffed, and physically and verbally abused. SAC at ¶21.  His  arrest form was signed by defendant M-DPD Officer Riley, badge #3924. *Id.*

Defendants violated his Fourth Amendment rights, post-arrest, in several ways.   He was held in custody for approximately 23 hours.  *Id.*  Many of the possessions he had with him at the time of his arrest, including a camera, were never returned to him.  *Id.*   Stewart was taken to the "kennel" makeshift detention center and held for several hours with access to food, water or a bathroom.  SAC at ¶¶21, 127.

Stewart's charges were favorably terminated by a dismissal at his arraignment.  *Id.*  Stewart also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental pain and suffering, embarrassment, anguish, emotional distress, lost property, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages.  SAC at ¶131; 71, ¶12 & 73, ¶25.

### 11.     Plaintiff Welander States a Claim for Malicious Prosecution

An original judicial proceeding was commenced and continued after he was accosted by dozens of officers, without any visible agency or name identification, but who were believed to be with the M-DPD who shouted at him, ordered him to the ground, forced his face into the dirt as he complied, pointed rifle-type weapons at them and arrested him, all without probable cause.  *Id.* at ¶23.  Welander was placed in plastic handcuffs with his hands behind his back and was dragged

backwards by his handcuffs, causing him extreme pain. *Id.* Welander's arrest form was signed by M-DPD T. Wever, badge #4994. *Id.* Welander was charged with resisting arrest without violence. *Id.*

Defendants violated his Fourth Amendment rights, post-arrest, in several ways. Welander was kept in handcuffs for an extended period of time, even while in custody at the "kennel" temporary detention facility. *Id.* His possessions were dumped into the street by defendants at the time of his arrest and were never returned to him. *Id.* Welander was held in custody for approximately for approximately three days, including for a full day after his second bond hearing on November 22, 2003. *Id.* Welander was required to retain counsel and return from out of state to defend against the baseless charges. SAC at ¶131.

His charges were favorably terminated by a dismissal nolle prosequi on May 17, 2004. *Id.* Welander also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental pain and suffering, embarrassment, anguish, emotional distress, lost property, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages. SAC at ¶131; 71, ¶12 & 73, ¶25.

### 12. Plaintiff Welle States a Claim for Malicious Prosecution

Each of the elements of a malicious prosecution claim are established for Plaintiff Welle. An original judicial proceeding was commenced and continued after she was trapped and arrested on November 21, 2003, without probable cause and with unreasonable force as she complied with an illegal order to disperse a lawful assembly across from the Dade County Jail. *Id.* at ¶24. M-DPD Officer M. Romero**,** badge #3935, signed Welle's arrest form. *Id.* Welle was falsely charged with unlawful assembly, which was changed to "failure to obey" an order to disperse. *Id.*

Defendants violated her Fourth Amendment rights, post-arrest, in several ways. Officers

with the M-DPD used chemical sprays against the demonstrators, even though they were not resisting and Welle was subjected to the chemical irritants following her arrest. *Id.* Welle was held in very tight plastic handcuffs for several hours at the arrest scene and while she was detained at the "kennel" makeshift detention center. *Id.* While in detention, she was questioned by Defendants about her political beliefs. *Id.* She was held in custody for two days. *Id.* The prosecution against her was pursued even though the charges against others arrested at the same time and place were dismissed, including by a directed verdict of acquittal for Plaintiff Golan and, after testimony by a M-DPD Lieutenant at the first case to go to trial that the police had attacked the demonstrators prior to the expiration of the dispersal time and that the demonstrators were, in fact, in compliance at the time of the police assault. *Id.* Welle was required to retain counsel and return from out of state to defend against the baseless charges. SAC at ¶131.

The charges were favorably terminated by acquittal at trial. *Id.* Welle also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental pain and suffering, embarrassment, anguish, emotional distress, lost property, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages. SAC at ¶131; 71, ¶12 & 73, ¶25.

## VI.    CONCLUSION

Based on the foregoing reasons, Defendants' Motion to Dismiss the Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) should be denied.

21

DATED: January 4, 2005                    Respectfully Submitted,


                                               s/ Andrea Costello
                                          _____
                                          ANDREA COSTELLO, FBN 532991


Carol A. Sobel (Pro Hac Vice)             Andrea Costello,  FBN 532991
LAW OFFICE OF CAROL A. SOBEL              Alice K. Nelson,  FBN 211771
429 Santa Monica Boulevard, Suite 550     SOUTHERN LEGAL COUNSEL, INC
Santa Monica, California 90401            1229 N.W. 12th Avenue
T. 310 393-3055; F. 310 393-3605          Gainesville, Florida 32601
CarolSobel@aol.com                        T. 352 271-8890; F. 352 271-8347
NATIONAL LAWYERS GUILD                    andrea.costello@southernlegal.org
MASS DEFENSE COMMITTEE                    alice.nelson@southernlegal.org


Robert W. Ross, Jr.,  FBN  921660         Mara Verheyden-Hilliard (Pro Hac Vice)
LAW OFFICES OF ROBERT W. ROSS, JR., P.A.  Carl Messineo (Pro Hac Vice)
601 South Federal Highway                 PARTNERSHIP FOR CIVIL JUSTICE, INC.
Lake Worth, Florida 33460                 1901 Pennsylvania Avenue, NW
T. 561 251-4896; F. 561 241-2790          Washington, D.C. 20006
bravelaw@mindspring.com                   T. 202 530-5630; F. 202 530-5634
NATIONAL LAWYERS GUILD                    NATIONAL LAWYERS GUILD
MASS DEFENSE COMMITTEE                    MASS DEFENSE COMMITTEE


Jonathan Moore (Pro Hac Vice)
MOORE & GOODMAN, LLP
740 Broadway at Astor Place
New York, New York 10007
T. 212 353-9587; F. 212 674-4614
NATIONAL LAWYERS GUILD
MASS DEFENSE COMMITTEE


22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was furnished by U.S. Mail this

4th day of January, 2005 to the following:

Beverly Pohl and Bruce S. Rogow
Bruce S. Rogow, P.A.
Broward Financial Centre
500 E. Broward Blvd., Ste. 1930
Fort Lauderdale, FL 33394

Warren Bittner
City of Miami Attorney's Office
Miami Riverside Center
444 S.W. 2nd Avenue, Suite 945
Miami, FL 33133

Elizabeth M. Rodriguez
Kubicki Draper
City National Bank Building, PH
25 West Flagler Street
Miami, FL 33130

Russell Koonin
Office of the United States Attorney
99 N.E. 4th Street, Suite 300
Miami, FL 33132-2111

Susan Torres
Miami-Dade County Attorney's Office
111 N.W. 1st Street, Suite 2810
Miami, FL 33128-1930

S/ Andrea Costello

Andrea Costello