FILED by __ D.C.
ELECTRONIC

**Jan 4 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No.  04-20707-CIV-ALTONAGA/Bandstra

KILLMON, et al.,

      Plaintiffs,

v.

CITY OF MIAMI, et al.,

      Defendants.

_____/


## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT BY DEFENDANTS KEN JENNE AND THE BROWARD SHERIFF'S OFFICE

### I.    STATEMENT OF FACTS

Plaintiffs hereby incorporate by reference the Statement of Facts in Plaintiffs' Memorandum of Law in Opposition to Defendant City of Miami and Timoney's Motion to Dismiss the Second Amended Complaint ("SAC").

### II.    DEFENDANT JENNE IS NOT ENTITLED TO QUALIFIED IMMUNITY[1] [2]

Supervisory liability attaches where a supervisor either "personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising

---

[1] Plaintiffs are not pursuing their claims that each Defendant is liable for the actions each other entity Defendant at this time.  Plaintiffs reserve the right to raise this argument in the future if discovery supports the claim.

[2] In response to Defendant Jenne's motion to dismiss the injunctive relief claim, Plaintiffs incorporate their discussion of the injunctive relief claims set forth in opposition to the motions filed by the City and the federal defendants.

official and the alleged constitutional violation." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (citation omitted). The necessary causal connection exists here between Jenne and the harm to Plaintiffs because Jenne's improper "custom or policy . . . resulted in deliberate indifference to constitutional rights" [citation]; and the facts alleged support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. *Gonzalez*, 325 F.3d at 1234-5.

Plaintiffs have pled all required facts against Jenne to support liability on this basis: he is the Sheriff; he was a participant in the Joint Plan (or designated someone to act in his stead on the Planning Committee); he approved and adopted the unlawful Plan and directed his officers to implement it, which they did and, consequently, violated Plaintiffs' Fourth and First Amendment rights. SAC at ¶30. The facts alleged by Plaintiffs, based on the statements in the Miami After-Action Report and the County's Independent Review Panel Report, support the specific allegation of a causal connection between the Plan for the FTAA protests and Plaintiffs' injuries.

Plaintiffs have alleged, based on public documents, that the Plan was purposely unlawful at its inception and that Jenne's approval of the "improper . . . policy . . . resulted in deliberate indifference to constitutional rights." *Gonzalez*, 325 F.3d at 1235. *See also Fundiller v. City of Cooper City*, 777 F.2d 1436, 1439, 1443 (11th Cir. 1985) (in case of excessive force, held policy makers liable where their acts or omissions evince deliberate indifference to constitutional rights); *Rivas v. Freeman*, 940 F.2d 1491 (11th Cir. 1991) (Sheriff's failure to establish policies concerning constitutional rights of prisoners warrants supervisory liability under §1983); *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 704 (11th Cir. 1985) (same). The widespread violations resulting from the Joint Plan in this case also evince "an inference that Jenne directed the subordinates to act unlawfully or knew that the defendants would act unlawfully and failed to stop them from doing so." *Gonzalez*, 325 F.3d at 1235. When the Complaint allows the inference of deliberate indifference to constitutional rights, dismissal from suit before discovery occurs is

2

premature. *Ancata*, 769 F.2d at 704.

This is not a case, as in *Post v. City of Fort Lauderdale*, where the causal connection is too weak to support supervisory liability. The unlawful policies put in place for the FTAA protests were approved by each participant and were the direct and immediate cause of each Plaintiffs' injuries. In *Post*, the Court found that incidental remarks suggesting that the code enforcement team had an unlawful intent were insufficient to support a causal connection between the City's policies and the unlawful acts, or that the supervisorial defendants in *Post* knew that the code enforcement team would act unlawfully. 7 F.3d 1552, 1560-61 (11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir. 1994).

The unexpected acts of an isolated group of employees in *Post*, like the unlawful execution of a lawful warrant in *Gonzalez*, is different at its core from a situation, as here, where Plaintiffs have pled a plan that was <u>deliberately</u> unlawful at its inception and intended to restrict core Fourth and First Amendment rights. Defendants knew that their subordinates would act against perceived FTAA protestors on less than reasonable suspicion or probable cause. That was the precise plan for what was characterized as the greater aim of preempting violence by preempting assemblies. The comprehensive plan at issue here, adopted and implemented by all of the Defendants specifically for the FTAA protests, is akin to the unlawful magnometer search policy condemned by this Circuit in *Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004) for its failure to apply individualized suspicion and its application based on content.

Plaintiffs believe that the Second Amended Complaint is sufficient even against Jenne in his individual capacity. Defendant asserts that *GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1367 (11th Cir. 1998), demands even more specificity than Plaintiffs have provided. This misreads, *GJR Investments*, in which the complaint failed to identify even the cause of action under which the facts applied. That is not the case here. Plaintiffs have identified the factual allegations applicable to each cause of action and identified the specific basis of the claim of each plaintiff

3

against each defendant.  But, as the case relied upon by Defendant Jenne holds, even if applicable to Jenne in his individual capacity, the heightened pleading requirement would not apply to the entity defendant, which does not have a defense of qualified immunity available to it.  *See Swann v. Southern Health Partners, Inc.*, 388 F.3d 834, 837-838 (11th Cir. 2004).

### III.    PLAINTIFFS HAVE STATED A *MONELL* CLAIM AGAINST THE BSO

Plaintiffs Killmon, Selman and Winawer each allege that they were arrested without lawful justificaiton and subjected to excessive force by BSO officers in the course of their arrests, all in violation of their constitutional rights. SAC at ¶¶5,20,25.  For the reasons set forth in the Opposition to the Motion to Dismiss filed by the City of Miami Defendants,[3] Plaintiffs have stated violations of their Fourth and First Amendment rights and they have established that there is liability for the Broward governmental entity based on the implementation of the unconstitutional Plan for policing the FTAA protests.

Plaintiffs have alleged that each of the individually named BSO deputies, listed on the arrest reports, were acting pursuant to the BSO policies. SAC at ¶¶48, 49, 50,  The FTAA Plan was crafted and approved over a period of months, with direct participation of the BSO.  SAC at ¶80.  The acts complained of were not isolated incidents by a few rogue officers.  Rather, the Plan was carried out in a coordinated manner by officers with BSO, among the other defendants.  SAC ¶¶87,89.  In fact, when Plaintiffs Killmon, Selman, and Winawer were arrested, they were first surrounded by approximately 50 officers from the BSO. SAC at ¶¶5,20,25.

Defendant Jenne, in his official capacity, relies on *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999), for the proposition that there can be no municipal liability because a deputy sheriff is not a final policy-maker.  This is irrelevant because Plaintiffs do not assert that the deputies are final policy-makers.  In *Brown*, the Plaintiffs "conceded that the Deputy Sheriff was not carrying out

---

[3] Plaintiffs expressly incorporate the arguments in support of their claim of municipal liability  in their opposition to the motion to dismiss filed by the City of Miami defendants.

the instructions of the Sheriff, that the Sheriff did not know about, ratify, or consent to the Deputy Sheriff's acts, and that there was no custom of unjustified arrests." *Id.* Therefore, the Court concluded that, in the absence of a official municipal policy or custom as a causation factor, there could be no liability against the County.

There are no such concessions in this case. To the contrary, Plaintiffs allege the deputies who signed their arrest forms were acting pursuant to a policy of the BSO, expressly approved by Sheriff Jenne as part of the nine-month long joint planning committee and Jenne's membership in the Joint Law Enforcement Command for the FTAA protests, as well as BSO's participation in the FTAA Legal Committee.. SAC ¶¶30,48,49,50,71,79,80. At the heart of this Plan were "unjustified arrests." *Brown* is inapposite and, on the facts alleged, municipal liability may be inferred against BSO.

## IV.   PLAINTIFFS KILLMON, SELMAN, STONE[4] AND WINAWER[5] STATE A CLAIM FOR MALICIOUS PROSECUTION AGAINST DEFENDANT BROWARD SHERIFF'S OFFICE AND JENNE

Defendants incorrectly argue that Plaintiffs Killmon, Selman and Winawer have failed to state a claim for malicious prosecution because they have not established a Fourth Amendment unreasonable seizure subsequent to their arrests. (Dkt. # 158 at 10-11.) This statement is incorrect under the facts in the Second Amended Complaint.

### A.      Section 1983 Malicious Prosecution Claim

Plaintiffs hereby incorporate by reference Sections A and B in their Memorandum in

---

[4] As noted by Plaintiffs in the Opposition to the City of Miami Defendants' Motion to Dismiss, Plaintiffs inadvertently stated that Plaintiff Stone's arresting officer and agency was the BSO when in fact, officer Rahming, is with the Miami Police Department. Plaintiffs have requested leave of Court to make this correction to the Second Amended Complaint. Accordingly, Plaintiffs have addressed Plaintiff Stone's malicious prosecution claim in the Opposition to the City of Miami Defendants' Motion to Dismiss.

[5] As noted by Defendants Jenne and BSO, there was a typographical error in Plaintiffs' Fifth Claim for Relief in the Second Amended Complaint. Plaintiffs intended to refer to Plaintiff Winawer, rather than Welander.

5

Opposition to the City of Miami and Timoney's Motion to Dismiss the Second Amended Complaint and their Memorandum in Opposition to Miami-Dade County and Alvarez's Motion to Dismiss the Second Amended Complaint.

### B.   Plaintiff Killmon States a Claim for Malicious Prosecution

Each of the elements of a malicious prosecution claim are established for Plaintiff Killmon. An original judicial proceeding was commenced on November 20, 2003, when he was accosted without warning, forcibly shoved to the ground, handcuffed and arrested, without probable cause, by approximately 50 to 60 officers, who wore no visible identifiable agency or name information, but who are believed to be employees of the defendant BSO, acting in coordination with supervisors and officers from the MPD.  SAC at ¶5. The officer who signed the arrest form for Killmon was Defendant BSO Deputy M. Neily, badge #6370.  *Id.*   Defendant Neilly is believed to have acted with Defendant Mandera and other presently unknown officers from BSO and other agencies in the arrest of, and use of excessive force against, Killmon.  *Id.*

Defendants violated his Fourth Amendment rights, post-arrest, in several ways.  Defendant Mandera used such force in the process of handcuffing Killmon that he suffered damage to his shoulder, requiring surgery.  *Id.*  Killmon was held for an excessive period of time, including for approximately five hours after all charges against him were dismissed and he was ordered released by the court. *Id.*  Killmon was initially held in a makeshift detention facility, similar to a dog kennel, where he was kept in handcuffs in the "kennel" cell for extended time, denied access to food, water and bathroom facilities and denied the right to make a phone call in a timely manner. *Id.*

Killmon's charges were favorably terminated by a dismissal at his bond hearing. *Id.*  His arrest was with malice because there was no probable cause – defendants based their arrest on information which they knew to be untrue and merely arrested Plaintiff based on ideological

profiling prohibited by the Constitution.[6]  SAC at ¶¶5 &134.  Killmon also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental pain and suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages.  SAC at ¶140; 72, ¶20.  Plaintiff is also fearful that information about his wrongful arrest has and will be disseminated by the defendants and that he has been labeled as someone who is likely to break the law.[7] SAC at ¶6.  Killmon is also reluctant to participate in large-scale lawful expressive activities, or does so with fear and apprehension that he will, again, be subject to similar unlawful acts by defendants done for the purpose of "limiting" lawful expressive activities.[8]  SAC at ¶135.

### C.    Plaintiff Selman States a Claim for Malicious Prosecution

Each of the elements of a malicious prosecution claim are established for Plaintiff Selman. An original judicial proceeding was commenced on November 20, 2003, as Selman walked peacefully more than a mile from Bayfront Park following the AFL-CIO permitted march and rally , along the old railroad tracks, and was accosted by approximately 40 to 50 officers, who shouted at him to get down and then forcibly handcuffed him.  SAC at ¶20.  Selman was arrested by Defendant BSO Officer LLoyd, badge #5345.  *Id.*

Defendants violated his Fourth Amendment rights, post-arrest.  He was held in custody for approximately 13 hours.  *Id.*  Selman was also questioned while in Defendants' custody, about his

---

[6] This allegation as to the element of malice is true for each Plaintiff and is incorporated by reference in the discussion of each individual's claims herein.

[7] This factual  allegation is true for each Plaintiff and is incorporated by reference in the discussion of each individual's claims herein.

[8] This factual allegation is true for each Plaintiff and is incorporated by reference in the discussion of each individual's claims herein.

citizenship, without counsel present, by an individual who identified himself as an agent of the Immigration and Naturalization Service. *Id.* He was held in the makeshift "kennel" detention cage and deprived of food, water and access to counsel. SAC at ¶133. While in Defendants' custody, Selman was told, if he had no money for bail, he could be held for up to three weeks in jail and thus, entered into a plea at his arraignment. SAC at ¶20.

Selman's charges were favorably terminated when he pled no contest at his bond hearing to a misdemeanor, with adjudication withheld, at his arraignment. *Id.* His arrest was with malice because there was no probable cause – defendants based their arrest on information which they knew to be untrue and merely arrested Plaintiff based on ideological profiling prohibited by the Constitution.[9] SAC at ¶¶25 &134. Selman also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental pain and suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages. SAC at ¶140; 72, ¶20. Plaintiff is also fearful that information about his wrongful arrest has and will be disseminated by the defendants and that he has been labeled as someone who is likely to break the law.[10] SAC at ¶6. Selman is also reluctant to participate in large-scale lawful expressive activities, or does so with fear and apprehension that he will, again, be subject to similar unlawful acts by defendants done for the purpose of "limiting" lawful expressive activities.[11] SAC at ¶135.

---

[9] This allegation as to the element of malice is true for each Plaintiff and is incorporated by reference in the discussion of each individual's claims herein.

[10] This factual allegation is true for each Plaintiff and is incorporated by reference in the discussion of each individual's claims herein.

[11] This factual allegation is true for each Plaintiff and is incorporated by reference in the discussion of each individual's claims herein.

### D.   Plaintiff Winawer States a Claim for Malicious Prosecution

Each of the elements of a malicious prosecution claim are established for Plaintiff Winawer. An original judicial proceeding was commenced on November 20, 2003, when he was accosted without warning, forcibly shoved to the ground, handcuffed and arrested, without probable cause, by approximately 50 to 60 officers, who wore no visible identifiable agency or name information, but who are believed to be employees of the defendant BSO, acting in coordination with supervisors and officers from the MPD.  SAC at ¶25. Winnawer's arrest form was signed by Defendant BSO Deputy M. Neily, badge #6370.  *Id.*  He was originally charged with disorderly conduct, which was then reduced to a charge of "failure to obey." *Id.*

Defendants violated his Fourth Amendment rights, post-arrest, in several ways. Winawer was handcuffed for more than 12 hours, suffering nerve damage to both hands.  *Id.*  He was held in the makeshift "kennel" detention cage and deprived of food, water and access to counsel.  *Id.*  He rejected the State's offer of a diversion program and completion of a "values" class.  *Id.*

His charges were favorably terminated by a dismissal nolle prosequi on April 28, 2004.  *Id.* His arrest was with malice because there was no probable cause – defendants based their arrest on information which they knew to be untrue and merely arrested Plaintiff based on ideological profiling prohibited by the Constitution.  SAC at ¶¶25 &134.  Winawer also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental pain and suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages.  SAC at ¶140; 72, ¶20.  Plaintiff is also fearful that information about his wrongful arrest has and will be disseminated by the defendants and that he has been labeled as someone who is likely to break the law. SAC at ¶6.  Winawer is also reluctant to participate in large-

scale lawful expressive activities, or does so with fear and apprehension that he will, again, be subject to similar unlawful acts by defendants done for the purpose of "limiting" lawful expressive activities.  SAC at ¶135.

## V.    CONCLUSION

Based on the foregoing reasons, Defendants' Motion to Dismiss the Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) should be denied.

DATED: January 4, 2005                      Respectfully Submitted,

                                            _____s/ Andrea Costello_____
                                            ANDREA COSTELLO, FBN 532991

Carol A. Sobel (Pro Hac Vice)               Andrea Costello,  FBN 532991
LAW OFFICE OF CAROL A. SOBEL                Alice K. Nelson,  FBN 211771
429 Santa Monica Boulevard, Suite 550       SOUTHERN LEGAL COUNSEL, INC
Santa Monica, California 90401              1229 N.W. 12th Avenue
T. 310 393-3055; F. 310 393-3605           Gainesville, Florida 32601
CarolSobel@aol.com                          T. 352 271-8890; F. 352 271-8347
NATIONAL LAWYERS GUILD                      andrea.costello@southernlegal.org
MASS DEFENSE COMMITTEE                      alice.nelson@southernlegal.org


Robert W. Ross, Jr.,  FBN  921660           Mara Verheyden-Hilliard (Pro Hac Vice)
LAW OFFICES OF ROBERT W. ROSS, JR., P.A.    Carl Messineo (Pro Hac Vice)
601 South Federal Highway                   PARTNERSHIP FOR CIVIL JUSTICE, INC.
Lake Worth, Florida 33460                   1901 Pennsylvania Avenue, NW
T. 561 251-4896; F. 561 241-2790           Washington, D.C. 20006
bravelaw@mindspring.com                     T. 202 530-5630; F. 202 530-5634
NATIONAL LAWYERS GUILD                      NATIONAL LAWYERS GUILD
MASS DEFENSE COMMITTEE                      MASS DEFENSE COMMITTEE


Jonathan Moore (Pro Hac Vice)
MOORE & GOODMAN, LLP
740 Broadway at Astor Place
New York, New York 10007
T. 212 353-9587; F. 212 674-4614
NATIONAL LAWYERS GUILD
MASS DEFENSE COMMITTEE

10

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was furnished by U.S. Mail  this

4th day of January, 2005 to the following:


Beverly Pohl and Bruce S. Rogow
Bruce S. Rogow, P.A.
Broward Financial Centre
500 E. Broward Blvd., Ste. 1930
Fort Lauderdale, FL 33394

Warren Bittner
City of Miami Attorney's Office
Miami Riverside Center
444 S.W. 2nd Avenue, Suite 945
Miami, FL 33133

Elizabeth M. Rodriguez
Kubicki Draper
City National Bank Building, PH
25 West Flagler Street
Miami, FL 33130

Russell Koonin
Office of the United States Attorney
99 N.E. 4th Street, Suite 300
Miami, FL 33132-2111

Susan Torres
Miami-Dade County Attorney's Office
111 N.W. 1st Street, Suite 2810
Miami, FL 33128-1930


                                    S/ Andrea Costello
                                    Andrea Costello

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.  04-20707-CIV-ALTONAGA/Bandstra

KILLMON, et al.,

      Plaintiffs,

v.

CITY OF MIAMI, et al.,

      Defendants.

                            /

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO CITY OF MIAMI AND CHIEF TIMONEY'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

**I.     THE STANDARD FOR REVIEWING A MOTION TO DISMISS**

      A complaint may not be dismissed pursuant to Fed. R. Civ. P. 12 (b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  The issue is "not whether a Plaintiff will ultimately prevail, but whether Plaintiff is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).   The material allegations and facts in the complaint must be accepted as true, *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000), and "liberally construed in favor of [the] plaintiff." *Conley*, 355 U.S. at 45.  In a motion to dismiss, the qualified immunity defense fails unless the "the complaint fails to allege the violation of a clearly established constitutional right." *Snider v. Jefferson State Community College*, 344 F.3d 1325, 1327 (11th Cir. 2003).  This is "a question of law. . . , accepting the facts alleged as true and drawing all reasonable inferences in plaintiff's favor." *Id.*, citing *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th

1

Cir. 2001) (citation in *Chesser* omitted).[1]

## II.   STATEMENT OF FACTS

Based on Defendants' own statements, Plaintiffs have alleged a deliberate plan ("Plan") implemented for the FTAA protests, "requir[ing] the multiple agencies involved to 'submit to a single plan and a single command,' with defendants CITY and TIMONEY in a 'primary leadership role.'" Second Amended Complaint ("SAC") at ¶67.   The Defendants developed "Rules of Engagement" to implement the plan and each agency was required to follow those Rules.  *Id.* TIMONEY "announced that defendants' action were based on the policy that stated: '[t]he easiest way to prevent violence and disturbance at the FTAA Summit was to use a heavy police presence to limit protest." SAC at  ¶1.

Each Plaintiff has alleged that s/he was subjected to unlawful arrest and other violations of Fourth and First Amendment rights pursuant to the Plan crafted and enforced under the direction of the City of Miami.  SAC at ¶¶5-25; 110-115; 120-25.  After arrest, each was held at the "kennel," a make-shift detention center operated jointly by the Miami Police Department ("MPD") and the Miami-Dade Police Department ("M-DPD") solely for FTAA arrestees. SAC at ¶98.  The City processed those arrested by MPD and all the other agencies in the Joint Task Force except M-DPD. *Id.*

Plaintiff KILLMON alleges that he was arrested, unlawfully, by officers from the Broward Sheriff's Office ("BSO"), "acting in coordination with supervisors and officers from the Miami Police Department ("MPD").  He has also alleged that he was held for hours in the kennel-like detention facility operated jointly by the MPD and the Miami-Dade Police Department ("M-DPD"), where he was kept in handcuffs and without food, water or bathroom facilities.  SAC at ¶5. KILLMON's facts are set forth more fully in the Opposition to the Motion to Dismiss of Defendant Jenne.

---

[1] Plaintiffs specifically adopt and incorporate the arguments made in the concurrently filed oppositions to the motions to dismiss filed by the other defendants.

Plaintiff ALDRICH was arrested on November 17, 2003, after Defendant MPD Officers, stopped, questioned, detained and photographed ALDRICH without his consent, without reasonable suspicion or probable cause, and merely because he was profiled as an FTAA protester.  *Id.* ALDRICH was subjected to an unlawful search by MPD officers while riding his bicycle on a public street, without probable cause or reasonable suspicion to believe that he had or was about to commit a crime.  He was held for a period of time in the "kennel" and transported to jail, then later taken to his arraignment in hand and leg shackles.  *Id.*  He was unlawfully kept in custody until November 20, 2003, being held until 9 hours after posting bail the day before, even though misdemeanor citations are generally released on their own recognizance without a bail hearing.  SAC at  ¶125. The charges were terminated in his favor, nolle prosequi, on or about April 26, 2004.  SAC at ¶6. He fears that information about his wrongful arrest has and will be disseminated by the defendants, including the federal defendants, and that he has been labeled as someone likely to break the law. *Id.*  He also suffered damages as a result of the original proceeding.  SAC at ¶124-35;70, ¶11.

Plaintiff BAME was arrested, without probable cause, on November 15, 2003, by Defendants Pelham, Townsend and Sayhih, all MPD officers, after he photographed the police detaining one of his friends while they were all standing on a public sidewalk during daylight hours in a retail area of downtown.  *Id.* at ¶7. When arrested, an MPD officer took the image card from BAME's digital camera and erased the photographs before returning the camera, although BAME was later able to recover the images from the memory card.  *Id.*  He was charged with obstructing a sidewalk even though he was not doing so, then held in custody for approximately 6 hours by Defendants before being released with no bond hearing.  *Id.*  All charges were dismissed on May 27, 2004.  *Id.*  While BAME was held in custody, he was subjected to a coerced interrogation about his political beliefs by individuals who identified themselves as agents with the FBI, an entity within the jurisdiction of the federal defendants.  *Id.*  He fears that information about his wrongful arrest has and will be disseminated by the defendants, including the federal defendants, and that he has been labeled as likely to break the law.  *Id.*  BAME also suffered damages as a result of the original proceeding.  *Id.*

3

at ¶¶121-25;70, ¶11 & 71, ¶13.

Plaintiff DIAMOND was arrested, without probable cause, on November 19, 2003, after he was detained by approximately a dozen bicycle officers from the MPD and an officer in a SWAT-like black jumpsuit, believed to be with MPD, subjected to a non-consensual search of his person and property and handcuffed. SAC at ¶9.) One of the officers involved in the unlawful detention, search and arrest of DIAMOND, was Defendant Durantano, MPD badge #5830. *Id.* Plaintiff was lawfully walking on the sidewalk and the only basis for the initial stop of him was political profiling as he was believed to be a demonstrator against the FTAA. *Id.* While in police custody by Defendants, DIAMOND was also subjected to non-consensual questioning by an Alcohol Tobacco and Firearms (ATF) agent, an employee of Defendant Ashcroft, about his political beliefs. *Id.* His personal property taken at the time of arrest by MPD was never returned. *Id.* He was originally charged with felony possession of "burglar" tools after the unlawful search produced a small combination pocket knife/tool in his possession, and a misdemeanor "unlawful assembly" charge. *Id.* The charges were changed to giving a false name after arrest because he initially asserted his constitutional right to refuse to identify himself to the police as there was not even reasonable suspicion to stop him or believe he had, or was about to, commit a crime. *Id.* He was held in custody for 5 days and approximately 13 hours after his bail was posted. *Id.* The charges were reduced to a single misdemeanor count of resisting arrest without violence. *Id.* All charges against him have been dismissed. *Id.* He is fearful that information about his wrongful arrest has and will be disseminated by the defendants, including the federal defendants, and that he has been labeled as someone likely to break the law. *Id.* DIAMOND also suffered damages as a result of the original proceeding. SAC at ¶125; 70, ¶11 & 71, ¶13.

Plaintiff FOSSE was arrested, without probable cause, on November 15, 2003, after she was detained on a public sidewalk, during daylight hours while in a retail shopping area of downtown. SAC at ¶11. The basis for stopping FOSSE and her friends, including plaintiff BAME, was political profiling as anti-FTAA protestors. *Id.* She was detained without any reasonable basis in the law for

4

doing so by defendant Sgt. Balbuena of the MPD.  *Id.*  Her arrest form is signed by defendant Romero, MPD Badge #6097.  *Id.*  Fosse was subjected to interrogation, without reasonable suspicion to believe she had committed, or was about to commit a crime.  *Id.*  She was physically restrained by officers with the MPD and questioned as to where she was from, how long she had been in town and how she had traveled to Miami.  *Id.*  She was arrested by the MPD after a non-consensual search of her property produced several FTAA-related flyers.  *Id.*  While under arrest at the Miami police station, she was subjected to a coerced interrogation by a team of eight law enforcement officers, who stated they were part of a Joint Task Force, including several believed to be agents with the federal defendants.  *Id.*  She was charged with "obstructing" a sidewalk, in violation of Miami Code §54-2.  *Id.*  FOSSE was held in custody for approximately 6 hours and then released with no bond hearing.  *Id.*  The charges were all dismissed on May 27, 2004.  *Id.*Plaintiff fears that information about her wrongful arrest has and will be disseminated by the defendants, including the federal defendants, and that she has been labeled as someone likely to break the law.  *Id.*  She also suffered damages as a result of the original proceeding.  SAC at ¶125; 70, ¶11 & 71, ¶13.

Plaintiff MITCHELL was arrested, without probable cause, as he was lawfully walking in a group of approximately 100 persons toward the Bayfront Park Amphitheater, where the permitted AFL-CIO rally and march were to occur on November 20, 2003.  *Id.* at ¶15.  The group was stopped by police and told they would have to proceed in smaller clusters or be "escorted" to buses to take them out of the area. *Id.*  Despite full compliance with this unlawful order, MITCHELL was among those herded, assaulted and arrested by a group of bicycle officers, all without probable cause and with unreasonable force.  *Id*. He was first detained with several hundred people, all of whom were surrounded by MPD policemen on bicycles and in riot gear, for over an hour, in front of the Miami Police Department.  *Id*.  After about an hour, MITCHELL and the others were informed by the police that he and the other FTAA demonstrators could leave in small groups to the north, away from the scheduled AFL-CIO rally site, or be escorted by the police to buses to take them out of the downtown Miami area.  *Id*.  As he left the area, with a small group of people,  on the sidewalk, two

5

rows of police on bicycles began riding side by side up the same sidewalk. *Id*. The police in front, including defendant Lt. Alvarez, ran into MITCHELL's legs several times with their bicycles, while yelling, falsely, that MITCHELL had kicked the bicycle. *Id*. MITCHELL did not respond and attempted to get out of their way. *Id*. He and the others were forced into the street because the bicycle police had made it impossible to walk on the sidewalk by riding in pairs on the sidewalk. *Id*. MITCHELL was surrounded on all sides by the bicycle officers, struck by an officer on a bike, knocking MITCHELL to the ground, who then falsely alleged that MITCHELL had struck him. *Id*. MITCHELL was arrested by MPD Officer defendant J. Guerra, badge #2600, and MPD Lt. Alvarez, badge #6137 or 0317. *Id*. He was charged with a felony, which was reduced to a misdemeanor count of resisting arrest. *Id*. When he was held at the MPD police station and repeatedly asserted his right to counsel, an officer believed to be with the MPD responded: "we are all alone in here, what's to stop me from beating the shit out of you?" *Id*. MITCHELL's backpack and all of his personal property at the time of his arrest were taken from him and never booked or returned. *Id*. After being subjected to interrogation at the MPD Homicide Unit, MITCHELL was transported to the "kennel" makeshift detention center. *Id*. While being taken from his holding cage to a processing table, he was subjected to a painful and excessive arm hold and then slammed by the officers into the concrete floor of the parking garage when he leaned forward to relieve the stress on his arms. *Id*. He was kept in handcuffs for most of the almost 9 hours after his arrest. *Id*. At his bond hearing, MITCHELL observed that the only defendants in handcuffs were those arrested as FTAA demonstrators. *Id*. Although he was never placed in general population, MITCHELL was subjected to an unjustified physical body cavity search several hours <u>after</u> returning from his bond hearing when an officer of defendant Miami-Dade County ordered him to strip and then inserted his finger in MITCHELL's anus. *Id*. At his trial on June 7, 2004, he was assigned community service as part of a pre-trial diversion, with a disposition of nolle prosequi to be entered upon the completion of community service. *Id*. Plaintiff is also fearful that information about his wrongful arrest has and will be disseminated by the defendants, including the federal defendants, and that he has been

6

labeled as someone who is likely to break the law.  *Id.*  MITCHELL also suffered damages as a result of the original proceeding.  SAC at ¶121-25; 70, ¶11 & 71, ¶13.

Plaintiff PITULA was stopped, detained and arrested, without probable cause, on November 11, 2003, as he walked during the day towards the activists' Convergence Center.   SAC at ¶17.) The officers involved in his detention and arrest included defendant M-DPD Officer Erdo Bermudez, defendant M-DPD Officer Fadrey, defendant MPD Officer Merced, and defendant M-DPD Officer E. Todoro.  *Id.*  Some were wearing the black uniforms of the MPD, while others were wearing brown uniforms worn by the M-DPD**,** and some were in plain clothes.  *Id.*  PITULA  exercised his constitutional right not to respond to the officers as he had not committed any crime and there was not even reasonable suspicion to support the stop.  *Id.*   He was subjected to a pat-down search, which produced no evidence of weapons or illegal activity.  *Id.*  His property was then searched without his consent and he was  informed he was being detained. *Id.*  Several additional police cars arrived at this time until there were approximately seven officers from the MPD and M-DPD.  *Id.* Although none had visible name tags or badges, his arrest form was signed by defendant M-DPD Det. R. Dean .  *Id.*  He was handcuffed in a police car for approximately 5 hours, except for a brief period when he was interrogated about his political and ideological beliefs and associations.  *Id.* When he refused to answer these questions, the police told him that the anti-FTAA activists would have their "asses-whipped" next week during the protests and would be beaten up and arrested by the police.  *Id.*   PITULA  was held in custody for approximately 15 hours, then released on bond the next day.  *Id.*  He was charged with "loitering and prowling" and with "resisting arrest without violence." *Id.*  The charges were dismissed on March 23, 2004.  *Id.*  When his property was returned after his release, several items were missing.  *Id.*  Plaintiff fears that information about his wrongful arrest has and will be disseminated by the defendants, including the federal defendants, and that he has been labeled as likely to break the law.  *Id.*  PITULA also suffered damages as a result of the original proceeding.  *Id.* at ¶125; 70, ¶11 & 71, ¶13.

Plaintiff ROSIN was arrested, without probable cause, on  the morning of November 20,

2003, as she marched, with approximately 100 lawful protestors to the scheduled AFL-CIO rally at the Amphitheater. SAC at ¶19.  She was stopped and surrounded by the police, then "escorted" them to the Miami police station, where the group was  surrounded and detained by officers in riot gear for well over an hour.  *Id.*  When finally permitted to leave to proceed to the Amphitheater area, their path was continually blocked by bicycle officers who struck the demonstrators with their bicycles and herded them back and away from the Amphitheater.  *Id.*  ROSIN was tackled by the police, thrown to the ground, and forcibly arrested as she videotaped the incident. *Id.*  The police confiscated the camera equipment and destroyed the videotape.  *Id.*   She was arrested by MPD Badge #2976 and held in custody for 40 hours. *Id.*  ROSIN never received several items of personal property from defendants following her arrest, including an orthopedic device.  *Id.*  Initially charged with aggravated assault on an officer and resisting arrest without violence, her charge was reduced to disorderly conduct at her first court appearance, while her co-defendant's charges were dropped entirely.  *Id.* Her charges were dismissed nolle prosequi on April 27, 2004.  Plaintiff is also fearful that information about her wrongful arrest has and will be disseminated by the defendants, including the federal defendants, and that she has been labeled as someone who is likely to break the law.  *Id.* ROSIN also suffered damages as a result of the original proceeding.  *Id.* at ¶121-25; 70, ¶11 & 71, ¶13.

Plaintiff STONE was arrested, without probable cause, on November 20, 2003, as he was standing on Biscayne Boulevard and SE 1st Street, where a crowd of demonstrators had assembled and a line of riot-gear clad police were standing across the width of Biscayne Boulevard. *Id.* at ¶22.  As he stood in this area, the line of police moved forward without warning, pushing the demonstrators with their shields.  *Id.* When STONE and two other individuals attempted to assist a woman being beaten by police, they were repeatedly struck by baton-wielding officers, including the one who had been beating the female demonstrator.  *Id.*  STONE was grabbed by an officer and pulled behind the police line, where he was repeatedly beaten on his ribs and legs.  *Id.*   He was handcuffed and his backpack was thrown into a trash canister by the police.  *Id.*  He was arrested by

8

defendant MPD Officer R. Rahming, badge #5861. *Id.* He was arrested, without probable cause and with unreasonable force, and charged with failing to disperse and being "part of an illegal assembly . . . that had exceeded the 30 minutes" allowed under Miami Code §54-6.1, a Miami public assembly ordinance, even though the plain language of the ordinance did not prohibit this conduct and could not reasonably be understood to make standing in a public place for 30 minutes a criminal offense. *Id.* The charge was ultimately reduced to failure to obey a police officer. *Id.* When STONE was arrested, the police took his glasses and placed him in "the freezer," a room maintained at a temperature of approximately 40 degrees. *Id.* When released, he was told that there was no record of any property booked for him, including his glasses. *Id.* STONE was held in custody for approximately 8 hours. *Id.* His charges were dismissed nolle prosequi on April 27, 2004. *Id.* Plaintiff fears that information about his wrongful arrest has and will be disseminated by the defendants, including the federal defendants, and that he has been labeled as someone likely to break the law. *Id.* He also suffered damages as a result of the original proceeding. *Id.* at 70, ¶11.

Plaintiff WINAWER was accosted without warning, forcibly shoved to the ground, handcuffed and arrested, without probable cause, on November 20, 2003, by approximately 50 to 60 officers, who wore no visible identifiable agency or name information, but who are believed to be employees of the defendant BSO, acting in coordination with supervisors and officers from the MPD. SAC at ¶25. Winnawer's arrest form was signed by Defendant BSO Deputy M. Neily, badge #6370. *Id.* He was originally charged with disorderly conduct, which was then reduced to a charge of "failure to obey." *Id.* WINAWER was handcuffed for more than 12 hours, suffering nerve damage to both hands. *Id.* He was held in the makeshift "kennel" detention cage and deprived of food, water and access to counsel. *Id.* He rejected the State's offer of a diversion program and completion of a "values" class. *Id.* His charges were favorably terminated by a dismissal nolle prosequi on April 28, 2004. *Id.* Winawer also suffered damages as a result of his arrest. SAC at ¶140; 72, ¶20. Plaintiff is also fearful that information about his wrongful arrest has and will be disseminated by the defendants and that he has been labeled as someone who is likely to break the

9

law. SAC at ¶6.

### III.   CHIEF TIMONEY IS NOT ENTITLED TO QUALIFIED IMMUNITY[2]

#### A.   The Test for Qualified Immunity

Qualified immunity does not protect those who are plainly incompetent or who knowingly violate the law. *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir.), *cert. denied sub nom DeArmas v. Kingsland*, 125 S.Ct. 80 (2004). The first part of the qualified immunity analysis asks whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a violation of a constitutional right is stated, then the Court must "ask whether the right was clearly established" at the time of the alleged injury. *Id. Accord, Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

To be "clearly established," "the right's contours must be so clear that every, objectively reasonable official must understand that what the defendant, in the context of the circumstances of the case, is doing clearly violates the right." *Vinyard v. Wilson*, 311 F.3d 1340, 1353 (11th Cir. 2002). "That the very act (or something materially similar to it) in question has previously been held unlawful by a court is not always necessary." *Snider v. Jefferson State Community College*, 344 F.3d 1325, 1328 (11th Cir. 2003). The reasoning of earlier cases may provide "fair warning," even if the specific facts of those cases are not identical. *Hope*, 536 U.S. at 743 ("The reasoning, though not the holding, in a[n earlier] case . . . sent the same message to reasonable officers in that Circuit.").

#### B.   The Basis of Liability for Timoney

Supervisory liability attaches where a supervisor either "personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir.

---

[2]Plaintiffs unintentionally failed to remove the official capacity claims against all Defendants except Jenne, whose agency is not independently named as a Defendant.

10

2003) (citation omitted).   A causal connection may be established in one of three ways: first, by a history of widespread abuse that the supervisor fails to correct; second, when a supervisor's improper "custom or policy . . . resulted in deliberate indifference to constitutional rights" [citation]; or, third, when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. *Gonzalez*, 325 F.3d at 1234-5.   In this case, the second and third bases may reasonably be inferred from the facts alleged by Plaintiffs.   Chief Timoney claimed credit for the design and implementation of the deliberate plan to suppress speech as a sweeping prophylactic measure against wholly speculative unlawful acts, none of which these plaintiffs ever engaged in during the FTAA protests.  SAC at ¶¶1, 27, 79, 84-101.  The Plan imposed a single command, led by TIMONEY and MPD.  SAC at ¶79.  Moreover, he was present on the scene "and participated directly in the enforcement actions, both on bicycle and foot."  SAC at ¶27.

These allegations are in stark contrast to the claimed basis for supervisorial liability in *Gonzalez, supra*, and *Dalrymple v. Reno*, 334 F.3d 991  (11th Cir. (2003), *cert. denied*, 125 S.Ct. 1655 (2004).  Nor is this a case like *Cotton v. Jenne*, 326 F.3d 1352, 1361 (11th Cir. 2003), devoid of any allegations that the supervisor directed the unlawful acts. These decisions do not immunize Defendants' conduct.   Unlike   lower level government agents engaged in unlawful conduct incidental to the execution of "valid search and arrest warrants," Plaintiffs have alleged facts to support the inference that Miami's plan was purposely unlawful at its inception and that Timoney's personal and direct involvement in the execution of the "improper . . . policy . . . resulted in deliberate indifference to constitutional rights." *Gonzalez*, 325 F.3d at 1235;  *See also Fundiller v. City of Cooper City*, 777 F.2d 1436, 1439, 1443 (11th Cir. 1985) (in case of excessive force, held policy makers liable where their acts or omissions evince deliberate indifference to constitutional rights); *Rivas v. Freeman*, 940 F.2d 1491 (11th Cir. 1991) (Sheriff's failure to establish policies concerning constitutional rights of prisoners warrants supervisory liability under §1983; *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 704 (11th Cir. 1985) (same).  The widespread violations

11

resulting from the Joint Plan in this case also evince "an inference that [Timoney] directed the subordinates to act unlawfully or knew that the defendants would act unlawfully and failed to stop them from doing so." *Gonzalez*, 325 F.3d at 1235.  When the Complaint allows the inference of deliberate indifference to constitutional rights, dismissal from suit before discovery occurs is premature. *Ancata*, 769 F.2d at 704.

Timoney may be liable as were the agents in *Hobson v. Wilson*, 737 F.2d 1, 3 (D.C. Cir. 1984) (*per curiam*), *cert. denied* 470 U.S. 1084 (1985), cited by the City to support its erroneous assertion that there are insufficient facts alleged by Plaintiffs at this stage of the litigation to survive a motion to dismiss.  *Hobson*, on appeal after a jury trial (*id.* at 2), denied qualified immunity to government officials because they acted in a "supervisory capacity, exercising substantial responsibility for developing and implementing a policy knowingly designed to thwart plaintiffs' exercise of their First Amendment rights."  *Id.*  *Hobson* expressly rejected the argument that "compliance with an agency's approved policy" when it is so clearly unlawful should warrant qualified immunity. *Id.*  The same is true here.  The policy developed and implemented by Timoney, was specifically "designed to thwart plaintiffs' exercise of their First Amendment rights" (*id.*) to prevent wholly speculative violence and Defendants are not insulated from liability for the policies unavoidable (and intended) consequences.

### B.   Plaintiffs Have Stated a Violation of Their Fourth Amendment Rights

This Circuit recently underscored that there is no exemption from core Fourth Amendment principles for law enforcement response to large scale demonstrations, even where the government implements prophylactic policies aimed at preventing potential violence.

> It is quite possible that both protestors and passersby would be safer if the City were permitted to engage in mass, warrantless, suspicionless searches.  Indeed, it is quite possible that our nation would be safer if police were permitted to stop and search anyone they wanted, at any time, for no reason at all.  [Citation.] Nevertheless, the Fourth Amendment embodies a value judgment by the Framers. . . .  It establishes searches based on evidence -- rather than potentially effective, broad prophylactic dragnets -- as the constitutional norm."

*Bourgeois v. Peters*,387 F.3d 1303, 1311-12 (11th Cir. 2004).  Though the prevention of crime is important, "this aim cannot be accomplished by [government acts] which deny rights created or protected by the federal Constitution.'" *Cooper v. Aaron*, 358 U.S. at 16 (citation omitted).

Plaintiffs have asserted several bases for violations of their Fourth Amendment rights.  First, all allege that they were arrested based on the Plan without even "arguable" probable cause.  SAC at ¶¶1, 5-25, 79-101, 110-14, 121-25.  Second, nearly all Plaintiffs allege that their arrests were made with excessive force.  SAC at ¶¶5-25, 96-101, 111-14, 121-25.   Third, most Plaintiffs allege that they were subjected to nonconsensual and unlawful searches of their person and/or property, apart from effectuating an baseless arrest.  SAC at ¶¶5-25, 11-14, 121-25.  Each claim of a Fourth Amendment violation must be analyzed independently.  *See Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002).

### a.    The arrests without even "arguable" probable cause

The Fourth Amendment includes the right to be free from an unjustified arrest, as well as the right to be free from the use of excessive force during an arrest.  *See Vinyard*, 311 F.3d at 1347.  This includes the fundamental freedom to stand on street corners and sidewalks and associate with friends.  *See City of Chicago v. Morales*, 527 U.S. 41, 53 (1999).  "Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is "a part of our heritage [citation], or the right to move 'whatsoever place one's own inclination may direct. . . .' [Citation.]"  *Id.* at 54 (citation omitted).

A seizure occurs when government officials, "by means of physical force or show of authority... in some way restrains the liberty of a citizen."  *Graham*, 490 U.S. at 294, *quoting Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). While an arrest is "the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence, *California v. Hoter*, 499 U.S. 621, 624-26 (1991), any physical force, "however slight," is a seizure, even though the force did not result in an arrest, search or, in some cases, even an intent to detain.  *Id.* at 626; *Park v. Shifler*, 250 F.3d 843, 852-53 (4th Cir. 2001); *U.S. v. Zapata*, 18 F.3d 971, 977 (1st Cir. 1994).  A seizure occurs "whenever a police officer

13

accosts an individual and restrains his freedom to walk away."  *Terry*, 392 U.S. at 16; *accord, County of Sacramento v. Lewis*, 523 U.S. 823 (1998).

The Fourth Amendment requires <u>individualized</u> probable cause to believe that a person has committed a crime for a valid seizure.  *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).   The mere fact that a person who is not known to the local police is on a public sidewalk, or walking on a public way, at a time when anti-FTAA protestors are expected in the City is insufficient to authorize the police to stop, question, search and detain the person. *Brown v. Texas*, 443 U.S. 47 (1979).  *Brown* held the Fourth Amendment was violated by the use of a Texas statute to arrest a person who refused to identify himself after police detained, searched and required identification, with <u>no</u> reason to suspect specific criminal acts.  "When the officers detained [Brown] for the purpose of identifying himself, they performed a seizure of his person subject to the requirements of the Fourth Amendment."  *Id.* at 50.  "[T]he Fourth Amendment requires that a seizure must be based on <u>specific, objective facts</u> indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers."  *Id.* at 51 (internal citations omitted) (emphasis).

"The flaw in [Defendants' actions] is that none of the circumstances preceding the officers' detention [of plaintiffs] justified a reasonable suspicion that [they were] involved in criminal conduct."  *Brown*, at 51-52.   Even Brown's presence in an alley or "the neighborhood [being] frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct. . . .  <u>The record suggests an understandable desire to assert a police presence; however, that purpose does not negate Fourth Amendment guarantees.</u>" *Id.* at 52 (emphasis supplied).

An officer may stop someone briefly and engage in some further investigation but, "[t]o ensure that the resulting seizure is constitutionally reasonable, a *Terry* stop must be limited.  The officer's actions must be '<u>justified at its inception</u>, and . . . reasonably related in scope to the

14

circumstances which justified the interference in the first place.'" *Hiibel v. Sixth Judicial District Court of Nevada*, 124 S.Ct. 2451, 2458  (2004), *citing Terry v. Ohio*, 392 U.S. 1 (1968) (emphasis supplied) (edits in *Hiibel*).  *Terry*  applies to "all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *Reid v. Georgia*, 448 U.S. 438, 440 (1980).

 An officer's "hunch," or even an alleged "anonymous" tip that an individual has a weapon is insufficient to justify a stop.  *See Florida v. J.L.*, 529 U.S. 266, 273-74 (2000).  Thus, "probable cause requires more than suspicion." *Lee*, 284 F.3d at 1195 (citation omitted).  "[R]efusal to cooperate, <u>without more</u>, [does not] furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991). As each Plaintiff has alleged, Defendants lacked even reasonable suspicion under *Brown*, let alone "'some minimal level of objective justification' for making a *Terry* stop."  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

### b.      The unlawful searches

"The most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specially established and well-delineated exceptions, which are 'jealously and carefully drawn.'" *Bourgeois*, 387 F.3d at 1313 (citations omitted). "'A search or seizure is ordinarily unreasonable in the absence of [at least some] individualized suspicion of wrongdoing.'" *Id.*, *quoting City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000).  "Even a search under exigent circumstances must be supported by probable cause." *Id.* at 1316.  "[A] person walking to a rally hardly seems like the type of 'exigent circumstance' the Supreme Court had in mind in crafting this doctrine." *Id.*

"In this case, ordinary citizens seek to assemble and exercise free speech rights in a public place." 387 F.3d at 1315.  "In their persons and property, however, individuals 'are not shorn of all *Fourth Amendment* protection when they step from their homes onto the public sidewalks.'" *Id.* Plaintiffs' perceived ideological opposition to the FTAA cannot substitute for individualized suspicion as "a person walking to a rally hardly seems like the type of 'exigent circumstance' the

15

Supreme Court had in mind in crafting this doctrine." *Id.* at 1316.   Based on the factual allegations and the applicable established law, there is <u>no</u> conceivable basis for finding that Defendants' conduct was "objectively reasonable."   Defendants could not, lawfully,  detain and search plaintiffs for no reason other than the belief that they were in Miami to express their opposition to the FTAA, or had participated in anti-FTAA events at which some unidentified demonstrators allegedly engaged in some minor "unlawful" conduct. *See e.g., Noto v. United States*, 367 U.S. 290, 299-300 (1961) (First Amendment bars punishment of "one in sympathy with the legitimate aims of [the Communist Party], but not specifically intending to accomplish them by resort to violence");  *NAACP v. Claiborne Hardware*, 458 U.S. 886, 925 (1982) ("guilt for association" is alien to the First Amendment).

### c.   The use of excessive force in the unlawful arrests

"'[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard.'" *Garrett v. Athens-Clarke County, Georgia*, 378 F.3d 1274, 1279 (11th Cir. 2004), *quoting Graham v. Connor*, 490 U.S. 386, 395 (1989) (any use of force "in the course of an arrest, investigatory stop, *or other 'seizure' of a free citizen*, [is] analyzed under the Fourth Amendment and its 'reasonableness' standard") (emphasis added).  The "reasonableness" of a particular seizure is determined by "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, *quoting Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotations omitted). *Graham* applies to the "totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Garrett*, 378 F.3d at 1279, *quoting Lee*, 284 F.3d at 1197-98 (internal quotations in *Lee* omitted in *Garrett*).  If there is <u>no</u> basis for a lawful detention or arrest, <u>no</u> force is justified. *Jackson*, 206 F.3d at 1171; *Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1198); *Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir.

16

1995).

For each of the Plaintiffs, even if the arrests were somehow found to be lawful, the force used to effectuate the arrests would still be excessive as the alleged crimes were minor, there was absolutely no immediate threat to the safety of the officers or anyone else, and no Plaintiff resisted or attempted to evade the unlawful arrest. Thus, every criterion on these facts weighs in Plaintiffs' favor and the inference that the force used by Defendants' officers was excessive.

### C.   The Fourth Amendment Violations Alleged  were "Clearly Established" at the Time of Their Arrests

As Plaintiffs have established a violation of a constitutional right under the Fourth Amendment, the inquiry now shifts to whether the right was "clearly established" in November, 2003.   Plaintiffs may show that the law was "clearly established" for purposes of giving "fair notice" in one of three ways.  First, they may show that the case is one of 'obvious clarity' by showing that the words of the federal constitutional provision are so clear and the conduct here so egregious that there is no need to look to case law to establish the unlawfulness of the conduct.  *U.S. v. Lanier*, 520 U.S. 259, 271 (1997); *Hope*, 536 U.S. at 739; *accord, Vinyard*, 311 F.3d at 1350 and n.18.

"Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face," the Court then looks to decisional law to assess if the law was "clearly established." *Vinyard*, 311 F.3d at 1351.  "When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." *Id.*, *citing Marsh*,  268 F.3d at 1031-32 n.9.  "These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances." *Vinyard*, 311 F.3d at 1351.  In light of such precedents, "officials can still be on notice that their conduct violates clearly established law even in novel factual circumstances." *Hope*, 122 S.Ct. at 2516. "[A]lthough earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding."

17

*Id.*

Third, if there is "no case law with a broad holding of "X" that is not tied to particularized facts, [the Court must] then look at precedent that is tied to the facts." *Vinyard*, 311 F.3d at 1351. Under the third approach, the Court looks to decisions of the United States Supreme Court, the Eleventh Circuit, the Florida Supreme Court, or the "concensus" of federal circuits to find more fact-specific precedents. *Id.* "'[I]n light of pre-existing law the unlawfulness must be apparent." 311 F.3d at 1353, citing *Hope*, 122 S.Ct. at 2515. Under any of these three approaches, the conclusion is the same: the law was "clearly established" and "fair notice" was given of what was unlawful.

### 1. The Fourth Amendment Applies with "Obvious Clarity" to the Alleged Wrongful Conduct of Defendants and Gave "Fair Notice" of the Law

The Fourth Amendment stands to deter illegal conduct by the government in the first place. *Boyd v. United States*, 116 U.S. 616 (1886). The "unreasonable search and seizure" bar means, that criminal liability must be based on personal conduct and not association with others for lawful purposes as "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to [arrest] that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). The alleged wrongful conduct of Defendants here "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [Defendants], notwithstanding the lack of fact-specific case law." *Lee*, 284 F.3d at 1199. An objectively reasonable officer would know that s/he could not, even once, arrest persons based on political profiling, absent "specific, objective facts establishing reasonable suspicion to believe that the suspect was involved in criminal activity" to justify even the initial stop. *Hiibel*, *supra*, at 2457, citing *Brown*, 443 U.S. at 51-52. Reasonable suspicion may not rest on broad profiles, making suspect whole categories of people without individualized suspicion. *Brent v. Ashley*, 247 F.3d 1294, 1300-1301 (11th Cir. 2001); *United States v. Montoya DeHernandez*, 473 U.S. 531, 546-47 (1985).

18

2.      **Supreme Court law and the law of this Circuit was "clearly established"**

"[C]onstitutional limitations on the scope and operation of stop and identify statutes," require that an initial stop must be based on "specific, objective facts establishing reasonable suspicion to believe the suspect was involved in criminal activity." *Hiibel*, 124 S.Ct. at 2457, *citing Brown*, 443 U.S. at 52.   Even a detention for a brief time, with further investigation, must be "'justified at its inception, and . . . reasonably related in scope to the circumstances which justified the interference in the first place." *Hiibel*,  at 2458 (citation omitted); *accord Terry*, 392 U.S. at 20.

On the facts alleged – that Plaintiffs did not violate the law and obeyed all police orders – "a reasonable police officer would have known that he lacked reasonable suspicion for stopping Plaintiffs and that he was violating clearly established law in doing so." *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000) (affirming denial of "qualified immunity defenses to Plaintiffs' illegal stop claims") (citations in *Jackson* omitted).   "This circuit's case law has clearly established that 'mere presence at the scene of a crime, without more, does not support a finding of probable cause to arrest.'" *Holmes v. Kuycnda*, 321 F.3d 1069, 1081 (11th Cir.  2003) (internal citation omitted); *id.* at 1082. An arrest made without probable cause is patently unconstitutional.  *Redd v. City of Enterprise*, 140 F.3d 1378 (11th Cir. 1998); *accord Kingsland*, 382 F.3d at 1232 (no qualified immunity on false arrest claim).

Similarly, the Fourth Amendment right to be free from excessive force in the effectuation of an arrest was clearly established.  *Durruthy v.  Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003).

**D.      Plaintiffs Have Stated A Violation of "Clearly Established" First Amendment Rights**

1.      **The Right to Assemble and Speak**

Plaintiffs have alleged that the policy to prevent them from assembling fundamentally burdened their expressive activity through the targeted violation of their Fourth Amendment rights

19

all amounts to a violation of their clearly established First Amendment rights.  This Circuit's decision in *Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004), establishes that a policy implicating Fourth Amendment rights that is implemented on the basis of the content of the protestors' speech violates the First Amendment, as well.  *Id.* at 1317 ("decision to institute the mass search policy content-based").  Defendants "targeted [the protestors] because of the message they were sending. " *Id.*  "[W]hen a government official decides that certain expressive activity will lead others to break the law, he is making a content-based decision.  *Id.* at 1320.

Plaintiffs have alleged that Defendants acted on the erroneous belief that the diminution of Fourth Amendment rights, especially the stops, detentions and searches, were "a permissible restriction on the manner of protest," *Bourgeois*, 387 F.3d at 1323, as the "easiest way to prevent violence and disturbance."  See SAC at ¶¶1, 27, 79, 84-101.  This is an impermissible "prophylactic measure" and, unlike in *Bourgeois*, not even tied to an otherwise permissible "manner" restriction.  *Id.* at 1322.

_____The Supreme Court has repeatedly instructed that, if the First Amendment means anything, it is that the government may not suppress or disrupt speech in advance of its expression in order to prevent speculative violence.  *Cox v. Louisiana*, 379 U.S. 536, 551 (1965).  "[T]he Constitution recognizes higher values than speed and efficiency." *Stanley v.  Illinois*, 405 U.S. 645, 656 (1972).  It is long and "clearly established" that the proper response to potential or actual violence is to arrest those who actually commit an unlawful act, rather than to suppress lawful First Amendment actions as a prophylactic measure.  *Kunz v. New York*, 340 U.S. 290, 294-95 (1951).  *Kunz* held that "[t[he [lower court] mistakenly derived support for its conclusion [that a permit for a rally was properly denied] from the evidence produced at the trial that appellant's religious meetings had, in the past, caused some disorder. There are appropriate public remedies to protect the peace and order of the community if appellant's speeches should result in disorder or violence." 340 U.S. at 294-295.

In *Carroll et al. v. President and Commissioners of Princess Anne et al.*, 393 U.S. 175 (1968), the Court vacated an injunction issued upon ex parte application to prevent a rally after a

20

similar event the prior day on the basis of potential for violence. "Ordinarily, the State's constitutionally permissible interests are adequately served by criminal penalties imposed after freedom to speak has been so grossly abused that its immunity is breached." *Id.* at 180-81. There are no facts here justifying any deviation from this well-settled rule, nor could there be since Defendants adopted their plan to "limit protest" months before Plaintiffs came together to engage in lawful expressive activities. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (government may not prohibit or penalize speech unless it is aimed at imminent lawless action).

Defendants applied a deliberate policy of preempting expression in Miami based on nothing more than generalizations about some unidentified persons or groups who may have engaged in unlawful activity in Seattle or other cities five years earlier, or even in Miami at a time and place when Plaintiffs were not present. This is the worst type of guilt <u>by</u> and <u>for</u> association. *See NAACP v. Claiborne Hardware*, 458 U.S. 886 (1982); *Healy v. James*, 408 U.S. 169 (1972).

Nor could defendants implement a policy allowing them to declare an unlawful assembly on a whim and arrest persons lawfully on a public sidewalk or in a public park. *Cox,* 379 U.S. at 551. This is particularly true of "archetypal" public fora such as sidewalks, which occupy "a special position in terms of First Amendment protection," in which the government's authority to restrict expression "is very limited." *Boos v. Barry*, 485 U.S. 312, 319 (1988). The government's ability to restrict speech in these fora is even more constrained when the speech at issue, as here, is political speech, as such expression occupies a special place at the core of the First Amendment. *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 513-14 (1981). No objectively reasonable officer would believe that a policy or practice regarding speech in pubic fora that, effectively, set "no limits at all on the dispersal authority of the police" would be lawful, *Boos*, 485 U.S. at 330, because a policy "that allows a person to stand on a public sidewalk only on the whim of a police officer is unconstitutional." *Shuttlesworth v. Birmingham*, 382 U.S.87 (1965).

### 2.    The Right to Photograph Police Actions

In addition to their right to assemble in public places, several Plaintiffs have stated an

21

additional First Amendment violation against the City of Miami Defendants.  The First Amendment right to document police actions in public places was clearly established and no objectively reasonable officer would believe that s/he could punish someone for doing so, or destroy the evidence of the police actions.  The Circuit's decision in *Smith v. Cumming*, 212 F.3d 1332-33 (11th Cir.), *cert. denied*, 531 U.S. 978 (2000), establishes, indisputably, that the First Amendment right to photograph police misconduct in public places was well-established in November 2003, when Defendants confiscated, smashed and erased Plaintiffs' documentation of Defendants' lawlessness. SAC at ¶¶7,19,21. *See also Blackston v. Alabama,* 30 F.3d 117, 120 (11th Cir.1994) (finding that plaintiffs' interest in filming public meetings is protected by the First Amendment); *Williamson v. Mills,* 65 F.3d 155 (11th Cir.1995) (denying qualified immunity to an officer who seized the film of and arrested a demonstrator for photographing undercover officers).

## IV.   PLAINTIFFS STATE A CLAIM FOR *MONELL* LIABILITY

The City erroneously asserts that Plaintiffs contend it is "purportedly liable only because of the undelineated acts of CHIEF TIMONEY." (Dkt. #162 at 5.)  The ability to establish municipal liability does not turn on liability for any officer, including the chief, bur rather, depends on injuries directly attributable to a "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  *Monell v. Dept. of Social Services ,* 436 U.S. 658, 694 (1978); *id.* at 690.  The City may be liable for its unlawful policy even if individual officers who committed the wrongful act are granted qualified immunity.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808  (1985).  "Local governing bodies . . . can be sued directly under §1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, . . . or decision officially adopted and promulgated by that body's officers."  *Id.* at 659.   "[T]he conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains"  *Bryon County v. Brown*, 520 U.S. 397, 404-405 (1997).

22

Plaintiffs readily meet the requirement of a "causal" policy as they have alleged adoption and execution of the unlawful plan for "policing" the FTAA protests by City officials with "final authority to establish municipal policy with respect to the action ordered."[3]  *Pembauer v. City of Cincinnati*, 475 U.S. 469, 481 (1986).  *See also McKusick v. City of Melbourne*, 96 F.3d 478, 484 (11th Cir. 1996) ("development and implementation of . . . enforcement procedure, . . . leading to the arrest of all antiabortion protestors found within the buffer zone, . . . [is] a cognizable policy choice").

"[W]here action is directed by those who establish government policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. *Pembauer*, *supra* at 481.  *Pembauer* imposed liability when a city prosecutor with decision-making authority instructed his subordinates to violate a citizen's Fourth Amendment rights by conducting an unreasonable search of his business.  *Id.* at 472-3.  Even though the Court found that the violation was not intended, liability existed based on supervisory policy because of a "deliberate choice to follow a cause of action [] made from among various alternatives by the official responsible for establishing final policy with respect to the subject matter in question."  *Pembauer*, 475 U.S. at 483-4 (edit supplied).  Plaintiffs have alleged that TIMONEY made such a deliberate choice when he adopted a policy for preempting lawful protests and conducting warrantless searches of those suspected of being anti-FTAA protestors in November, 2003, as well as the conditions of detention in the "kennel."  SAC at 1, 71-72.   These policies caused the violations of Plaintiffs' rights.

Plaintiffs' allegations are based on the factual assertions made by Defendants about the Plan in the MPD After-Action Report.  SAC at ¶27.   The Plan required the multiple agencies involved to "submit to a single plan and a single command," with defendants CITY and TIMONEY in a "primary leadership role."  SAC at  ¶79.  The Miami Defendants, with the FTAA Legal Training Committee (Legal Committee), developed Rules of Engagement each agency was required to follow.

---

[3] Timoney is alleged to be a final policy maker for the City (SAC  at ¶27, 79), as is Asst. Chief Fernandez, delegated by Timoney to implement the "policy" on November 20, 2003.  SAC at ¶34.

23

*Id.* The command structure for the FTAA consisted of two separate, but integrated, elements: the Miami Police Department Steering Committee and the Joint Law Enforcement Command. According to the Miami After-Action Report, the Joint Law Enforcement Command consisted of the heads of the agencies, or their delegated representatives. SAC at ¶79. Plaintiffs' injuries were not the result of a spur of the moment decision by Defendants or their officers. Rather, as Plaintiffs have alleged based on Defendants' own documents, the Planning and Intelligence Committee for the Joint Law Enforcement Command met on a regular basis for nine months before the FTAA meetings to develop a specific policy. SAC at ¶81. The City of Miami had a primary role in the Joint Law Enforcement Command. Again according to the City's After-Action Report, during the FTAA protests, these agencies "put aside their independence for one week and operated largely as a single entity," including explicitly in the agree-upon use of force and arrest protocols. *Id.*

In this instance, the City's liability may also be based on Defendants' failure to train their officers, with the widespread and deliberate violations of Plaintiffs' rights during the FTAA protests standing as evidence that the need for such training would have been obvious to anyone. *See e.g., City of Canton v. Harris*, 489 U.S. 378, 390 n. 10 (1989) (noting that after *Tennessee v. Garner*, 471 U.S. 1 (1985), the failure to train on the use of force is so certain to result in constitutional violations as to reflect "deliberate indifference" and establish municipal liability). In fact, the presence and involvement of multiple officers from the MPD who took no steps to prevent the wrongful acts against the Plaintiffs may also evince a failure to train on the part of the City. *City of Canton*, 489 U.S. 378; *id.* at 389-390. Thus, the motion to dismiss on this ground should be denied.

**VI.     PLAINTIFFS ALDRICH, BAME, DIAMOND, FOSSE, MITCHELL, PITULA, ROSIN AND STONE[4] STATE A CLAIM FOR MALICIOUS PROSECUTION AGAINST DEFENDANTS CITY OF MIAMI AND TIMONEY**

---

[4] As noted by Plaintiffs, Plaintiffs inadvertently stated that Plaintiff Stone's arresting officer and agency was the BSO when in fact, Officer Rahming, is with the Miami Police Department. Plaintiffs respectfully request leave of Court to make this correction to the Second Amended Complaint. For purposes of responding to defendant's motion, Plaintiffs have addressed Plaintiff Stone's malicious prosecution claim herein.

24

Defendants incorrectly argue that Plaintiffs Aldrich, Bame, Diamond, Fosse, Mitchell, Pitula, Rosin and Stone have failed to state a claim for malicious prosecution because they have not established a Fourth Amendment "seizure" subsequent to their arrests. (Dkt. #162 at 10-11.) Defendants also argue Plaintiffs fail to state a claim because none of them established that they were in custody at the time of or subsequent to their arraignments. *Id.* These statements are incorrect under the facts in the Second Amended Complaint. SAC at ¶¶120-125.

A.    **Section 1983 Malicious Prosecution Claim**

To establish a federal malicious prosecution claim under § 1983, a plaintiff must prove the elements of the common law tort of malicious prosecution, and a violation of the Fourth Amendment right to be free from unreasonable search and seizure. *Wood v. Kessler*, 323 F.3d 872, 881 (11th Cir. 2003), *cert. denied*, 124 U.S. 298 (2003). Under Florida law, a plaintiff must establish six elements to state a claim for malicious prosecution: (1) an original judicial proceeding against the plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant[5]; and (6) the plaintiff suffered damages as a result of the original proceeding. *Alamo Rent-A-Car v. Mancusi*, 632 So.2d 1352, 1355 (Fla. 1994).

In addition to the common law elements, there must also be a violation of the Fourth Amendment right to be free from unreasonable search and seizure. *Wood*, 323 F.3d at 881. A "seizure" is established, under a "continuing seizure" theory, when following arrest, a plaintiff is

---

[5] *See Alderman v. McDermott*, 2004 WL 1109541 at *9 (M.D. Fla.) (To establish a malicious prosecution, plaintiff may prove either actual or legal malice. "Legal malice may be inferred from, among other things, *a lack of probable cause*, gross negligence, or great indifference to persons, property, or the rights of others.") (emphasis added).

25

released on bond and obligated to appear to answer the charges. *See Albright v. Oliver*, 510 U.S. 266, 267-81 (1994) (explained most completed in Ginsburg J. concurring opinion).  In *Kingsland v. City of Miami*, 382 F.3d 1220, 1236 (11th Cir. 2004), *cert. denied sub nom, DeArmas v. Kingsland*, 125 S. Ct. 80 (2004), the Eleventh Circuit did not overrule the "continuing seizure" theory, but clarified that the plaintiff's post-arrest/pre-trial release conditions need to constitute a "significant deprivation" of the plaintiff's Fourth Amendment liberty interest to amount to a "seizure." *See also Whiting v. Traylor,* 85 F.3d 581, 584-85 (11th Cir. 1996) ("seizure" established for malicious prosecution claim where plaintiff experienced "physical restraints" of person when surrendered to an arrest warrant issued two months after initial stop, arraigned, detained for additional charges, then released on bond).  Each of the Plaintiffs can show such significant deprivations and physical restraints following arrest.

**B.    Plaintiffs State a Claim for Malicious Prosecution**

Defendants argue that under *Kingsland*, 382 F.3d at 1234, Plaintiffs fail to state a claim for malicious prosecution because the requirement of posting bond, appearing at arraignment and returning to the state for court appearances do not constitute a "seizure" under the Fourth Amendment. (Dkt. #162 at 11.)  Defendants' argument misrepresents the relevant facts in the Second Amended Complaint which clearly show that Plaintiffs have stated a claim.

As discussed below, each Plaintiff has established the state law elements of a malicious prosecution claim.  Also, unlike the plaintiff in *Kingsland*, each of the Plaintiffs can establish a significant deprivation of their liberty interests by the Defendants, post-arrest, which constitutes a "seizure" in violation of the Fourth Amendment.  *See e.g., Whiting,* 85 F.3d at 584-85. The facts concerning the post-arrest physical restraint of each of the named Plaintiffs are anything but the "normal conditions of pretrial release" which the Eleventh Circuit, in *Kingland*, found did not rise

26

to the level of "seizure" under the Fourth Amendment for purposes of a malicious prosecution claim.

Plaintiffs experienced significant deprivations of their liberty interests during egregious pre-trial release procedures such as: holding them for several hours to days in jail after they had posted bond; strip and body cavity searches performed immediately prior to release after bail was posted several hours earlier and Plaintiffs had spent extended periods of time in custody for non-violent misdemeanor offenses without being subjected to such searches upon booking into jail; requiring Plaintiffs to post bail, rather than releasing Plaintiffs on their own recognizance – the standard procedure for non-violent misdemeanor offenses; leaving Plaintiffs in restraints (handcuffs and leg shackles) for several hours post-arrest; holding plaintiffs for hours in make-shift "kennel" type detention cages without access to a phone, water, food or bathroom before transporting them to jail for further detention; destroying or failing to return plaintiffs' personal property;  interrogating plaintiffs about their political beliefs and associations while in custody after they requested counsel; requiring Plaintiffs to retain private counsel and return from out of state to defend against charges for which they were either acquitted or received a nolle prosequi.  SAC at ¶¶ 6, 7, 9, 11, 15, 17, 19, 22, 127-29.

Each of the elements of the malicious prosecution claim are established for each of the Plaintiffs, as detailed below.  Defendants arguments to the contrary are without merit.

### 1.     Plaintiff Aldrich States a Claim for Malicious Prosecution

An original judicial proceeding was commenced and continued against him after Aldrich was detained, subjected to an unlawful search and arrested by MPD officers on November 17, 2003, without probable cause[6] or reasonable suspicion to believe that he had or was about to commit a

---

[6] As to the absence of probable cause element of each Plaintiff's malicious prosecution claim, the discussion of the violation of each plaintiff's Fourth Amendment rights and lack of probable cause for their arrests is discussed above..

crime. SAC at ¶6. He was falsely charged with obstructing a sidewalk. *Id.*

Defendants violated his Fourth Amendment rights, post-arrest, in several ways. He was held for a period of time in the make-shift detention "kennel," transported to jail and taken to his arraignment in hand and leg shackles. *Id.* After his arraignment, he was unlawfully kept in custody until November 20, 2003, and was not released until nine hours after posting bail the day before, even though non-violent misdemeanor arrestees are generally released on their own recognizance without a bail hearing. *Id.* & ¶121. Aldrich was required to retain counsel and return from out of state to defend against the baseless charges. *Id.* & ¶125.

His charges were terminated in his favor on or about April 26, 2004, when they were nolle prosequi. *Id.* at ¶6. His arrest was with malice because there was no probable cause – defendants based their arrest on information which they knew to be untrue and merely arrested Plaintiff based on ideological profiling prohibited by the constitution.[7] *Id.* & ¶122. Aldrich also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages. SAC at ¶124-35 & 70, ¶11. Plaintiff is also fearful that information about his wrongful arrest has and will be disseminated by the defendants and that he has been labeled as someone who is likely to break the law.[8] SAC at ¶6. Aldrich is also reluctant to participate in large-scale lawful expressive activities, or does so with fear and apprehension that he will, again, be subject to similar unlawful acts by defendants done for the purpose of "limiting" lawful expressive

---

[7] This allegation as to the element of malice is true for each Plaintiff and is incorporated by reference in the discussion of each individual's claims herein.

[8] This factual allegation is true for each Plaintiff and is incorporated by reference in the discussion of each individual's claims herein.

activities.[9]  SAC at ¶124.

### 2. Plaintiff Bame States a Claim for Malicious Prosecution

An original judicial proceeding was commenced and continued following his arrest, without probable cause, on November 15, 2003, by Defendants MPD officers Pelham, Townsend and Sayhih while Bame was lawfully on a public sidewalk.  *Id.* at ¶7.

Defendants also violated his Fourth Amendment rights, post-arrest, in several ways.  When he was arrested, a MPD officer took the image card from Bame's digital camera and erased the photographs.  *Id.*  Bame was held in custody for approximately six hours by Defendants and subjected to a coerced interrogation about his political beliefs.  *Id.*  He was falsely charged with obstructing a sidewalk and then released with no bond hearing.  *Id.*  Bame was required to retain counsel and return from out of state to defend against the baseless charges.  *Id.* & ¶125.

His charges were favorably terminated by a dismissal on May 27, 2004.  *Id.*   Bame also suffered damages as a result of the original proceeding, including:  loss of liberty, physical pain, mental suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense and other compensatory damages.  SAC at ¶121-25; 70, ¶11& 71, ¶13.

### 3. Plaintiff Diamond States a Claim for Malicious Prosecution

An original judicial proceeding was commenced and continued following his arrest, on November 19, 2003, after he was detained handcuffed, subjected to a non-consensual search of his person and property, and arrested, without probable cause, by officers from the MPD, including Defendant Durantano, badge #5830.  SAC at ¶9.  He was falsely charged with felony possession of "burglar" tools (a small combination pocket knife/tool) and a misdemeanor, "unlawful assembly."  *Id.*  The charges were changed to the misdemeanor of giving a false name after arrest, then changed,

---

[9] This factual allegation is true for each Plaintiff and is incorporated by reference in the discussion of each individual's claims herein.

29

again, to resisting arrest without violence. *Id.*

Defendants also violated his Fourth Amendment rights, post-arrest, in several ways. While in Defendants' custody, Diamond was subjected to non-consensual questioning about his political beliefs. *Id.* His personal property taken at the time of arrest was never returned. *Id.* Diamond was held in custody for five days and for approximately 13 hours after his bail was posted. *Id.* Diamond was required to retain counsel and return from out of state to defend against the baseless charges. *Id.* & ¶125.

The charges were terminated in his favor through a dismissal. SAC at ¶9. Diamond also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, and other compensatory damages. SAC at ¶125; 70, ¶11 & 71, ¶13.

### 4. Plaintiff Fosse States a Claim for Malicious Prosecution

Each of the elements of a malicious prosecution claim are established for Plaintiff Fosse. An original judicial proceeding was commenced and continued following her arrest, without probable cause, on November 15, 2003, after she was detained, on a public sidewalk, without any reasonable basis in the law for doing, so by defendant Sgt. Balbuena of the MPD. SAC at ¶¶11. Her arrest form is signed by defendant Romero, MPD Badge #6097. *Id.* She was falsely charged with "obstructing" a sidewalk, in violation of Miami Code §54-2. *Id.*

Defendants also violated her Fourth Amendment rights, post-arrest, in several ways. Fosse was physically restrained, searched and interrogated by Defendants, without reasonable suspicion to believe she had committed, or was about to commit a crime. *Id.* Fosse was held in custody for approximately 6 hours and then released with no bond hearing. *Id.* She was required to retain counsel and return from out of state to defend against the baseless charges. *Id.* & ¶125.

30

The charges were favorably terminated by a dismissal on May 27, 2004.  SAC at ¶11.  Fosse also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental suffering, embarrassment, anguish, emotional distress, lost property, costs related to criminal defense, and other compensatory damages. SAC at ¶125 & 71, ¶13.

### 5.     Plaintiff Mitchell States a Claim for Malicious Prosecution

Each of the elements of a malicious prosecution claim are established for Plaintiff Mitchell. An original judicial proceeding was commenced and continued following his arrest, without probable cause when he was among a group of protesters herded, detained, assaulted and arrested by a group of MPD bicycle officers, all without probable cause and with unreasonable force.  SAC at ¶15. Mitchell was arrested by MPD Officers defendant J. Guerra, badge #2600, and Lt. Alvarez, badge #6137 or 0317.  *Id.*   Mitchell was falsely charged with a felony, which was reduced to a misdemeanor count of resisting arrest.  *Id.*

Defendants also violated his Fourth Amendment rights, post-arrest, in several ways. Mitchell's backpack and all of  his personal property were taken from him and never booked or returned.  *Id.* When Mitchell repeatedly asserted his right to counsel, an officer believed to be with the MPD responded: "we are all alone in here, what's to stop me from beating the shit out of you?" *Id.*  After being subjected to interrogation at the MPD Homicide Unit, Mitchell was transported to the "kennel" makeshift detention center.  *Id.*  While being transported from his holding cage to a processing table, he was subjected to a painful and excessive arm hold and then slammed by the officers into the concrete floor of the parking garage when he leaned forward to relieve the stress on his arms.  *Id.*  He was kept in handcuffs for almost nine hours after his arrest.  *Id.*  At his bond hearing, Mitchell observed that the only defendants in handcuffs were those arrested as FTAA demonstrators.  *Id.*   Although he was never placed in general population, Mitchell was subjected

31

to an unjustified physical body cavity search several hours _after_ returning from his bond hearing when an officer of defendant Miami-Dade County ordered him to strip and then inserted his finger in Mitchell's anus. _Id_. He was required to retain counsel and return from out of state to defend against the baseless charges. _Id._ & ¶128-29.

His charges were favorably terminated when, at his trial on June 7, 2004, Mitchell was assigned community service as part of a pre-trial diversion, with a disposition of nolle prosequi to be entered upon the completion of community service. _Id._ Mitchell also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental suffering, embarassment, anguish, motional distress, physical harm, medical expenses, lost property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages. SAC at ¶121-25; 70, ¶11 & 71, ¶13.

### 6.    Plaintiff Pitula States a Claim for Malicious Prosecution

Each of the elements of a malicious prosecution claim are established for Plaintiff Pitula. An original judicial proceeding was commenced and continued following his arrest after he was stopped, detained, searched (without consent) and arrested without probable cause by defendant MPD Officer Merced, and other unknown MPD officers, on November 11, 2003, as he walked during the day towards the activists' Convergence Center. SAC at ¶17. He was falsely charged with "loitering and prowling" and with "resisting arrest without violence." _Id._

Defendants also violated his Fourth Amendment rights, post-arrest, in several ways. He was subjected to a pat-down search, which produced no evidence of weapons or illegal activity. _Id._ His property was searched without his consent and several items were not returned, including his driver's license, credit card and bank card. _Id._ He was held in handcuffs in a police car for approximately 5 hours, except for a brief period of time when he was interrogated about his political and ideological

beliefs and associations.  *Id.*  Pitula was held in custody for approximately 15 hours.  *Id.*  He was released on bond the next day.  *Id.*  He was required to retain counsel and return from out of state to defend against the baseless charges.  *Id.* & ¶125.

His charges were favorably terminated by a dismissal on March 23, 2004.  *Id.*  When his property was returned to him after his release, several items were not returned.  *Id.*  Pitula also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense and other compensatory damages.  SAC at ¶125; 70, ¶11 & 71, 13.

### 7.   Plaintiff Rosin States a Claim for Malicious Prosecution

Each of the elements of a malicious prosecution claim are established for Plaintiff Rosin. An original judicial proceeding was commenced and continued following  the morning of November 20, 2003, as she marched with approximately 100 lawful protesters and was (without probable cause) stopped, detained, herded, surrounded, assaulted and forcibly arrested by MPD bicycle officers as she videotaped the incident.   SAC at ¶19. She was arrested by MPD Badge #2976.  *Id.*  Initially falsely charged with felony aggravated assault on an officer and resisting arrest without violence, her charge was reduced to disorderly conduct at her arraignment, while her co-defendant's charges were dropped entirely.  *Id.*

Defendants also violated her Fourth Amendment rights, post-arrest, in several ways.  The MPD confiscated her camera equipment and destroyed the videotape.  *Id.* She was taken to the make shift detention "kennel," and  held in custody for a total of 40 hours.  *Id.* & ¶127.  Rosin never received several items of personal property from defendants following her arrest, including an orthopedic device.  *Id.*  She was required to retain counsel and return from out of state to defend against the baseless charges.  *Id.* & ¶125.

33

Her charges were favorably terminated by dismissal nolle prosequi on April 27, 2004. SAC at ¶19.  Rosin also suffered damages as a result of the original proceeding, including: loss of liberty, physical pain, mental suffering, embarrassment, anguish, emotional distress, medical expenses, lost property, costs related to criminal defense, damages related to conditions of pre-trial detention in "the kennel" and other compensatory damages.  SAC at 121-25; 70, ¶11 & 71, ¶13.

### 8.    Plaintiff Stone States a Claim for Malicious Prosecution

Each of the elements of a malicious prosecution claim are established for Plaintiff Stone. An original judicial proceeding was commenced and continued following his arrest, without probable cause, on November 20, 2003, as he was pushed forward, without warning, by officers using riot shields, repeatedly struck by baton-wielding officers and grabbed by an officer and pulled behind the police line where he was repeatedly beaten on his ribs and legs.  SAC at ¶22.  He was arrested by defendant MPD Officer R. Rahming, badge #5861.  *Id.*    He was falsely charged with failing to disperse and "illegal assembly" under Miami Code § 54-6.1.  *Id.*  The charge was reduced to failure to obey a police officer.  *Id.*

Defendants also violated his Fourth Amendment rights, post-arrest, in several ways.  After he was handcuffed, his backpack was thrown into a trash canister by the police.  *Id.*  When Stone was arrested, the police took his glasses and placed him in "the freezer," a room maintained at a temperature of approximately 40 degrees.  *Id.*  Stone was held in custody for approximately eight hours.  *Id.*  When released, he was told that there was no record of any property booked for him, including his glasses.  *Id.*   He was required to retain counsel and return from out of state to defend against the baseless charges.  *Id.* & ¶125.

His charges were favorably terminated by a dismissal nolle prosequi on April 27, 2004.  *Id.*  Stone also suffered damages as a result of the original proceeding, including: loss of liberty,

physical pain, mental suffering, embarrassment, anguish, emotional distress, physical harm, medical expenses, lost property, costs related to criminal defense, related to conditions of pre-trial detention in "the kennel" and other compensatory damages.  SAC at ¶125 & 70, ¶11.

## VI.   PLAINTIFFS HAVE STATED A CLAIM FOR INJUNCTIVE RELIEF[10]

Plaintiffs incorporate the argument set forth in response to the federal defendants motion to dismiss.  The only facts before the Court at this stage establish that several of the Plaintiffs – some of whom are Florida residents – intend to engage in similar activities in the future (SAC at ¶¶5, 13, 18, 46), and that the City intends to apply the same "Miami Plan" in the future.  SAC at ¶94. The City's After-Action Report expressly stated that Defendants viewed the Joint Plan applied against Plaintiffs in November, 2003 as a model for policing protests and intended to use the same policy in the future.  SAC at ¶72.  Plaintiffs have alleged that the City's policy or practice has resulted in a severe restraint on their exercise of their First Amendment rights.  SAC at ¶5-25, 11-14, 121-25.  This type of "chilling effect" on freedom of expression represents a sufficient "continuing injury" to support a claim for injunctive relief.  *Secretary of State of Md. v. Munson*, 467 U.S. 947, 956-57 (1984).

This Circuit has recognized the instruction of *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972), *rhr'g denied*, 409 U.S. 901 (1986), that "allegations of a subjective 'chill'" are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  At the same time, the Circuit has recognized that "a plaintiff can overcome the 'subjective chill' hurdle with sufficient demonstrations of the 'chilling effect' in their compalint. [Citation.] *Smith v. Meese*, 821 F.2d 1484, 1494 (11th Cir. 1987).  In *Smith*, it was sufficient that the Plaintiffs' complaint contained sufficient facts of a "chilling effect" in "an attack by a group of people on a specifically discriminatory governmental policy *which has already had the demonstrable objective effect of limiting, or chilling the exercise of protected constitutional rights." Id.* at 1494 (emphasis supplied).  Plaintiffs readily

---

[10] Plaintiffs incorporate the arguments in support of their injunctive relief claims set out in the opposition to the motion to dismiss filed by the federal defendants.

meet this standard as each alleges s/he has been arrested and preempted from expression because of their perceived ideological and political association with anti-FTAA demonstrators.

Moreover, Plaintiffs have alleged sufficient facts to establish a basis for injunctive relief on a second, independent basis.  In addition to challenging the use of force and the deliberate disruption of lawful expressive activity, all without even "arguable" probable cause, Plaintiffs have alleged that the information concerning their unlawful arrests has been collected and disseminated by Defendants to other law enforcement agencies.   The injunctive relief sought by Plaintiffs is plainly tailored to remedying such a "chilling effect."  An order directing the Defendants to expunge the records of Plaintiffs' arrest and to notify all law enforcement agencies to which the information was sent that the information was not accurate would provide Plaintiffs with some guarantee that they may exercise their First Amendment rights, no matter what their views and no matter what other persons join in the lawful expression of the same position, without the fear that they will be stopped, searched, detained and/or arrested for doing so, or that they will be labeled a "lawbreaker."

## VII.   PLAINTIFFS' CLASS ACTION CLAIMS ARE PROPERLY BROUGHT

Plaintiffs incorporate the argument set out in the Opposition to the Motion to Dismiss filed by the federal defendants.

## VIII.  PLAINTIFFS' CLAIM FOR COSTS OF CRIMINAL PROSECUTION AS DAMAGES IN THE CIVIL ACTION IS PROPER

With a single selective quote from *Heck v. Humphrey*, 512 U.S. 477 (1994), Defendants erroneously argue that Plaintiffs may not seek damages for their criminal prosecutions except for costs up to the time of their release from custody.[11]  This assertion is flat wrong.  While it is true that a plaintiff is not entitled, generally, to recover attorneys' fees expended for defending him in the prosecution of the charges <u>after</u> the point that s/he was discharged from the alleged illegal custody based solely on a  false arrest claim, this limit does <u>not</u> apply to a claim of malicious prosecution,

---

[11] Defendants previously argued that Florida law prohibited damages for malicious prosecution.  Correctly, they have now abandoned that argument.

which Plaintiffs have also raised.  SAC at ¶¶126-31.

"If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 888 (5th ed. 1984). *But a successful malicious prosecution plaintiff may recover,* in addition to general damages, "compensation for any arrest or imprisonment, including damages for discomfort or injury to his health, or loss of time and deprivation of the society." *Id.,* at 887-888 (footnotes omitted).

*Heck*, 512 U.S. at 484.

For these reasons, it is not proper to strike damages for the costs of criminal prosecution.


## IX.    CONCLUSION

Based on the foregoing reasons, Defendants' Motion to Dismiss the Second Amended

Complaint pursuant to Fed. R. Civ. P. 12(b)(6) should be denied.



DATED: January 4, 2005                      Respectfully Submitted,

                                                       s/ Andrea Costello
                                            ANDREA COSTELLO, FBN 532991

Carol A. Sobel (Pro Hac Vice)               Andrea Costello,  FBN 532991
LAW OFFICE OF CAROL A. SOBEL               Alice K. Nelson,  FBN 211771
429 Santa Monica Boulevard, Suite 550       SOUTHERN LEGAL COUNSEL, INC
Santa Monica, California 90401              1229 N.W. 12th Avenue
T. 310 393-3055; F. 310 393-3605            Gainesville, Florida 32601
CarolSobel@aol.com                          T. 352 271-8890; F. 352 271-8347
NATIONAL LAWYERS GUILD                      andrea.costello@southernlegal.org
MASS DEFENSE COMMITTEE                      alice.nelson@southernlegal.org


Robert W. Ross, Jr.,  FBN  921660
LAW OFFICES OF ROBERT W. ROSS, JR., P.A.
601 South Federal Highway
Lake Worth, Florida 33460
T. 561 251-4896; F. 561 241-2790
bravelaw@mindspring.com
NATIONAL LAWYERS GUILD
MASS DEFENSE COMMITTEE

Mara Verheyden-Hilliard (Pro Hac Vice)
Carl Messineo (Pro Hac Vice)
PARTNERSHIP FOR CIVIL JUSTICE, INC.
1901 Pennsylvania Avenue, NW
Washington, D.C. 20006
T. 202 530-5630; F. 202 530-5634
NATIONAL LAWYERS GUILD
MASS DEFENSE COMMITTEE

Jonathan Moore (Pro Hac Vice)
MOORE & GOODMAN, LLP
740 Broadway at Astor Place
New York, New York 10007
T. 212 353-9587; F. 212 674-4614
NATIONAL LAWYERS GUILD
MASS DEFENSE COMMITTEE

38

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was furnished by U.S. Mail this

4th day of January, 2005 to the following:

Beverly Pohl and Bruce S. Rogow
Bruce S. Rogow, P.A.
Broward Financial Centre
500 E. Broward Blvd., Ste. 1930
Fort Lauderdale, FL 33394

Warren Bittner
City of Miami Attorney's Office
Miami Riverside Center
444 S.W. 2nd Avenue, Suite 945
Miami, FL 33133

Elizabeth M. Rodriguez
Kubicki Draper
City National Bank Building, PH
25 West Flagler Street
Miami, FL 33130

Russell Koonin
Office of the United States Attorney
99 N.E. 4th Street, Suite 300
Miami, FL 33132-2111

Susan Torres
Miami-Dade County Attorney's Office
111 N.W. 1st Street, Suite 2810
Miami, FL 33128-1930

S/ Andrea Costello
Andrea Costello

39