**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 04-CV-20707   - ALTONAGA/Turnoff**

KILLMON, et al.,

      Plaintiffs,

vs.

CITY OF MIAMI, et al.,

      Defendants.

_____/

**PLAINTIFF LAWRENCE WINAWER'S MOTION**
**FOR FINAL PARTIAL SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56(c) and S.D. Local Rule 7.5(C), Plaintiff LAWRENCE

WINAWER ("WINAWER"), moves the Court for an order granting Final Partial Summary

Judgment on his claims that Defendant BROWARD SHERIFF'S OFFICE ("BSO") violated his First

and Fourth Amendment rights by, *inter alia*, targeting him based on his association with the FTAA

protests, then subjecting him to arrest without probable cause and excessive force.  Based on the

evidence presented in support of his motion, Plaintiff is entitled to judgment as a matter of law on

the First Claim for Relief in the Third Amended Complaint ("TAC") (First and Fourth Amendment

rights) and the Fifth Claim for Relief (wrongful arrest and excessive force).

**I.**     **STATEMENT OF FACTS**

**The Arrest by Deputy Mandera**

In November, 2003, Plaintiff Winawer was employed as Field Director/State Organizer with

the Alliance of Retired Amerncans ("ARA").  Ex. 1, p. 4 (Deposition of Winawer ("WINAWER")

p.13, line 21).  He was assigned to the office of the Florida Alliance for Retired Americans

("FLARA"), an advocacy group for Seniors located in Wellington, Florida. Ex. 1, p. 5 (WINAWER p.14, line 6). In this capacity, he was responsible for arranging buses from around the state of Florida to bring retirees to the FTAA meetings in Miami in November 2003. Ex. 1, pp. 6a, 6b (WINAWER p.17, line 21- p.18, line 3).

On November 20, 2003, Winawer attended a rally sponsored by the AFL-CIO in the Bayfront Amphitheater. The rally lasted approximately 90 minutes to two hours. Ex. 1, p 7 (WINAWER p.23, lines 3-8). Following the rally, there was a march through downtown Miami, also sponsored by the AFL-CIO, but Winawer did not participate in it. Ex. 1, p. 8 (WINAWER p.24, lines 13-17). Instead, after the rally concluded, Winawer remained in the amphitheater. *Id.*, lines 18-20.

Shortly before 5:00 that afternoon, Winawer left the area of the Bayfront Amphitheater with a large group of seniors whom he was assisting to locate their buses for their return trips home. Ex. 1, p. 9 (WINAWER p.25, lines 4-9); *id.*, p. 11 (WINAWER p.28, lines 4-5; p.128, lines 12-21). One of the retirees was co-plaintiff Bentley Killmon. *Id.*, lines 16-20. As they walked west on N.E. 5th, away from the area of the amphitheater, a phalanx of police blocked all paths except N.E. 2nd Avenue  Winawer and the others were herded north on N.E. 2nd to the railroad tracks. Ex. 1, p. 10 (WINAWER p.27, lines 3-27). They were expressly told by police that the only route by which they could leave the area was by traveling along the railroad tracks. Ex. 1, p. 12 (WINAWER p.29, lines 11-15). The railroad tracks run west at that point, between N.E. 6th and N.E. 7th Streets. Ex. 2. Winawer walked along this course, which led him farther away from the Bayfront Amphitheater, staying a few feet south of the tracks. Ex. 1, p.   (WINAWER p.204, lines 3-8).

At about the same time as Winawer and Killmon were walking parallel to the railroad tracks, two Field Forces of BSO deputies were marching up North Miami Avenue, away from the amphitheater. Ex. 6, pp. 9-10  (BROOKS pp. 40-41). Shortly after 5:00 p.m, as the BSO officers

reached N.E. 6th Street, they spotted Winawer and the small group walking along the railroad tracks. Ex. 3 (BSO After-Action Report - Daily Log (BSO 008200)).  Winawer and those in his general vicinity were then approximately one and one-half blocks to the east of the deputies and nearly a mile <u>away</u> from the amphitheater and downtown Miami.  Ex. 2, Ex. 4 (Video).  There was no group of protestors "assembled" in the area; rather, as the video demonstrates, there were a few people standing on the sidewalk or crossing the street in the block closer to the deputies.  Ex. 4  (Video).

At 5:30 p.m., Winawer and 21 others were arrested.  Ex. 3 (BSO After-Action Report - Daily Log (BSO 008200)).  At the time, Winawer was wearing an orange vest, identifying him as with the AFL-CIO. Ex. 1, p. 13 (WINAWER p.138, lines 1-2; Ex. 1, p. 14 (WINAWER p. 139) Ex.4 (video).

Winawer's contact with BSO followed a sweep of downtown Miami in the late afternoon of November 20th by a number of law enforcement entities, including BSO, in a concerted plan to force demonstrators – and those associated with them – north out of downtown and, for Winawer, herd them to the railroad tracks and then north as the sole course of escape.  Ex. 5, p. 9 (Deposition of Mandera ("MANDERA") p.75, lines 12-25), Ex. 6, pp. 9-10  (BROOKS pp. 40-41).  Lines of police formed human blockades across the roadways to achieve this goal and funnel protestors in a narrow escape route.  When the BSO deputies spotted Winawer and the others walking along N.E. 6th Street, one officer stated words to the effect: "There they are.  Arrest teams." Ex. 4.  At that point, BSO was still on N. Miami, well more than a block away from Killmon, Winawer and the others, who were on N.E. 6th Street.  With that considerable distance between them, the BSO arrest teams, including defendant Mandera, were brought forward and marched the distance to effectuate the arrests of Winawer and the others.  Ex. 4.

Winawer was arrested and charged with a violation of §877.03 Fla. Stat.: "disorderly conduct."   Ex. 7 (Arrest Affidavit). The narrative portion of the Arrest Affidavit states: "Pursuant

to mutual aid agreement subject was given a dispersal order by Major Burden MPD/After given the opportunity to disperse, subject became violent and had to be arrested.  FTAA arrest."  *Id.*  The Arrest Affidavit is signed by defendant N. Mandera. *Id.*

The video produced by BSO of Winawer's arrest confirms Winawer's factual recollection of this event.  When Winawer and Killmon had progressed west approximately 15 yards along the railroad tracks, a wall of BSO deputies descended on them, yelling for everybody to get down.  Ex. 1, p. 15 (WINAWER p.30, lines 1-3); Ex. 4.  The commands were given with the deputies' weapons drawn and shields out. Ex. 1, p. 16  (WINAWER p.31, lines 1-3).  At no point prior to or after the time Winawer was told he was under arrest and ordered to get on the ground did he hear any dispersal order given.  *Id.* at lines 6-8).  In addition, from the time that BSO is shown marching up N. Miami Avenue and suddenly spotting Winawer and the others until the time the order of arrest is given, no dispersal order is heard on defendants' 11-minute video recording of this incident.  Ex. 4.  So, BSO's own evidence confirms the absence of a dispersal order.

There simply is no factual evidence to support a reasonable belief that Winawer and the others heard or should have heard any dispersal order as they left downtown.  Significantly, Winawer took a path out of downtown with the Seniors that was separate from the bulk of the demonstrators, who were forced north on Miami Avenue.  Instead, Winawer walked north from the amphitheater along the bay and then west on  N.E. 5th Street, where they were blocked by the officers who funneled them onto N.E. 2nd Avenue.  Moreover, the only dispersal order which defendant Mandera, Winawer's arresting officer, could recall was one purportedly given far away from the railroad tracks where Winawer and the others were arrested. Ex. 5, p. 10 (MANDERA p.76, lines 1-5).  No reasonable basis exists to conclude that Winawer heard this dispersal order.

Defendants are unable to offer any facts supporting probable cause or even "arguable"

probable cause for Winawer's arrest.  According to Capt. Brooks, as the BSO Field Forces were going north on Miami Avenue, several blocks away from where Winawer and the others were walking, "rocks and bottles" were being thrown at the officers.  Ex. 6, p. 14 (Deposition of Capt. John Brooks ("BROOKS") p. 48).  Assuming this allegation is true, there is no evidence to support a belief that Winawer and the others walking near him were involved in throwing any objects at the officers at any time.  No rocks, bottles or other projectiles are shown on the videotape or listed as evidence on his Arrest Affidavit. Also, no mention of anything being thrown is included on the Arrest Affidavit.  Ex. 7.

According to Deputy Mandera, she was ordered by Miami Police Department ("MPD") Major Burden to arrest Winawer when Burden was standing right next to Mandera.  Ex. 5, p. 13 (MANDERA p. 83, lines 2-8).  Mandera claims that she relied on Burden's directive as she did not observe Winawer engage in any "violent" conduct, as described in the arrest form.  *Id.* at p.14 (MANDERA p. 84, lines 16-21).  Defendant Mandera admits that she signed a pre-prepared arrest affidavit, averring to facts she had not witnessed.  *Id.* at line 25 - p. 85, line 2); *id.*, p. 11 (MANDERA p. 80, lines 8-11).[1]

Mandera's claim that MPD Major Burden ordered her to arrest Winawer is patently false. Significantly, Major Burden is neither seen nor heard on the video recording of the arrests. Declaration of Robert Ross ("ROSS") ¶¶ 4-5.  At his deposition in Winawer's criminal case in early 2004, Major Burden testified that he had no idea why Winawer was arrested and had not given the order to arrest him. Ex. 9, pp. 3, 5-6 (Deposition of Major Burden ("BURDEN") p. 63, lines 18-24; p.71, line 18 - p. 72, line 16).

---

[1] In fact, Mandera signed several arrest affidavits at the location where she arrested Winawer. Each affidavit was identical in the narrative as to the basis for the arrest.  Ex. 7, Ex 8, p. 4.

Complying with BSO orders, Winawer was lying prone on the ground next to Killmon, with the nearest person to them on the railroad tracks located approximately 15 yards away. Ex. 1, p. 15 (WINAWER p. 30, lines 15-20); Ex. 4 (Video). The video demonstrates that there was nothing even remotely resembling an organized group on the railroad tracks. Ex. 4. As Winawer complied fully with the orders to get on the ground, he was surrounded by the BSO deputies and then handcuffed. Exhibit 4 (video). Winawer could not see the officer who handcuffed him because his face was in the gravel. Ex. 1, p. 17 (WINAWER p.32, lines 4-18). A few minutes after he was handcuffed with his hands behind his back, Winawer was yanked to his feet by pulling sharply on his arms. Ex. 1, p. 18 (WINAWER p.33, lines 1-10).

After being jerked to a standing position while handcuffed behind his back, Winawer at once felt pain in his arms and hands and immediately told the BSO deputies about it. Ex. 1, p.20 (WINAWER p.35, lines 18-25). The handcuffs were so tight that he began to experience numbness in his hands as he was taken to a processing area. Ex. 1, p. 21 (*Id*. p.36, 6-13). Although he asked repeatedly for his handcuffs to be loosened, he received no response. *Id*., lines 14-25.

Once jerked to his feet, Winawer was taken to an area at Northeast 1st Avenue and the railroad tracks for processing. Ex. 1, p. 19 (*Id.*, p.34, 21-24). After he was processed at the railroad tracks, Winawer was placed on a bus[2] for transportation by BSO to the temporary detention facility operated for FTAA arrests. Ex. 1, p. 25 (WINAWER p.44, lines 8-10); Ex. 3, p.  (transport log). Winawer's arrest report states the time of his arrest as 7:30 p.m, approximately two hours after he was originally placed in handcuffs. Ex. 7. While he was held on the bus by BSO, he again told BSO deputies he could not feel his hands and asked for medical assistance. Ex. 1, pp. 22-23 (WINAWER p.40, line 22 - p.41, line 6). He was held on the bus for about 3 hours with his hands uncomfortably

---

[2] Ex. 1, p. 22 (WINAWER p.40, lines 15-16).

wrenched and tightly handcuffed behind his back. Ex. 1, p. 24 (WINAWER p.43, lines 20-24).

Winawer was prosecuted for "disorderly conduct."  His arrest form was pre-written by an unknown person and is virtually identical to every other person arrested on the railroad tracks at that time: "defendant became violent . . ."  Ex. 1, p.26 (WINAWER p.98, lines 19-22); Ex. 6, p.17 (BROOKS p. 52, lines 10-12); Ex. 8.  Deputy Mandera signed more than one pre-written arrest form: she signed Winawer's for his arrest at N.E. 6th and N.E.1st Avenue at 7:30 p.m.,[3] and signed a Jane Doe arrest form for 3rd and Biscayne at the same time.[4]  Under the laws of physics, Deputy Mandera could not possible have been in both places, a mile apart, at the same time.

In preparation for the FTAA protests, Deputy Mandera was provided with training specifically to be able to distinguish "law-abiding demonstrators" from law-breaking protestors.  Ex. 5, p. 3 (MANDERA p.18, lines 19-25).  The training provided to BSO personnel for the FTAA included the MPD Power Point, with its three-colored coding for demonstrators: green, yellow and red.  Ex. 11 (Excerpt from BSO training materials).  When Deputy Mandera considered the training she had received, she viewed Winawer and the others on the railroad track as engaging in "passive resistance, obstruction by sitting or lying,"[5] even though it is indisputable that the order for these individuals to lie down on the ground came from BSO.  Ex. 1, p. 19 (WINAWER p. 31) and Ex. 4

**Captain John Brooks:**

Capt. Brooks was the highest ranking BSO command staff member on sight for the FTAA.  Ex. 6, p. 8 (BROOKS p. 39, lines 12-15).  Capt. Brooks was not required to check with any member of the command staff above him while carrying out the operations of the BSO Field Forces in Miami

---

[3] Ex. 7 (Winawer Arrest Affidavit)

[4] Ex. 8 ("Jane Doe" Arrest Affidavit)

[5] Ex. 5, pp. 5-6 (MANDERA p. 21, line 21 - p.22, line 3)

on the afternoon of November 20, 2003, or to move forward with arrests at the railroad tracks.  Ex. 6, p. 9 (BROOKS p. 40, line 17 - p. 41, line 5).  Brooks was in continuing contact with the BSO FTAA command center.  *Id.*, p. 11 (BROOKS p. 42, lines 13-16).  Defendant Brooks was at the intersection of N. Miami Avenue and the railroad tracks at the time the BSO Field Force targeted Winawer and the others for arrest at Brooks' direction.  Ex. 6, p.7 (BROOKS p. 27, lines 12-14).

According to Capt. Brooks, as the BSO Field Forces were going north on N. Miami Avenue a block south of the railroad tracks, "rocks and bottles" were being thrown at them.  Ex. 6, p. 14 (*Id.*, p. 48).  When they reached the railroad tracks and saw Winawer and the others to the east, Capt. Brooks "dispatched Chief Reffet with his personnel to go and address the rocks and bottles that were being thrown" in the direction of the officers.  *Id.*, p.48, lines 16-23.  Specifically, Capt. Brooks directed Chief Refett to "go down and stop whoever was throwing rocks and bottles[.]" Ex. 6, p. 15 (*Id.*, p.49, lines 1-2).  Immediately after that, Chief Refett "went down . . . and made several arrests" while Brooks remained a block away, observing until Refett was "in a position that he was secure[.]" *Id.* (BROOKS p.49, lines 5-9).  Brooks was aware that Chief Refett was arresting the people on the railroad tracks as it was occurring. Ex. 6, p. 24 (BROOKS p.113, lines 12-21).  These arrests for purported "rock and bottle" throwing included Winawer. Ex. 6, p. 16 (BROOKS p. 50, lines 17-22).

**General Facts in Support of Summary Judgment**

Defendant BSO provided more than 110 officers, two Field Forces, for the FTAA police presence.  Ex. 6, p.  (BROOKS p. 36, lines 1-2).  The BSO trained its officers by showing films of demonstrators at other events, including adapting a Power Point produced by the MPD, and presenting the stereotypes of demonstrators set out in the MPD materials, including the presence of violent demonstrators whose purpose is to disrupt events.  Ex. 11.  BSO incorporated into the training of its officers the Miami color-coded demonstrator categories. Ex. 6, p. 5 (BROOKS p. 20).

After the FTAA, when BSO "started looking at the arrest affidavit[s] individually," the entity identified problems in the arrest forms based on a lack of "individual responsibility" by the deputies completing the arrest affidavits."  Ex. 6, p. 25 (BROOKS p. 128, line 7 - p. 129, line 2).

## II.    THE STANDARD FOR GRANTING SUMMARY JUDGMENT

Plaintiff moves for summary judgment on his claims for violation of his First and Fourth Amendment rights to be free from targeting based on political profiling, and unreasonable seizure, including false arrest and excessive force.  Summary judgment is proper when "'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.' *FED. R. CIV. P. 56 (c).*"  *Kingsland v. City of Miami*, 382 F.3d 1220, 1226-27 (11th Cir. 2004).  Once the moving party sustains its burden, the non-movant must go beyond the pleadings to demonstrate a genuine issue of a material fact exists for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The responding party must submit  evidence adequate to show the essential elements of its case, and for which that party bears the burden of proof at trial.  *Id.* at 322.

Generally, the court "view[s] the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve[s] all reasonable doubts in favor of the non-movant."  *Kingsland*, 382 F.3d at 1226-27 (citations omitted).  *Accord*, *Skop v. Padgett*, 485 F.3d 1130, 1136 (11th Cir. 2007).  However, where there is video evidence of the event in question, the Court must "view[] the facts in the light depicted by the videotape."  *Scott v. Harris*, 127 S.Ct 1769, 1776 (2007).  The ultimate question is whether a jury could return a verdict in favor of the plaintiff based on the proffered evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON HIS CLAIM OF A VIOLATION OF HIS FIRST AMENDMENT RIGHTS

Winawer came to Miami on November 20, 2003 to facilitate the exercise of First Amendment rights by the members of his organization, the Florida Association of Retired Americans

("FLARA").  In that capacity, he participated in the rally sponsored by the AFL-CIO at the Bayfront Amphitheater.  It is black letter law that the government may not disrupt or punish political expression and association unless evidence of "clear and present danger of a riot, disorder, interference with traffic in public streets, or other immediate threat to public safety, peace, or order appears." *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940).

The BSO video (Ex. 4) of the arrest scene demonstrates unequivocally, there was no evidence of "violence or threat of violence on [plaintiff's] part, or on the part of any [other person in Winawer's vicinity.]" *Edwards v. South Carolina*, 372 U.S. 229, 236 (1963) (bracketed edits supplied).  The assertion by defendants that Winawer was ordered to disperse and then became "violent" is "so utterly discredited by the [video] that no reasonable jury could [] believe[]" defendants' version of events.  *Scott*, 127 S. Ct. at 1776.

In reality, Winawer and the others were targeted because of their association with the FTAA protests.  There is no other explanation.  Defendant Brooks asserts that he took his action, directing the Field Force to "stop whoever was throwing rocks and bottles.," because some <u>demonstrators</u> had been throwing "rocks and bottles" at the BSO contingent as it marched up N. Miami Avenue.  Ex. 6, p.15 (BROOKS p.49, lines 1-2). So, the only reasonable inference is that Brooks targeted Winawer and the others because they were suspect as the ones with the FTAA protest paraphanalia. *See* Exhibit 4.  Otherwise, logic would dictate that the people shown on the video in the block closer to the BSO deputies on N. Miami would be suspected of throwing projectiles at the BSO deputies, not Winawer and the group that was walking west toward the BSO officers as the deputies came east on N.E. 6th Street from N. Miami Avenue.  Punishing Winawer for Brooks' perceived association of Winawer with other FTAA protestors alleged to have thrown rocks and bottles at the police at another location is  the worst type of guilt <u>by</u> and <u>for</u> association.  *See NAACP v.  Claiborne*

*Hardware*, 458 U.S. 886 (1982); *Healy v. James*, 408 U.S. 169 (1972).

**IV.   PLAINTIFF WINAWER IS ENTITLED TO SUMMARY JUDGMENT ON HIS CLAIM OF FALSE ARREST AND EXCESSIVE FORCE**

**A. Defendants Lacked Probable Cause to Arrest Winawer**

The cardinal rule of the Fourth Amendment is that no person shall be subject to seizure without individualized suspicion that the person "seized" - not someone else in the vicinity - has done something unlawful.  *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *accord, Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002).  "[A]n arrest is a seizure[.]" *Skop*, 485 F.3d at 1137.  "[A]n arrest made without probable cause violates the Fourth Amendment."  *Davis v. Williams*, 451 F.3d 759, 764 n.8 (11th Cir. 2006), *citing Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir. 1998) (citation omitted).  *See also, Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003) ("'Plainly, an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment.'"), *citing Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998).

"Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *Skop*, 485 F.3d at 1137 (citation omitted).  The existence of probable cause "naturally depends on the elements of the alleged crime, [citation], and the operative fact pattern." *Skop*, 485 F.3d at 1137-38.  In this instance, plaintiff was charged with "disorderly conduct," which is defined as follows:

> Whoever commits such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons why may witness them, or engages in brawling or fighting or engages in such conduct as to constitute a breach of the peace or disorderly conduct, shall be guilty of a misdemeanor in the second degree. . . .

§877.03,  Fla. Stat. (2003).  No facts support Winawer's arrest on this or any other charge.

Winawer's arrest stems from defendant Brooks' allegation that some individuals were throwing "rocks and bottles" at the BSO officers as they advanced north on Miami Avenue.[6] But, even if that is true, Winawer and the others were several blocks away from where the "rocks and bottles" were purportedly thrown.  Nothing supports the belief that Winawer or those near him were among those throwing projectiles at the officers.

"Probable cause to arrest and detain one suspect does not extend to another person in mere propinquity to that suspect." *Ortega v. Christian*, 85 F.3d 1521, 1525-26 (11th Cir. 1996), *citing Swint v. City of Wadley*, 51 F.3d 988, 997 (11th Cir. 1995).  "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause underlined particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (citations omitted) (emphasis supplied).  So, while defendants may have had "an understandable desire to assert a police presence [at the FTAA]; . . . that purpose does not negate Fourth Amendment guarantees." *Brown v. Texas,* 443 U.S. 47, 52 (1979) (bracketed edits supplied).

Both the United States Supreme Court and this Circuit have made it clear that the Fourth Amendment means that arrests may not be based on broad profiling, absent "specific, objective facts" demonstrating reasonable suspicion of actual or imminent criminal activity.  *Brown*, 443 U.S. at 51-52 (no reasonable suspicion based on individual's mere presence in an area known for high criminal activity);  *United States v. Montoya DeHernandez*, 473 U.S. 531, 546-47 (1985)*;Bourgeois v. Peters*, 387 F.3d 1303, 1311-12 (11th Cir. 2004), (broad profiles of problem demonstrators may not make suspect whole categories of people without individualized suspicion); *Brent v. Ashley*, 247 F.3d 1294, 1300-1301 (11th Cir. 2001).  *See also*, *Ybarra*, 444 U.S. at 91 ("person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise

_____

[6] Ex. 6, pp. 14-15 (BROOKS pp. 48-49).

to probable cause to [arrest] that person.").  *See also Barham v. Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006) (no probable cause for mass arrest of large assembly of political protestors).

In this instance, the necessary <u>individualized</u> suspicion is lacking entirely.  None of the defendants witnessed any unlawful conduct by Winawer.  Ex. 5, p. 14 (MANDERA p, 84, lines 16-21); Ex. 6, p. 14  (BROOKS p. 48, lines 10-15; p. 113, lines 12-25).  In fact, MPD Major Burden, whom defendant Mandera claims ordered the arrest of Winawer, denies both that he gave the arrest order and any personal knowledge of unlawful acts supporting Winawer's arrest.  Ex. 9, p. 3 (BURDEN p. 63, lines 13-25).  Strikingly, the arrest affidavit for Winawer does not allege that he threw "rocks and bottles."  Rather, it states as the sole basis for his arrest that he was ordered to disperse and failed to do so and <u>then</u> became "violent" and had to be arrested, Ex. 7, but none of the defendants can say of what that post-dispersal-order "violent" conduct by Winawer consisted.  In short, there was no probable cause to arrest Winawer.

**B.     Plaintiffs Lacked Even "Arguable" Probable Cause to Arrest Winawer**

**1.     No facts support "arguable" probable cause to arrest Winawer**

Even when no "probable cause" exists to justify a warrantless arrest, a defendant may still assert "arguable" probable cause for the arrest.  *Kingsland*, 382 F.3d at 1232.  This determination requires the court to ask whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff[.]" *Id.*, *quoting Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990).  Under the totality of the circumstances here, no reasonable officer could have believed there was a basis to arrest Winawer.  In defendants' earlier appeal of the denial of qualified immunity, the Eleventh Circuit ruled that:

> Taking the allegations as true, the complaint establishes that the Protestors were arrested without arguable probable cause.  Killmon,

13

> Selman, and Winawer were arrested hours after and more than a mile
> away from where the march had ended.  The complaint alleges that
> neither the arresting officers nor Captain Brooks saw the Protestors
> violate the law.

*Killmon v. The City of Miami*, 199 Fed. Appx. 796, 799 (11th Cir. 2006).  Those facts have now been

proven to be true.

Although defendants may assert that the events of the day clouded their judgment in this

instance, this is no excuse as there is no exemption from these core Fourth Amendment principles

for a law enforcement response to large scale demonstrations, even to prevent potential violence.

> It is quite possible that both protestors and passersby would be safer if the City were
> permitted to engage in mass, warrantless, suspicionless searches. . . .  Nevertheless,
> the Fourth Amendment embodies a value judgment by the Framers. . . .  It establishes
> [seizures] based on evidence -- rather than potentially effective, broad prophylactic
> dragnets -- as the constitutional norm."

*Bourgeois*, 387 F.3d at 1311-12 (bracketed edits supplied).

## 2.   "Arguable" probable cause may not rest on the "following orders" defense given the facts of this case

In the totality of the circumstances here, "arguable" probable cause to arrest Winawer may

not be based on the "following orders" defense by defendant Mandera because the right at issue –

to be free from unreasonable seizure – was clearly established and any reasonably objective officer

would or should have known that following an order to arrest in the facts known in this case would

result in a violation of Winawer's constitutional rights.  *O'Rourke v. Hayes*, 378 F.3d 1201, 1210

(11th Cir. 2004), citing *Brent*, 247 F.3d at 1306.  *See also Hartsfield v. Lemacks*, 50 F.3d 950, 955

(11th Cir. 1995) ("Given the per se rule against warrantless searches and the guidance of the

[Supreme Court's] description of reasonable policy efforts, all reasonable police officers should have

known that [the defendant's] acts . . . violated the law.").[7]

When the BSO officers, including Mandera, first observed Winawer and the others walking alongside of the railroad tracks, plaintiff was doing nothing unlawful (Ex. 4 (video)), and nothing that any of the defendants observed Winawer do before or after the initial contact with the BSO officers created even arguable probable cause for Winawer's arrest. Again, defendant Mandera concedes she saw nothing unlawful done by Winawer, but asserts that she relied on an order from Major Burden to arrest Winawer. Ex. 5, p. 14 (MANDERA p. 84, lines16-21). Major Burden concedes that he has no idea why Winawer was arrested. Ex. 9, p. 6 (BURDEN p.72, lines 8-16). Defendant Brooks, who directed the BSO Field Force team to "take care of the people throwing rocks and bottles," resulting in Winawer's arrest,[8] also has no idea why Winawer was arrested.

If none of the law enforcement officers involved in Winawer's arrest knows why he was arrested, there can be no possible basis for establishing even "arguable" probable cause for his arrest. *Cf. Dept. of Highway Safety v. Shonyo*, 659 So.2d 352, 353 (Fla 2nd DCA 195) ("fellow officers rule allows an arresting officer to assume that probable cause to arrest a suspect exists when he relies upon the representations of an officer who has firsthand knowledge of events"). Defendant Mandera

---

[7] The consensus of federal circuit decisions on the defense of "just following orders" is that there is no immunity from liability when the officer knew or should have known that what s/he was doing violated constitutional rights. *See Hare v. City of Corinth, Ms.*, 36 F.3d 412, 416 (5th Cir. 1994) (no qualified immunity for officers following orders "if they know or should have known that their [conduct] violates the plaintiff's constitutional rights"), *citing Villaneuva v. George,* 659 F.2d 851, 855 (8th Cir. 1981) (en banc); *Forsyth v. Kleindienst*, 599 F.2d 1203, 1217 (3d Cir. 1979) *cert. denied*, 453 U.S. 913 (1981) ("if [officers] knew or should have known that their actions were violating the plaintiffs' constitutional rights, then they will not be allowed to hide behind the cloak of institutional loyalty"); *Thaddeux-X v. Blatter,* 175 F.3d 378, 393 (6th Cir. 1999) ("Reliance on a superior's orders does not in itself dissipate all liability."); *Raysor v. Port Auth.*, 768 F.2d 34, 38 (2d Cir. 1985), *cert. denied*, 475 U.S. 1027 (1986) (police officer liable for false arrest under § 1983 even though arrest was made at superior's order).

[8] Ex. 6, p. 15 (BROOKS p.49).

can point to no one with firsthand knowledge upon whom she relied to arrest Winawer as Major Burden denies that he ordered Winawer's arrest and the video demonstrates that Burden did not give a dispersal order and was not present at this location.

The "fellow officer" rule provides no sanctuary for defendant Mandera's unlawful conduct for a separate, independent reason.  "[T]he fellow-officer rules [applies only] when the arresting officer was absent for a significant portion of the events that gave rise to probable cause. [Citations.] The rule typically requires that the fellow officer actually communicate to the arresting officer the basis for probable cause.  See *Voorhees [v. State], 699 So. 2d [602], 609 [Fla. 1997]*."  *Killmon*, 199 Fed. Appx. at 800 (bracketed edits supplied).  No such communication can be established here. The arrest of Winawer without knowledge of what unlawful act he was alleged to have committed is "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was [or should have been] readily apparent to [Defendants] . . ."  *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002).

As the video recording of the arrest demonstrates, unequivocally, each individual defendant could clearly observe that Winawer and the others were simply walking along the railroad tracks, peacefully.  That is what they were doing when Brooks targeted them.  That is what they were doing when Mandera arrived at the scene to arrest Winawer.  There was no "assembly," unlawful or otherwise.  There were no "rocks and bottles" thrown, so there was no "disorderly conduct."  No possible violation of the law on this basis that could have been observed by the arresting officer.

> [W]e recognize that precedent squarely precludes [the officer's] claim.  In *Hartsfield*, 50 F.3d at 956, we held that "all officers, including those following someone else's lead, could be held liable under § 1983 if "they knew or should have known that their conduct might result in a violation of the [plaintiff's] rights."

*O'Rourke*, 378 F.3d at 1210 (footnote omitted).   That is the only reasonable result here.

The "arguable" probable cause defense fails here for a second reason.  The arrest affidavit

signed by Mandera was pre-written and virtually identical for all of the individuals arrested on the railroad tracks.  Ex. 7, Ex. 8.  "The arrest affidavit includes recklessly or deliberately false statements that are material to a finding of arguable probable cause.  If the defendants fabricated or unreasonably disregarded certain pieces of evidence to establish probable cause or arguable probable cause, . . . reasonable officers in the same circumstances and possessing the same knowledge as the defendants could not have believed that probable cause existed to arrest the plaintiff." *Kingsland*, 382 F.3d at 1233.

When reviewed after the fact, BSO recognized that the pre-written arrest forms were a problem because they failed to establish individualized suspicion. Ex. 6, p. 25  (Brooks Dep. p.128, lines 7-25).  Any reasonable officer would or should have known in making the arrest and signing the pre-written affidavit that there was no lawful basis for this action and, certainly, having signed several such false affidavits, averring to facts she had not witnessed, defendant Mandera should have known there was no probable cause, "arguable" or otherwise," to arrest Winawer.

C.   **Because There Was No Basis to Arrest Winawer, There Was No Lawful Basis to Use Force to Effectuate the Arrest**

Independent of his false arrest claim, plaintiff has alleged that he was subjected to excessive force by being tightly handcuffed behind his back for hours and by force used to jerk him to his feet after he was handcuffed while lying prone on the ground.  "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197, citing *Graham v. Connor*, 490 U.S. 386, 394-395 (1989).  "[I]f an arresting officer does not have the right to make an arrest, he does not have the right to use some degree of physical coercion or threat thereof to effect it." *Bashir*, 445 F.3d at 1332. *Accord, Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000) ; *Thornton*, 132 F.3d at1400; *Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995).

In this instance, plaintiff's claim is far more than the ordinary force used in making an arrest. Prolonged tight handcuffing may establish a claim for excessive force. "The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances." *Mena v. Muehler*, 544 U.S. 93, 103 (2005) (Kennedy, J., concurring), *citing Graham v. Connor*, 490 U.S. 386 (1989). "If the [detention] extends to the point when the handcuffs can cause real pain or serious discomfort, provision must be made to alter the conditions of detention at least long enough to attend to the needs of the detainee." *Id.* "[T]wo to three hours . . . certainly approaches, and may well exceed, the time beyond which a detainee's Fourth Amendment interests require revisiting the necessity of handcuffing in order to ensure the restraint, even if permissible as an initial matter, has not become excessive." *Id. Accord*, *Mena*, 544 U.S. at 106 (Stevens, J., concurring) (jury could properly conclude that person tightly handcuffed behind back for two to three hours was subjected to excessive force).

Winawer was tightly handcuffed while lying on the ground, jerked to a standing position by pulling his handcuffed arms, then held tightly handcuffed behind his back for more than 5 hours during the total time he was in the custody of defendants, beginning with his arrest at approximately 5:30 p.m near the railroad tracks, then while being held by BSO in the transportation van before being taken to the temporary detention facility, then while being transferred by BSO to the County jail facilities.

From the first moment he was jerked to his feet while handcuffed, Winawer repeatedly informed BSO personnel that he was in extreme pain and could not feel his hands. Ex. 1, pp. 17-22 (WINAWER at p. 32-36, 40). His pleas for help were unanswered and, instead, he remained handcuffed tightly behind his back for hours while in the custody and transport of BSO. *Id.* at pp. 36, 40. *Davis v. Williams*, 431 F.3d 759, 767 (11th Cir. 2006). As a result of being tightly

handcuffed for so long, Winawer suffered abrasions, blisters and nerve damage to several fingers. He still  experiences nerve damage more than four years later.  Ex. 1, p.  (WINAWER p.38); Exhibits  11 and 12.

## CONCLUSION

For all of the foregoing reasons, plaintiff's motion for partial summary judgment should be granted.  No material facts exist to create a dispute as to whether his First and Fourth Amendment rights were violated in this instance.  Both the evidence and well-established law support his motion.

Dated: January 31, 2008                    Respectfully submitted,

                                                    s/ Andrea Costello
                                         _____

CAROL A. SOBEL (Pro Hac Vice)          ANDREA COSTELLO, FBN 532991
LAW OFFICE OF CAROL A. SOBEL          CENTER FOR CONSTITUTIONAL RIGHTS
429 Santa Monica Blvd., Ste. 550       666 Broadway, 7th floor
Santa Monica, CA 90401                 New York, New York 10015
T. 310 393-3055; F. 310 393-3605       T 212 614-6400; F. 212 614-6499
carolsobel@aol.com                     acostello@ccrjustice.org

Robert W. Ross, Jr.,  FBN  921660      Alice K. Nelson,  FBN 211771
LAW OFFICES OF ROBERT W. ROSS, JR.,    SOUTHERN LEGAL COUNSEL, INC
P.A.                                   1229 N.W. 12th Avenue
3923 Lake Worth Road, Suite 102        Gainesville, Florida 32601
Lake Worth, FL 33461                   T. 352 271-8890; F. 352 271-8347
T. 561 241-2790; F. 561 241-2790       alice.nelson@southernlegal.org
bravelaw@mindspring.com

Mara Verheyden-Hilliard (Pro Hac Vice) Jonathan Moore (Pro Hac Vice)
Carl Messineo (Pro Hac Vice)           MOORE & GOODMAN, LLP
PARTNERSHIP FOR CIVIL JUSTICE,         740 Broadway at Astor Place
INC.                                   New York, New York 10007
1901 Pennsylvania Avenue, NW           T. 212 353-9587; F. 212 674-4614
Washington, D.C. 20006                 Jmoore@bdhny.org
T. 202 530-5630; F. 202 530-5634
mvh@justiceonline.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of January 2008, a true and correct copy of the

foregoing was furnished by electronic notification for counsel registered for CM/ECF or by U.S.

Mail to the following:

Bruce S. Rogow
Bruce S. Rogow, P.A.
Broward Financial Centre
500 E. Broward Blvd., Ste. 1930
Fort Lauderdale, FL 33394
Counsel for BSO Defendants
guntherc@bellsouth.net

Warren Bittner
Christopher A. Green
City of Miami Attorney's Office
Miami Riverside Center
444 S.W. 2nd Avenue, Suite 945
Miami, FL 33133
Counsel for City of Miami Defendants
WRBittner@ci.miami.fl.us
CAGreen@ci.miami.fl.us

Rachel Entman
Beth Jarrett
Office of the United States Attorney
99 N.E. 4th Street, Suite 300
Miami, FL 33132-2111
Counsel for the Federal Defendants
Rachel.Entman@usdoj.gov
Beth.Jarrett@usdoj.gov

Robert W. Ross, Jr.
Ross Law Firm, P.L.
8461 Lake Worth Road, #426
Lake Worth, FL 33467
Counsel for Plaintiffs
bravelaw@mindspring.com

Bernard Pastor
Wifredo Ferrer
Miami-Dade County Attorney's Office
111 N.W. 1st Street, Suite 2810
Miami, FL 33128-1930
Counsel for Miami-Dade County Defendants
pastor@miamidade.gov
WAF@miamidade.gov

Michael Fertig
Jennifer Cohen Glasser
Akerman Senterfitt
One Southeast Third Avenue, 28th Floor
Miami, FL 33131-5600
Counsel for Hialeah Defendants
mfertig@akerman.com
jennifer.glasser@akerman.com

Ronald J. Cohen
Maria Montenegro
Osnat K. Rind
Cohen & Rind, P.A.
Andrew Jackson Building
8100 Oak Lane, Suite 403
Miami, Lakes, FL 33016
Counsel for Defendant Jesse Henriquez, *et al*.
rcohen@roncohenlaw.com
mimimonte@aol.com

Beverly Pohl
Broad and Cassel
100 SE Third Ave., Ste. 2700
Fort Lauderdale, FL 33394
Counsel for BSO Defendants
bpohl@broadandcassel.com

Carol A. Sobel (Pro Hac Vice)
Law Office of Carol A. Sobel
429 Santa Monica Boulevard, Suite 550
Santa Monica, CA 90401
Counsel for Plaintiffs
CarolSobel@aol.com

Mara Verheyden-Hilliard (Pro Hac Vice)
Carl Messineo (Pro Hac Vice)
Partnership for Civil Justice, Inc.
617 Florida Avenue, NW
Washington, DC 20001
Counsel for Plaintiffs
mvh@JusticeOnline.org
cm@JusticeOnline.org

Jonathan Moore (Pro Hac Vice)
BELDOCK, HOFFMAN & LEVINE LLP
99 Park Avenue, Suite 1600
New York, NY 10016
Counsel for Plaintiffs
jmoore@gis.net

           s/ Andrea Costello
Andrea Costello