UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 04-CV-20707  - ALTONAGA/Turnoff

KILLMON, et al.,

  Plaintiffs,

vs.

CITY OF MIAMI, et al.,

  Defendants.

_____/

**PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS IN
SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

  Plaintiff Lawrence WINAWER hereby submit his CONCISE STATEMENT OF

MATERIAL FACTS in support of his motion for partial summary judgment.

**The Arrest by Deputy Mandera**

  1.  In November, 2003, Plaintiff Winawer was employed as Field Director/State

Organizer with the Alliance of Retired Amerncans ("ARA").  Ex. 1, p. 4 (Deposition of Winawer

("WINAWER") p.13, line 21).

  2.  He was assigned to the office of the Florida Alliance for Retired Americans

("FLARA"), an advocacy group for Seniors located in Wellington, Florida. Ex. 1, p. 5 (WINAWER

p.14, line 6).  In this capacity, he was responsible for arranging buses from around the state of

Florida to bring retirees to the FTAA meetings in Miami in November 2003.  Ex. 1, pp. 6a, 6b

(WINAWER p.17, line 21- p.18, line 3).

  3.  On November 20, 2003, Winawer attended a rally sponsored by the AFL-CIO in the

Bayfront Amphitheater.  The rally lasted approximately 90 minutes to two hours.  Ex. 1, p 7 (WINAWER p.23, lines 3-8).  Following the rally, there was a march through downtown Miami, also sponsored by the AFL-CIO, but Winawer did not participate in it.  Ex. 1, p. 8 (WINAWER p.24, lines 13-17).  Instead, after the rally concluded, Winawer remained in the amphitheater.  *Id.*, lines 18-20.

4.     Shortly before 5:00 that afternoon, Winawer left the area of the Bayfront Amphitheater with a large group of seniors whom he was assisting to locate their buses for their return trips home.  Ex. 1, p. 9 (WINAWER p.25, lines 4-9); *id.*, p. 11 (WINAWER p.28, lines 4-5; p.128, lines 12-21).  One of the retirees was co-plaintiff Bentley Killmon.  *Id.*, lines 16-20.

5.     As they walked west on N.E. 5th, away from the area of the amphitheater, a phalanx of police blocked all paths except N.E. 2nd Avenue  Winawer and the others were herded north on N.E. 2nd to the railroad tracks.  Ex. 1, p. 10   (WINAWER p.27, lines 3-27).  They were expressly told by police that the only route by which they could leave the area was by traveling along the railroad tracks.  Ex. 1, p. 12 (WINAWER p.29, lines 11-15).  The railroad tracks run west at that point, between N.E. 6th and N.E. 7th Streets.  Ex. 2.  Winawer walked along this course, which led him farther away from the Bayfront Amphitheater, staying a few feet south of the tracks. Ex. 1, p.  (WINAWER p.204, lines 3-8).

6.     At about the same time as Winawer and Killmon were walking parallel to the railroad tracks, two Field Forces of BSO deputies were marching up North Miami Avenue, away from the amphitheater.  Ex. 6, pp. 9-10  (BROOKS pp. 40-41).  Shortly after 5:00 p.m, as the BSO officers reached N.E. 6th Street, they spotted Winawer and the small group walking along the railroad tracks. Ex. 3 (BSO After-Action Report - Daily Log (BSO 008200)).  Winawer and those in his general vicinity were then approximately one and one-half blocks to the east of the deputies and nearly a

mile <u>away</u> from the amphitheater and downtown Miami.   Ex. 2, Ex. 4 (Video).   There was no group

of protestors "assembled" in the area; rather, as the video demonstrates, there were a few people

standing on the sidewalk or crossing the street in the block closer to the deputies.   Ex. 4  (Video).

7.     At 5:30 p.m., Winawer and 21 others were arrested.   Ex. 3 (BSO After-Action Report

- Daily Log (BSO 008200)).   At the time, Winawer was wearing an orange vest, identifying him as

with the AFL-CIO.   Ex. 1, p. 13 (WINAWER p.138, lines 1-2; Ex. 1, p. 14 (WINAWER p. 139)

Ex.4 (video).

8.     Winawer's contact with BSO followed a sweep of downtown Miami in the late

afternoon of November 20th by a number of law enforcement entities, including BSO, in a concerted

plan to force demonstrators – and those associated with them – north out of downtown and, for

Winawer, herd them to the railroad tracks and then north as the sole course of escape.   Ex. 5, p. 9

(Deposition of Mandera ("MANDERA") p.75, lines 12-25), Ex. 6, pp. 9-10  (BROOKS pp. 40-41).

Lines of police formed human blockades across the roadways to achieve this goal and funnel

protestors in a narrow escape route.   When the BSO deputies spotted Winawer and the others

walking along N.E. 6th Street, one officer stated words to the effect: "There they are.  Arrest teams."

Ex. 4.   At that point, BSO was still on N. Miami, well more than a block away from Killmon,

Winawer and the others, who were on N.E. 6th Street.   With that considerable distance between

them, the BSO arrest teams, including defendant Mandera, were brought forward and marched the

distance to effectuate the arrests of Winawer and the others.   Ex. 4.

10.     Winawer was arrested and charged with a violation of §877.03 Fla. Stat.: "disorderly

conduct."   Ex. 7 (Arrest Affidavit). The narrative portion of the Arrest Affidavit states: "Pursuant

to mutual aid agreement subject was given a dispersal order by Major Burden MPD/After given the

opportunity to disperse, subject became violent and had to be arrested.  FTAA arrest."   *Id.*  The

Arrest Affidavit is signed by defendant N. Mandera. *Id.*

11.     When Winawer and Killmon had progressed west approximately 15 yards along the railroad tracks, a wall of BSO deputies descended on them, yelling for everybody to get down.  Ex. 1, p. 15 (WINAWER p.30, lines 1-3); Ex. 4.  The commands were given with the deputies' weapons drawn and shields out. Ex. 1, p. 16  (WINAWER p.31, lines 1-3).  At no point prior to or after the time Winawer was told he was under arrest and ordered to get on the ground did he hear any dispersal order given.  *Id.* at lines 6-8).  In addition, from the time that BSO is shown marching up N. Miami Avenue and suddenly spotting Winawer and the others until the time the order of arrest is given, no dispersal order is heard on defendants' 11-minute video recording of this incident.  Ex. 4.  So, BSO's own evidence confirms the absence of a dispersal order.

12.     Significantly, Winawer took a path out of downtown with the Seniors that was separate from the bulk of the demonstrators, who were forced north on Miami Avenue.  Instead, Winawer walked north from the amphitheater along the bay and then west on  N.E. 5th Street, where they were blocked by the officers who funneled them onto N.E. 2nd Avenue.  The only dispersal order which defendant Mandera, Winawer's arresting officer, could recall was one purportedly given far away from the railroad tracks where Winawer and the others were arrested. Ex. 5, p. 10 (MANDERA p.76, lines 1-5).

13.     According to Capt. Brooks, as the BSO Field Forces were going north on Miami Avenue, several blocks away from where Winawer and the others were walking, "rocks and bottles" were being thrown at the officers.  Ex. 6, p. 14 (Deposition of Capt. John Brooks ("BROOKS") p. 48).  No rocks, bottles or other projectiles are seen on the videotape or listed as evidence on his Arrest Affidavit.  No mention of anything being thrown is made on the Arrest Affidavit.   Ex. 7.

14.     According to Deputy Mandera, she was ordered by Miami Police Department

("MPD") Major Burden to arrest Winawer when Burden was standing right next to Mandera. Ex. 5, p. 13 (MANDERA p. 83, lines 2-8). Mandera claims that she relied on Burden's directive as she did not observe Winawer engage in any "violent" conduct, as described in the arrest form. *Id.* at p.14 (MANDERA p. 84, lines 16-21). Defendant Mandera admits that she signed a pre-prepared arrest affidavit, averring to facts she had not witnessed. *Id.* at line 25 - p. 85, line 2); *id.*, p. 11 (MANDERA p. 80, lines 8-11). Mandera signed several arrest affidavits at the time when she arrested Winawer. Each narrative was identical as to the basis for the arrest. Ex. 7, Ex 8, p. 4.

15.     Significantly, Major Burden is neither seen nor heard on the video recording of the arrests. Declaration of Robert Ross ("ROSS") ¶¶ 4-5. At his deposition in Winawer's criminal case in early 2004, Major Burden testified that he had no idea why Winawer was arrested and had not given the order to arrest him. Ex. 9, pp. 3, 5-6 (Deposition of Major Burden ("BURDEN") p. 63, lines 18-24; p.71, line 18 - p. 72, line 16).

16.     Complying with BSO orders, Winawer was lying prone on the ground next to Killmon, with the nearest person to them on the railroad tracks located approximately 15 yards away. Ex. 1, p. 15 (WINAWER p. 30, lines 15-20); Ex. 4 (Video). As Winawer complied fully with the orders to get on the ground, he was surrounded by the BSO deputies and then handcuffed. Exhibit 4 (video). Winawer could not see the officer who handcuffed him because his face was in the gravel. Ex. 1, p. 17 (WINAWER p.32, lines 4-18). A few minutes after he was handcuffed with his hands behind his back, Winawer was yanked to his feet by pulling sharply on his arms. Ex. 1, p. 18 (WINAWER p.33, lines 1-10).

17.     After being jerked to a standing position while handcuffed behind his back, Winawer at once felt pain in his arms and hands and immediately told the BSO deputies about it. Ex. 1, p.20 (WINAWER p.35, lines 18-25). The handcuffs were so tight that he began to experience numbness

in his hands as he was taken to a processing area. Ex. 1, p. 21 (*Id*. p.36, 6-13). Although he asked repeatedly for his handcuffs to be loosened, he received no response. *Id*., lines 14-25.

18.    Once jerked to his feet, Winawer was taken to an area at Northeast 1st Avenue and the railroad tracks for processing. Ex. 1, p. 19 (*Id.*, p.34, 21-24). After he was processed at the railroad tracks, Winawer was placed on a bus for transportation by BSO to the temporary detention facility operated for FTAA arrests. Ex. 1, p. 22 (WINAWER p.40, lines 15-16); Ex. 1, p. 25 (WINAWER p.44, lines 8-10); Ex. 3, p.   (transport log). Winawer's arrest report states the time of his arrest as 7:30 p.m, approximately two hours after he was originally placed in handcuffs. Ex. 7. While he was held on the bus by BSO, he again told BSO deputies he could not feel his hands and asked for medical assistance. Ex. 1, pp. 22-23 (WINAWER p.40, line 22 - p.41, line 6). He was held on the bus for about  3 hours with his hands uncomfortably wrenched and tightly handcuffed behind his back. Ex. 1, p. 24 (WINAWER p.43, lines 20-24).

19.    Winawer was prosecuted for "disorderly conduct." His arrest form was pre-written by an unknown person and is virtually identical to every other person arrested on the railroad tracks at that time: "defendant became violent . . ." Ex. 1, p.26 (WINAWER p.98, lines 19-22); Ex. 6, p.17  (BROOKS p. 52, lines 10-12); Ex. 8. Deputy Mandera signed more than one pre-written arrest form: she signed Winawer's for his arrest at N.E. 6th and N.E.1st Avenue at 7:30 p.m., and signed a Jane Doe arrest form for 3rd and Biscayne at the same time. Ex. 7 (Winawer Arrest Affidavit); Ex. 8 ("Jane Doe" Arrest Affidavit). Under the laws of physics, Deputy Mandera could not possible have been in both places, a mile apart, at the same time.

20.    In preparation for the FTAA protests, Deputy Mandera was provided with training specifically to be able to distinguish "law-abiding demonstrators" from law-breaking protestors. Ex. 5, p. 3 (MANDERA p.18, lines 19-25). The training provided to BSO personnel for the FTAA

included the MPD Power Point, with its three-colored coding for demonstrators: green, yellow and red. Ex. 11 (Excerpt from BSO training materials). When Deputy Mandera considered the training she had received, she viewed Winawer and the others on the railroad track as engaging in "passive resistance, obstruction by sitting or lying," [Ex. 5, pp. 5-6 (MANDERA p. 21, line 21 - p.22, line 3)], even though it is indisputable that the order for these individuals to lie down on the ground came from BSO. Ex. 1, p. 19 (WINAWER p. 31) and Ex. 4

**Captain John Brooks:**

21.   Capt. Brooks was the highest ranking BSO command staff member on sight for the FTAA. Ex. 6, p. 8 (BROOKS p. 39, lines 12-15). He was not required to check with any member of the command staff above him while carrying out the operations of the BSO Field Forces in Miami on the afternoon of November 20, 2003, or to move forward with arrests at the railroad tracks. Ex. 6, p. 9 (BROOKS p. 40, line 17 - p. 41, line 5). Brooks was in continuing contact with the BSO FTAA command center. *Id.*, p. 11 (BROOKS p. 42, lines 13-16). Defendant Brooks was at the intersection of N. Miami Avenue and the railroad tracks at the time the BSO Field Force targeted Winawer and the others for arrest at Brooks' direction. Ex. 6, p.7 (BROOKS p. 27, lines 12-14).

22.   According to Capt. Brooks, as the BSO Field Forces were going north on N. Miami Avenue a block south of the railroad tracks, "rocks and bottles" were being thrown at them. Ex. 6, p. 14 (*Id.*, p. 48). When they reached the railroad tracks and saw Winawer and the others to the east, Capt. Brooks "dispatched Chief Reffet with his personnel to go and address the rocks and bottles that were being thrown" in the direction of the officers. *Id.*, p.48, lines 16-23. Specifically, Capt. Brooks directed Chief Refett to "go down and stop whoever was throwing rocks and bottles[.]" Ex. 6, p. 15 (*Id.*, p.49, lines 1-2). Immediately after that, Chief Refett "went down . . . and made several arrests" while Brooks remained a block away, observing until Refett was "in a position that he was secure[.]"

*Id.* (BROOKS p.49, lines 5-9).  Brooks was aware that Chief Refett was arresting the people on the

railroad tracks as it was occurring. Ex. 6, p. 24 (BROOKS p.113, lines 12-21).  These arrests for

purported "rock and bottle" throwing included Winawer. Ex. 6, p. 16 (BROOKS p. 50, lines 17-22).

**General Facts in Support of Summary Judgment**

23.     Defendant BSO provided more than 110 officers, two Field Forces, for the FTAA

police presence. Ex. 6, p.   (BROOKS p. 36, lines 1-2).  The BSO trained its officers by showing

films of demonstrators at other events, including adapting a Power Point produced by the MPD, and

presenting the stereotypes of demonstrators set out in the MPD materials, including the presence of

violent demonstrators whose purpose is to disrupt events.  Ex. 11.  BSO incorporated into the

training of its officers the Miami color-coded demonstrator categories. Ex. 6, p. 5 (BROOKS p. 20).

24.     After the FTAA, when BSO "started looking at the arrest affidavit[s] individually,"

the entity identified problems in the arrest forms based on a lack of "individual responsibility" by

the deputies completing the arrest affidavits."  Ex. 6, p. 25 (BROOKS p. 128, line 7 - p. 129, line

2).

Dated: January 31, 2008                    Respectfully submitted,

                                                       s/ Andrea Costello

CAROL A. SOBEL (Pro Hac Vice)              ANDREA COSTELLO, FBN 532991
LAW OFFICE OF CAROL A. SOBEL              CENTER FOR CONSTITUTIONAL RIGHTS
429 Santa Monica Blvd., Ste. 550           666 Broadway, 7th floor
Santa Monica, CA 90401                     New York, New York 10015
T. 310 393-3055; F. 310 393-3605           T 212 614-6400; F. 212 614-6499
carolsobel@aol.com                         acostello@ccrjustice.org

Robert W. Ross, Jr.,  FBN  921660          Alice K. Nelson,  FBN 211771
LAW OFFICES OF ROBERT W. ROSS, JR.,        SOUTHERN LEGAL COUNSEL, INC
P.A.                                       1229 N.W. 12th Avenue
3923 Lake Worth Road, Suite 102            Gainesville, Florida 32601
Lake Worth, FL 33461                       T. 352 271-8890; F. 352 271-8347
T. 561 241-2790; F. 561 241-2790           alice.nelson@southernlegal.org
bravelaw@mindspring.com

Mara Verheyden-Hilliard (Pro Hac Vice)
Carl Messineo (Pro Hac Vice)
PARTNERSHIP FOR CIVIL JUSTICE, INC.
1901 Pennsylvania Avenue, NW
Washington, D.C. 20006
T. 202 530-5630; F. 202 530-5634
mvh@justiceonline.org

Jonathan Moore (Pro Hac Vice)
MOORE & GOODMAN, LLP
740 Broadway at Astor Place
New York, New York 10007
T. 212 353-9587; F. 212 674-4614
Jmoore@bdhny.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of January 2008, a true and correct copy of the foregoing was furnished by electronic notification for counsel registered for CM/ECF or by U.S. Mail to the following:

Bruce S. Rogow
Bruce S. Rogow, P.A.
Broward Financial Centre
500 E. Broward Blvd., Ste. 1930
Fort Lauderdale, FL 33394
Counsel for BSO Defendants
guntherc@bellsouth.net

Warren Bittner
Christopher A. Green
City of Miami Attorney's Office
Miami Riverside Center
444 S.W. 2nd Avenue, Suite 945
Miami, FL 33133
Counsel for City of Miami Defendants
WRBittner@ci.miami.fl.us
CAGreen@ci.miami.fl.us

Rachel Entman
Beth Jarrett
Office of the United States Attorney
99 N.E. 4th Street, Suite 300
Miami, FL 33132-2111
Counsel for the Federal Defendants
Rachel.Entman@usdoj.gov
Beth.Jarrett@usdoj.gov

Robert W. Ross, Jr.
Ross Law Firm, P.L.
8461 Lake Worth Road, #426
Lake Worth, FL 33467
Counsel for Plaintiffs
bravelaw@mindspring.com

Bernard Pastor
Wifredo Ferrer
Miami-Dade County Attorney's Office
111 N.W. 1st Street, Suite 2810
Miami, FL 33128-1930
Counsel for Miami-Dade County Defendants
pastor@miamidade.gov
WAF@miamidade.gov

Michael Fertig
Jennifer Cohen Glasser
Akerman Senterfitt
One Southeast Third Avenue, 28th Floor
Miami, FL 33131-5600
Counsel for Hialeah Defendants
mfertig@akerman.com
jennifer.glasser@akerman.com

Ronald J. Cohen
Maria Montenegro
Osnat K. Rind
Cohen & Rind, P.A.
Andrew Jackson Building
8100 Oak Lane, Suite 403
Miami, Lakes, FL 33016
Counsel for Defendant Jesse Henriquez, *et al.*
rcohen@roncohenlaw.com
mimimonte@aol.com

Beverly Pohl
Broad and Cassel
100 SE Third Ave., Ste. 2700
Fort Lauderdale, FL 33394
Counsel for BSO Defendants
bpohl@broadandcassel.com

Carol A. Sobel (Pro Hac Vice)

Law Office of Carol A. Sobel
429 Santa Monica Boulevard, Suite 550
Santa Monica, CA 90401
Counsel for Plaintiffs
CarolSobel@aol.com

Mara Verheyden-Hilliard (Pro Hac Vice)
Carl Messineo (Pro Hac Vice)
Partnership for Civil Justice, Inc.
617 Florida Avenue, NW
Washington, DC 20001
Counsel for Plaintiffs
mvh@JusticeOnline.org
cm@JusticeOnline.org

Jonathan Moore (Pro Hac Vice)
BELDOCK, HOFFMAN & LEVINE LLP
99 Park Avenue, Suite 1600
New York, NY 10016
Counsel for Plaintiffs
jmoore@gis.net

　　　　　s/ Andrea Costello　　　　　
Andrea Costello